CLERK OF DISTRICT COURT
NORTHERN DIST. OF TX
FORT WORTH DIVISION
FILED

2018 SEP 24  PM 4: 25

DEPUTY CLERK_____

1  **Jenifer Knighton, Pro Se Litigant**
2  **19543 Cabra Ct.**
   **Katy, Texas 77449**
3  **832-910-2931**
   jeniferknighton08@Yahoo.com
4

5

6        **UNITED STATES DISTRICT COURT**
7        **NORTHERN DISTRICT OF TEXAS**
            **FORT WORTH DIVISION**
8

9

10 **JENIFER LYNE KNIGHTON, PRO SE**   |   **Case No.:**

11          **PLAINTIFF,**                       **418-cV-792-Y**

12 **vs.**                                  **ORIGINAL COMPLAINT AND**
                                            **JURY TRIAL DEMANDED**
13 **THE UNIVERSITY OF TEXAS AT**
14 **ARLINGTON,**
   **DAWNETTA SMITH,**
15 **DEBRA WOODY,**
   **EDDIE FREEMAN,**
16 **JEAN HOOD,**
   **VISTASP KARBHARI,**
17 **AND SHELBY BOSEMAN**

18

19          **DEFENDANTS.**

20

21            **ORIGINAL COMPLAINT AND JURY DEMAND**
22
   TO THE HONORABLE UNITED STATES DISTRICT JUDGE:
23
   Jenifer L. Knighton, Pro Se Litigant, files this Complaint against Defendants, and respectfully
24
   shows the following:
25

26                     **PRELIMINARY STATEMENT**
27
       1.  This is a civil action brought to vindicate the Plaintiffs' rights under the United States
28

ORIGINAL COMPLAINT                                              PAGE | 1

Constitution, the Texas State Constitution, and under the statutory laws of the United States and Texas.

2.   This is a civil action for declaratory, injunctive, monetary, and punitive relief against the Defendants named hereinafter for injuries that Plaintiff Jenifer Knighton sustained as a result of the acts and omissions of the Defendants relating to sexual harassment, retaliation, extortion, negligence, defamation and discrimination involving Defendants Dawnetta Smith, Debra Woody, Eddie Freeman, Jean Hood, Vistasp Karbhari, and Shelby Boseman.

3.   This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983.

4.   Plaintiff asserts two separate theories of liability for damages under Title IX: 1) deliberate indifference and clearly unreasonable acts and omissions that created a hostile sexual environment to UTA female students at field placements by conduct and policies, making a student more vulnerable to sexual harassment itself; and; 2) deliberate indifference and a clearly unreasonable response after sexual harassment was reported that caused Plaintiff and other female students to endure additional harassment.

5.   Defendants intentionally acted in a clearly unreasonable fashion in violation of Title IX by acts of deliberate indifference to sexual harassment; directly supporting and attempting to maintain an environment of sexual harassment; and unlawfully discriminating against victims of sexual harassment.

6.   Defendants lack of promptness in investigating and remedying third party sexual harassment further constitutes deliberate indifference, because these investigative delays by Defendants helped to create the hostile environment for victims of sexual harassment.

7.   The University's numerous procedural failures in Jenifer's case included:

a. failing to investigate her allegations; ignoring Jenifer's repeated requests of assistance and rights to a NON-biased, thorough, and impartial investigation;

b. as a "responsible employee" Defendant Smith and Defendant Woody had a duty to Knighton; Smith and Woody failed to report the sexual harassment of David Jones to Michelle Willbanks, UTA's Title IX coordinator;

c. All Defendants failed to disclose to Knighton the name and contact information for the Title IX coordinator so that she could file a complaint;

d. Defendants failed to disclose to Knighton her rights under "Title IX."

e. Prior to contacting Plaintiff or any of the other UTA students, Smith contacted the male perpetrator and warned him that he had been reported by Plaintiff;

f. UTA Defendants made an attempt to cover up the sexual harassment by asking other female interns to remain at the field placement to remain at the agency.

g. failing to provide Jenifer with resources promised to students reporting sexual harassment/misconduct in University procedures;

h. retaliating against Jenifer by making demonstrably untrue complaints against her after she reported sexual harassment; and telling the accused to file an interruption of internship on Jenifer.

i. unreasonably precluding Jenifer from presenting exculpatory evidence and further ignoring any exculpatory evidence Jenifer was able to introduce.

8. In its zeal to vigorously ignore any and all complaints by Plaintiff, Defendants unreasonably ignored recorded voicemails, text messages, emails, witness' statements and a seventy-eight-minute recorded phone call that Plaintiff had with Defendant Dawnetta Smith;

9. The evidence proved that based on "preponderance of evidence" that David Jones did sexually harass, harass, verbally abuse, intimidate, scare, and attempt to extort money from Plaintiff and other female students.

10. The evidence proved that Defendants Smith and Woody mishandled Plaintiff's original verbal and written complaint.

11. The evidence proved that Smith discriminated against Knighton based on her sex when she failed to respond to her February 2018 complaint of sexual harassment by David Jones, the owner Wellspring; where Knighton was assigned by UTA to complete her practicum.

12. The evidence proved that Smith retaliated against Knighton by denying her request to extend the deadline for her to complete the necessary hours for her practicum because she reported sexual harassment to the School of Social Work in February 2018.

13. The evidence proved that Smith, Woody, and Freeman made a deliberate and malicious attempt to cover up the sexual harassment and discrimination that Plaintiff endured.

14. The evidence proved that Dawnetta Smith fabricated Plaintiff's words.

15. The evidence proved that Defendant Smith attempted to paint a defaming picture of Knighton in an attempt to cover up her own wrongdoing.

16. Jenifer presented these facts as part of an appeal of Defendant Freeman's preliminary Investigation report. The University deemed this deeply troubling evidence irrelevant and denied her request for reconsideration and closed their investigation.

17. Title 42 U.S.C. § 2000d(7) (Civil rights remedies equalization) provides, in relevant part, that:

(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the

ORIGINAL COMPLAINT                                                    PAGE | 4

Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State.

18.     Plaintiff has exhausted all University Administrative Remedies at The University of Texas at Arlington.

19. Knighton is part a protected class.

## STATEMENT OF JURISDICTION AND VENUE

20.     Federal subject matter jurisdiction of this Court is invoked pursuant to 28 U.S.C. §1331 and 1343(a)(3), (4) to obtain redress for the deprivation of rights guaranteed by the Fourth, Eighth, and Fourteenth Amendments to the Constitution of the United States pursuant to 42 U.S.C. § 1983.

21.     The Court has federal question jurisdiction and supplemental jurisdiction, respectively, pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367

(i) Plaintiff states a claim under the laws of the United States, including Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88; and

(ii) the state law claims asserted herein are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

(iii) This action is for a claim exceeding the amount of $25,000.

22.     The Court has personal jurisdiction over Defendants on the grounds that

Defendants are considered to conduct business, and/or committed the wrongful acts complained

of herein, in Tarrant County, Texas.

23.     Venue properly lies in this Court pursuant to 28 U.S.C. §1391 because

Defendants are considered to reside in this judicial district and/or a substantial part of the events

or omissions giving rise to the claims occurred in this district.

## PARTIES

24.     Plaintiff Jenifer Knighton, Pro Se Litigant (hereinafter "Plaintiff" "Knighton"

"Jenifer") is an individual and resident of The State of Texas.

25.     During the relevant period, and at all material times, Plaintiff is/was a graduate

student enrolled in The University of Texas at Arlington, School of Social Work.

26.     To protect the identity of students/victims not included in this complaint as

Plaintiffs and comply with The Family Educational Rights and Privacy Act ("FERPA") (20

U.S.C. § 1232g; 34 CFR Part 99) the Fictitious names of Jane Doe 1, Jane Doe 2, and Jane Doe 3

were given to the students and/or victims:

         a.   that at all relevant times were enrolled in UTA, The University of Texas at

             Arlington, School of Social Work;

         b.   And were students and/or victims that were enrolled and participated in

             UTA's School of Social Work Field Education Program at Wellspring Family

             and Community Institute with Plaintiff.

27.     The University of Texas at Arlington (hereinafter "UTA", "University" "UTA

School of Social Work") is an agency of the State of Texas and a federally funded institution of

higher education.

28. Defendant Dawnetta Smith (hereinafter "Defendant Smith" "Smith") is/was at all

relevant times the Assistant Dean for Field Education for UTA's School of Social Work at The University of Texas at Arlington.

29.     Defendant Dawnetta Smith is sued herein in her individual and official capacity.

30.     Defendant Debra Woody (hereinafter "Defendant Woody" "Woody") is/was at all relevant times the Senior Associate Dean for The School of Social Work at The University of Texas at Arlington.

31.     Defendant Debra Woody is sued herein in her individual and official capacity.

32.     Defendant Eddie Freeman (hereinafter "Defendant Freeman" "Freeman") is/was at all relevant times the Executive Director for Equal Opportunity Services ("EOS") and Deputy Title IX Coordinator at The University of Texas at Arlington.

33.     Defendant Eddie Freeman is sued herein in his individual and official capacity.

34.     Defendant Jean Hood (hereinafter "Defendant Hood" "Hood") is/was at all relevant times the Vice President for Human Resources at The University of Texas at Arlington.

35.     Defendant Jean Hood is sued herein in her individual and official capacity.

36.     Defendant Vistasp Karbhari (hereinafter "Defendant Karbhari" "Karbhari") is/was at all relevant times the President of The University of Texas at Arlington.

37.     Vistasp Karbhari is sued herein in his individual and official capacity.

38.     Defendant Shelby Boseman (hereinafter "Defendant Boseman" "Boseman") is/was at all relevant times the University Attorney at The University of Texas at Arlington.

39.     Defendant Shelby Boseman is sued herein in his individual and official capacity.

40.     Defendants, Fictitious Parties A through L (Hereinafter Defendant A through L) are those persons, entities or parties who participated in causing injury to Plaintiff.

**FACTUAL ALLEGATIONS**

41.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

42.    Jenifer is a white female.

43.    Jenifer was born and raised in a small town in Florida. To her disadvantage, her father passed away when she was a year old; leaving her 18-year-old mother to care for 3 small children with minimal resources.

44.    At a young age Jenifer knew that she wanted to help people. However, Jenifer had a tough childhood, experiencing abuse, drugs and alcohol, and at the age of 15 she dropped out of high school. At the age of 16, Knighton became pregnant and developed what was later known as an "eating disorder."

45. Knighton moved to Texas in 2008 with the hopes of giving her children a better life with more opportunities than what she had as a child. Not long after arriving to Texas did she find herself in an abusive relationship. It seemed as though her whole life, all odds were against her but in 2014 her life took a drastic turn.

46.    In 2014, After a 13-year battle with Bulimia and surviving, Jenifer was able to receive proper treatment in an outpatient setting. Jenifer worked hard to overcome the eating disorder and in 2015 she successfully discharged from the Houston Eating Disorder Center (HEDC).

47.    Jenifer was later interviewed and selected to share her story as one of the success stories; she was even featured on the website of HEDC.

48.    Knighton had hope for life and for recovery. Her Motto was that regardless of what life has done to you or what happens in your life, it does not determine your destiny.

49.    Shortly after Knighton discharged from treatment she enrolled with the Institute for Chemical Dependency Studies (ICDS) to become a substance abuse counselor.

50. Knighton excelled at ICDS and upon completion, she received a recommendation letter from the institute.

51. Jenifer later registered with the State of Texas and became a Licensed Chemical Dependency Counselor Intern "LCDCI."

52. In the beginning of her career, Jenifer worked at a women's substance abuse treatment center in the admissions department. She loved her job; she had joy, happiness and a true passion for helping others. Jenifer knew that she had found her purpose in life.

53. In 2015, Jenifer enrolled into a bachelor's program at Springfield College, Houston campus. Jenifer was a model student to her peers and professors; she also made the Dean's list for five consecutive semesters while a student at Springfield College.

54. Knighton worked full-time, she was a full-time student and mother; and she had to complete a year-long research project during her enrollment at Springfield that required many hours of dedication.

55. In May of 2017, Jenifer graduated from Springfield College with a Bachelor of Science; she graduated in Magna Cum Laude with a GPA of 3.875.

56. In the beginning of 2017, Jenifer landed a job as a Certified Peer Specialist at one of the biggest mental health authorities in Houston, TX. Much of her job consisted of outreach in the community, such as visiting the homeless encampments and assisting the homeless population; assisting individuals that had mental health diagnosis and substance abuse problems; and providing resources for those individuals. She even had the opportunity to assist impacted individuals after Hurricane Harvey hit Houston.

57. Many of the locations that Jenifer was assigned to were undisclosed domestic

violence shelters. On top of assisting individuals that were homeless, she also worked with women that had extensive histories of violence, abuse and trauma.

58.     Jenifer was an inspiration to her clients, coworkers, friends, and in the community. She had a true passion to work with individuals and promote positive change in her community. She had hope for any and every person that she crossed paths with regardless of how bad or good their situation was.

59.     Jenifer had so much passion and love for the work that she was doing that she decided to further her education in hope of someday becoming a master's level social worker.

60.     Jenifer started her journey of looking for an accredited social work program; That is when she came across The University of Texas at Arlington, School of Social Work.

61.     Knighton researched UTA School of Social Work website, she looked at reviews from past students and she made sure that they were accredited.

62.     Knighton inquired about admission to UTA, and because she had such a high GPA in undergrad., Jenifer was able to get acceptance into the UTA School of Social Work without having to complete the Graduate Record Examinations (GRE) or the personal statement.

63.     The program that UTA was offering worked well for Jenifer because they offered courses in an online cohort; and she would be able to complete her degree by the Spring of 2019, allowing her to graduate a year before her daughter went off to college.

64. It also allowed Knighton to continue to work full-time and have time for her family while she was completing her degree.

65.     Knighton applied to the UTA School of Social Work and was accepted into the Fall 2017 online Master of Social work cohort.

66.     Jenifer had a solid academic record and was planning to attend law school

following her graduation from UTA in the Spring of 2019.

67.     Jenifer had/has no prior history or reports of misconduct or disciplinary action of any kind, at UTA or otherwise.

68.     Following her graduation at UTA, Jenifer would have been eligible to take the State of Texas exam to become a Licensed Master Social worker (LMSW).

69.     Following her graduation at UTA, Jenifer would have been eligible to become a Licensed Chemical Dependency Counselor (LCDC).

70.     In order to graduate with her MSW cohort, Knighton was required to follow the UTA School of Social Work academic plan that was created for students that enrolled in the Fall of 2017.

71.   In the Fall of 2017, Hurricane Harvey hit Houston and surrounding areas, severely impacting the residents including Knighton by causing a delay in her school books being delivered. Despite the unforeseen circumstances, Knighton was able to complete the Fall 2017 semester at UTA finishing with a 3.5 GPA. Knighton even received excellent feedback from one of her professors for her hard work, perseverance, and dedication to her education.

72.     When students enroll in the UTA MSW program, they are encouraged to begin looking for their MSW required field placements at least one semester before starting the field education or when beginning the graduate program because it can take months to find a placement.

73.     UTA offers several agencies that are already affiliated with the University or you have the option of finding an agency on your own where you want to complete your practicum at. Regardless of whether or not you choose your own placement or use the list that UTA provides, the University has to approve and affiliate the agency.

74. UTA School of Social Work Students are required to complete the practicum/field education at an agency that is affiliated and approved by the UTA School of Social Work.

75.     In the Spring of 2018, Jenifer was enrolled in a Split foundation placement. It required her to complete around 15 hours of field education work per week.

76.  Knighton was fully eligible to receive and enjoy all of the benefits and privileges of such enrollment, and of that educational opportunity, program or activity.

77.     Jenifer needed to successfully complete the UTA foundation field education course and practicum during the Spring 2018-time frame in order to graduate with her cohort in the Spring of 2019.

78.     On January 16, 2018, Knighton began her field placement at Harbor Hospice with field instructor Brenda Galindo MSW. Brenda was a part-time employee at Harbor Hospice and it was her first time as a field instructor with UTA. Since Knighton was referred by one of Brendas colleagues, she accepted to become an instructor. Knighton completed 2-3 weeks of her field education with Brenda at Harbor Hospice.

79.     Knighton did not have any complaints against her or negative feedback to her as a student. In fact, Brenda was extremely supportive and excited for Knighton to become a social worker.

80.     Wellspring Family and Community Institute LLC. was an agency that was affiliated with and approved by the UTA School of Social Work for UTA students to complete their required field placement.

81.     On the evening of January 26, 2018, Jenifer received a phone call from

David Jones, Owner of Wellspring; Jones offered Knighton a spot at the agency as a practicum student. Jones offered Plaintiff the availability of completing her practicum during the hours of Monday- Friday 4-8 and Saturday 9-2.

82.    Jones invited Jenifer to come in the next day for orientation. He told her that he did not want her to miss the opportunity to work with the agency. Jenifer explained to Jones that she had already found a field placement, but she would be willing to attend the orientation and consider switching placements.

83.    On January 27, 2018, Jenifer attended an orientation at Wellspring Family and Community Institute @ 440 Benmar Drive in Houston, Texas. The first impression of Wellspring at orientation was a good one. Plaintiff walked into a room filled with donuts, coffee, and orange juice.

84.    The individuals present at the agency were David Jones, Carolyn Smith, LPC-S, Kimberly Gallien, LCSW, a Board Member, three social work practicum students from UTA, and one student from Sam Houston State University. Kimberly was the Wellspring assigned Field Instructor with UTA, School of Social Work.

85.    As Plaintiff sat down she was given a professional folder that said Wellspring on it. Inside the folder were copies of all of the documents that the students needed for school and information on the agency.

86.    During orientation, the students were told about all of these wonderful programs and projects that Wellspring had to offer for the community. Wellspring had a few individuals come in as speakers. It was like a dream come true. Plaintiff was so excited for her future as a social worker.

87.    After orientation Knighton met with Kimberly and Carolyn and discussed her

hours that she had accrued at the Harbor Hospice. Plaintiff asked how she would get credit if she decided to change placements. Kimberly told Plaintiff that she was not sure and that she needed to ask her field liaison.

88.    Carolyn told Plaintiff that she hoped that she decided to finish her field placement at Wellspring. Plaintiff told her that she was pretty sure that she was going to.

89.    Plaintiff thought "this must be a sign from GOD, he is moving me to this new placement."

90. On or around January 29, 2018, Plaintiff contacted Brenda and consulted with her about switching placements. Brenda told Plaintiff that she was wholeheartedly supportive of Knighton because she felt that Knighton would get more clinical skills at Wellspring.

91. On January 29, 2018, Plaintiff met with David Jones to discuss a start date of the practicum and to send the over the proper paperwork to the University for students requesting to transfer placements.

92.    Knighton told Jones that she had already contacted the field office and that she wasn't sure she was going to be able to switch. Jones told Knighton to let him handle it and he would contact them because he would have more of an impact because it was institute to institute talking.

93.    On or around January 29, 2018 Plaintiff was approved by the UTA School of Social Work to complete her field education at Wellspring.

94.    Plaintiff began feeling uncomfortable at Wellspring soon after she began her field education. She felt an uncomfortable vibe from Jones due to the way he looked at and acted with Plaintiff and other female students.

95.    David Jones at Wellspring only had female student interns. Plaintiff remembered

that David Jones had previously made a statement to her that a male student was supposed to intern at Wellspring, but Knighton took his spot instead.

96.   In February of 2018, there were occasions that Jenifer and Jane Doe 1 were locked in the office at Wellspring with David Jones in the evening.

97. There was a deadbolt lock on the door that was locked and could only be opened with a key from both sides. A key that none of the female students had or had access to. When Knighton initially questioned Jones about the door being locked, he told her that the cleaning lady had locked it.

98. Plaintiff contacted the property management for that office building and they told her that the cleaning people do not lock the door when people are in the office; and the door should not be locked when people are in the office due to safety reasons.

99. On several occasions Jones told Plaintiff and other female students that if they did not complete the field education that they would not graduate on time and they would fail the whole field course. Jones knew that the field education was a requisite for students in the MSW program to graduate.

100.   In the beginning of February 2018, Jones inappropriately hugged Plaintiff. She felt uncomfortable but she was scared to tell anyone. Plaintiff needed to complete the required hours at Wellspring for field education and she feared that her academic and professional career would be in jeopardy if she reported Jones. Furthermore, Knighton felt like she was the only one that felt uncomfortable.

101.   Sometime in February 2018 Jones told Plaintiff and Jane Doe 1 and 2 that

they were not allowed to contact the University or the UTA School of Social Work for any reason. Jones told Plaintiff and Jane Doe 1 and 2 that they needed to go through him let him take care of things.

102.    In February 2018 there were occasions that Jones put his arm around Jane Doe 1 in the evenings as Plaintiff, Jones, and Jane Doe 1 were walking down the stairs to leave the office; there were other instances that Jones would get very close to Plaintiff and Jane Doe.

103.    Although students were supposed to be learning about social work practice, Often times Jones would stop them from working and have long conversations about himself.

104.    In February 2018, on another occasion when a client came in with his mother, Jones hugged the client's mother, Knighton and Jane Doe 1.

103.    In February 2018, Jane Doe 2 contacted her field liaison Haydee Hall via email about concerns that she had with UTA and Wellspring. Jane Doe 2 received backlash from Jones for contacting Ms. Hall and he reiterated that the students did not need to contact the school for any reason.

104.    On February 10, 2018, Plaintiff, Jane Doe 1,2 and 3 met with Kimberly Gallien, LCSW for group supervision. On this day, all students and the field instructor signed a learning contract. Ms. Gallien informed the students that she was not going to be present at agency, and that she would only meet with the students for supervision and to sign off on the required hours.

105.    On February 12, 2018, Plaintiff was ordered by Jones to contact the parent of a client. During the phone call, the parent stated that she had a runaway child at her house. Plaintiff paraphrased what the parent was saying to make sure that she was understanding the

parent correctly, as Plaintiff was taught to do in school. When the phone call ended, Jones verbally attacked and belittled Knighton in front of Jane Doe 1.

106.    Jones told Plaintiff that she was going to do things his way; and they would be lucky if the client came back for services. Jones told Plaintiff that it was none of her business if the client had a runaway at her house and she should not have asked because that was not the reason why she called the parent.

107.    Jones then went on to criticize Plaintiff's place of employment; followed by telling Plaintiff that she did not know what her purpose in life was. He proceeded to tell Plaintiff that he had previously terminated an intern for following state procedure as a mandated reporter.

108.    Jones told Plaintiff in front of Jane Doe 1 that things were going to be done his way because he was the owner of the agency and nobody could fire him. Furthermore, Jones told Plaintiff that he was the one that appointed the board members for Wellspring. Jones told Plaintiff that if she didn't like it, she had the key to the door and she could unlock it and leave.

109.    On or around February 13, 2018 Plaintiff contacted the UTA Social work office and spoke with an unknown individual. Knighton disclosed to the individual that the field instructor/social worker for Wellspring was not an employee of the agency or an onsite individual.

110.    Plaintiff also told the unknown individual that the students were being trained and supervised by Jones, an unlicensed individual. Knighton asked the unknown individual how they were going to learn if they were not shadowing a social worker. The unknown individual told Knighton that the Field instructor/social worker did not have to be at the agency, they only had to meet with the students for one hour per week for supervision.

111.    The unknown individual asked Knighton for the name of the agency; Knighton

told her it was Wellspring and told the unknown individual that she didn't want problems. Knighton was so fearful of Jones that she was scared to even disclose her name to the University.

112.    On February 13, 2018, Plaintiff received a text message from Jones telling her that there was no internship that night and to come on Thursday. That afternoon, Plaintiff contacted Jane Doe 1 and asked her if her scheduled hours had been canceled as well. Jane Doe 1 was still scheduled to go into Wellspring that evening which meant it would leave Jones alone with her.

113.    On or around February 19, 2018 Jones told Plaintiff and Jane Doe 1, and 2 that he had well-known contacts in Houston and that he was friends with people like the head person of CPS Joel Levine, a famous basketball player; and that he had friends within the political community.

114.    On February 19, 2018, the client from the previous week came in for services with his mother. They were excited because they were going to be able to work with Plaintiff. Jones met with Plaintiff and Jane Doe 1 prior to meeting with the client.

115.    In an inappropriate and uncomfortable manner, Jones set up the room as if the students and clients were in a role play; Jones told Plaintiff and Jane Doe 1 that they were going to be sitting a certain way, where they were going to sit, how Plaintiff was going to sit while he and Jane Doe 1 watched Plaintiff as she was providing services.

116.    Jones stated that he was glad that the client came back since they almost lost them as a client because of Plaintiff asking questions. Plaintiff told Jones that she felt uncomfortable with providing services to the client and politely asked him if she could shadow him so that she could do things the way that he wanted her to do them.

117.   Jones angrily yelled at Plaintiff in front of Jane Doe 1, "Oh no, no, no Ms. Knighton, you are not going to take over the show here. No, Ma'am."

118.   Plaintiff excused herself to go to the restroom where she broke down and cried because of the way that Jones yelled at her and humiliated her in front of Jane Doe 1.

119.   On February 20, 2018, Plaintiff received a text message from Jones telling her not to come in that evening; he told her to check her email because he sent her an assignment via email; and he told that he would give her credit for 4 hours. By Jones canceling on Knighton again, it would leave him alone again with Jane Doe 1.

120.   On or around February 18, 2018 Knighton submitted a weekly journal for her field course to UTA complaining about issues that were going on at Wellspring. Knighton included in the journal a request that the information not be relayed back to the agency.

121.   Jones requested Plaintiff's information on her LCDCI; and the contact information for one of the shelters that she worked at so that the shelter could possibly partner up with Wellspring.

122.   As required by Wellspring, Plaintiff went and completed a background check with Identigo and all of Knighton's background information was sent directly to Jones.

123.   On the evening of February 22, 2018 Jones asked Plaintiff and Jane Doe 1 if they could contact one of the clients the following morning because he was going into a treatment program. Jane Doe 1 was not available so Knighton said that she could do it. Jones gave Knighton the phone number to call.

124.   On the morning of February 23, 2018, as Jones requested, Plaintiff reached out to the client early in the morning to wish him well before he went into the treatment center.

125.   On the afternoon of February 23, 2018, Plaintiff had phone supervision with field

instructor Kimberly Gallien. The duration of the call lasted for one hour. Plaintiff and Ms. Gallien discussed things such as plaintiff's goals and aspirations. Ms. Gallien told the plaintiff that she was doing well and that she was excited for her because she saw the passion that Plaintiff had for people.

126.    On the afternoon of February 26, 2018, Plaintiff went to her practicum as usual. She began working on an assignment that was given to her by Jones. Plaintiff was moving at a fast pace;

127.    Jones made an inappropriate and humiliating comment to Plaintiff in front of Jane Doe 1 stating that maybe Plaintiff needed a coffee fix because of her movement.

128.    Out of fear, Plaintiff did not respond or try to explain to Jones the cause of her fast pace movement.  Shortly after, Jones told Plaintiff to get out of the way and let him do things.

129.    Jones ordered Plaintiff and Jane Doe 1 to go through the brochures of  other agencies and to highlight certain information in them so that he could use it to make brochures for his business. Jones then left the room.

130.    Plaintiff told Jane Doe 1 that she could not handle Jones' inappropriate behavior and comments anymore. Knighton told Doe 1 that she was scared to talk to Jones in fear that he would lash out at her and he didnt let the interns voice their concerns.

131.    While Plaintiff and Jane Doe 1 were working on the assignment given to them, Jones returned to the office and handed Plaintiff and Jane Doe 1 each an individually addressed envelope. Plaintiff thought that it was a stipend for the students. However, enclosed in the envelope was a bill for $100. Plaintiff and Jane Doe 1 were confused about the bill. Plaintiff

asked Jones what the bill was for. He told Plaintiff and Jane Doe 1 that it was a stipend that had to be paid for the field instructor that was providing supervision.

132.    Plaintiff told Jones that the students weren't supposed to be charged the practicum because they were students. Jones told Plaintiff and Jane Doe 1 that he informed everyone during the interview process that they would be responsible for paying for Kimberly to sign off on hours.

133.    Jones further said "well, Ms. Knighton maybe you were at a disadvantage because you didn't have an interview but everyone else did and they all knew."

134.    Jane Doe 1 looked at him and told him that he did not tell her anything about having to pay for supervision. Jones insisted that he told everyone about being charged.

135.    Jones proceeded by telling Plaintiff that if she didn't pay she would not get for her internship, including the hours that she had worked the previous weeks of her internship.

136.    Jane Doe 1 continued to dispute that Jones had ever said anything to her about having to pay for a practicum; that if he would have said anything about money, she would have remembered.

137.    Jones became angry; he looked Jane Doe 1 in the face and said "I told you I know I did when I interviewed you."

138.    Jones was sitting down in a rolling office chair twirling a key on his finger; the key dropped, and as he picked it up he started laughing.

139.    Plaintiff was scared by the reaction of Jones towards Jane Doe 1, so she sat down next to her and attempted to reach for her cell phone. Out of fear, Plaintiff couldn't move; she was scared; she knew the door may have been locked; she felt paralyzed and was not able to get to her phone.

140.    Jones became irate and turned into a monster. He told Plaintiff and Jane Doe 1 that he knew that they both had money and that they were either going to pay him or that they could leave and not come back.

141.    Jones proceeded by telling Plaintiff and Doe 1 that they had no values.

142.    Jane Doe 1 firmly told Jones that he did not tell her anything about having to pay money; she then asked Jones, "how can you tell me I don't have values Dr.Jones? I took a $30,000 pay cut to finish school."

143.    Jones told Knighton and Jane Doe 1 that he was keeping it real with them because he was nothing but real; and that he should be the one getting paid for having to be with us late at night. Jones went on to tell Plaintiff and Jane Doe 1 that nobody wanted them because they were nontraditional students and that he was doing them a favor.

144.    Jones said, "its only $4 a day and you spend more than that on lunch."

145.    Jones said that he was tired of seeing interns come in there and talk about spending money and going out and having fun and then not wanting to give him money for helping them.

146.    Jones proceeded to ask Jane Doe 1, "what are you going to do when your kids grow up, tell them that their mom chose a $4 hamburger over her master's degree?"

147.    Jones reiterated that it was ok if Plaintiff and Jane Doe 1 didn't pay and that they just wouldn't get credit for any of the weeks that they didn't pay for including the previous weeks that they had already worked. For Plaintiff that meant that she was going to lose 95 hours of her time that she sacrificed for her field education.

148.    Plaintiff was scared by the look on Jones' face and his behavior towards them.

They were scheduled to leave at 8PM that evening. However, after keeping Plaintiff almost an hour over their scheduled time to leave, Jones looked at the clock and said, "ok let's wrap it up."

149.   Jones acted as if nothing had just happened.

150.   Jane Doe 1 and Jones walked to the front while Plaintiff gathered her things and straightened up the area. As Plaintiff was walking towards the front of the office, she saw Jones hugging Jane Doe 1.

151.   Jones then walked up to Plaintiff and hugged her and told her, "don't let this stop you from coming back."

152.   After that, Jones, Plaintiff, and Jane Doe 1 walked out of the office together.

153.   When Plaintiff got in her car, she burst into tears; As soon as plaintiff left the parking lot she contacted Jane Doe 1 to make sure that she was ok.

154.   Knighton and Jane Doe 1 both agreed that they had to report the incidents that were occurring at Wellspring.

155.   Knighton asked Jane Doe 1, "how can we be social workers advocating for our clients if we are not able to do it for ourselves?"

156.   On the night of February 26, 2018, Plaintiff contacted Jane Doe 2 and told her what had occurred that evening at Wellspring and that she would not be returning there.

157.   Plaintiff felt scared, violated, and disgusted by the inappropriate behaviors and actions of Jones. She told Jane Doe 2 that the following morning she would be contacting the UTA School of Social work and she was going to report everything that was happening at Wellspring; and the inappropriate behaviors of Jones.

158.   On the night of February 26, 2018, Jane Doe 1 sent the following text messages to Plaintiff:

ORIGINAL COMPLAINT                                                    PAGE | 23

    a.  "This is fraud, and he can take that invoice and shove it lol. He call himself preying in women he thought was desperate. But God will definitely see us through."

    b.  "Yes everything he said was inappropriate. Right it's not about if we can pay it, the point is this is wrong."

    c.  "No I'm not going tomorrow. I don't feel comfortable there anymore."

    d.  "I cried too, I sent an email to the school liaison. I'm so mad, I'm creeped out too."

    e.  "I was so excited about this internship too. Talking about my values, u know nothing about me. I took a pay cut to finish my degree also thought about not working to finish my degree. I was starting to feel something was not right about him, but I was just going to do my hours and be done. But I refuse to allow anyone to take advantage of me."

159.   On the morning of February 27, 2018 Plaintiff cried her whole way to work. She was in shock, she couldn't believe she was going through this. The field experience was supposed to be about learning how to be a social worker. It was supposed to be about learning how to implement social justice and change.

160.   When Knighton arrived at work, she told her supervisor that she had to leave because of the mental state that she was in caused by the incidents that were occurring at Wellspring by Jones.

161.   On February 27, 2018, Knighton received the following text messages from Jane Doe 2:

a. "Keep in mind (not meant to dissuade) that this could also impact the other interns. If I'm questioned I will be honest and back your courage."

b. "I'm not worried or concerned you're doing the right thing."

162.   On February 27, 2018, Knighton contacted UTA School of Social Work Field Liaison Haydee Hall.

163.   During the call with Hall, Plaintiff was hysterical and crying as she explained to Hall that Jones was verbally abusing, humiliating, intimidating the students, trying to manipulate them, extort money from them, and inappropriately hugging selective students.

164.   Knighton informed Hall that there was another student present (Jane Doe 1) with her on the evening of February 26, 2018 and that there were two other UTA students at the internship (Jane Doe 2 and Jane Doe 3) as well. Knighton continuously apologized to Ms. Hall for crying.

165.   Hall reassured Plaintiff that she did the right thing by reporting Jones and Wellspring.

166.   Knighton told Hall that the students were so worried about losing their hours and not being able to complete their hours which is why nobody wanted to speak up.

167.   Hall told Knighton that she was going to contact the UTA School of Social Work field office to figure out what needed to be done.

168.   Prior to Jones finding out that Knighton had reported him, Haydee Hall acted quickly and contacted Kimberly Gallien and asked her how things were going with Knighton. Gallien gave Hall a good review on plaintiff and said that she was doing well.

169.   On February 27, 2018, Haydee Hall sent the following text messages to Knighton:

    a.  9:28AM, I spoke with Kristen in the field office and she is speaking to Dr. Smith now. Will have an answer and more information later today.

    b.  9:29AM, Thank you for sending me this information and saying something. What is happening is not ok.

    c.  10:18 AM, Please don't apologize, you are ok. I am sorry that you are dealing with this.

    d.  4:25 PM, Jennifer I have spoken to the field office twice today, they were going to have a meeting this afternoon and should be sending out an email with further instructions and/or questions. Just wanted to keep you in the loop.

170.    On the afternoon of February 27, 2018, Knighton received a call from Kristen Terry, Academic Advisor in the field office at UTA, School of Social Work.

171.    Knighton told Terry everything that she told Hall about what was happening at Wellspring and what Jones was doing to the female students; Plaintiff gave Terry the name of Jane Doe 1, Doe 2, and Jane Doe 3.

172.    Knighton told Terry that the students were scared to speak up out of fear of losing their hours and not being able to graduate.

173.    Kristen Terry proceeded to tell Knighton that Smith had already contacted Jones and that per Smith, Jones would be filing an "Interruption of Field Placement" form.

174.    Knighton was confused and told Terry that she did not want this form on her file because she didn't do anything wrong.

175.    Jones was not the Field Instructor for Wellspring, so he didn't have the authority to fill out the Interruption Form and he should have never been contacted by Smith because he was only the agency contact and not the Field Instructor.

176.    Terry told Knighton that the Interruption form was normal procedure when the student was no longer going to be at the agency. Terry then told Knighton that Smith would be contacting her the next day for a Level 2 conference to discuss her disruptive behaviors at Wellspring.

177.    At this point Knighton did not even know what a Level 2 conference was because she had never been in trouble with any University.

178.    Knighton was the initial student that spoke up on behalf of all of the students and the only student that false allegations were made against; and the only student that was told she was going to receive disciplinary actions against her, the same day that she reported Jones. Had Smith contacted Plaintiff or the other students before contacting Jones, she would have known the truth and Knighton would not have suffered further severe emotional injury.

179.    In the Spring of 2018, Jane Doe 1 was in her last semester at UTA. After Knighton informed the University about Jones, Doe 1 was told that she had to go back to Wellspring.

180.    After Doe 1 confirmed Knighton's allegations against Jones and she refused to go back to Wellspring; she was forced to withdraw from the field course that she was in. The explanation of the University was that "she had been in the wrong placement from the beginning," a placement that the University approved her to go to.

181.    Following the phone call with Kristen Terry on February 27, 2018, Terry sent an email to Ms. Knighton stating the following:

    a.   It was nice speaking with you on the phone. I am very sorry that you have not had a positive experience at your placement with Defendant Agency A. Dr. Smith will be contacting you to schedule a level 2 conference call.

ORIGINAL COMPLAINT                                                          PAGE | 27

182.   After finding out that Smith contacted Jones and told him that he had been reported by Plaintiff, Plaintiff feared for her safety because Jones knew where Plaintiff lived; he knew that Plaintiff was a single mother; and he knew that she lived alone with her three daughters.

183.   Knighton was so scared to the point that she told another student that if anything happened to her, she did not have any enemies.

184.   On February 27, 2018, Knighton did a google search and discovered that Jones was not who he portrayed himself to be "a superintendent of a successful charter school" that he mysteriously walked out on one day in 2014 to pursue his passion of helping others."

185.   Jones, previously the principal of a failing charter school was arrested in 2010 for failure to report child abuse when one of his teachers beat a student.

186.   Although Jones, who was represented by current Houston Mayor, Sylvestor Turner was acquitted of the charges; Plaintiff feared for her safety because she had already seen a scary side of Jones; he now knew that he had been reported; and he had all of Knighton's background information. Plaintiff also feared that since Jones now knew that he had been reported, he had the power and political contact and could use it to destroy her future and career.

187.   On February 27, 2018, Jones hacked into Knighton's personal Gmail email account; changed the password, recovery address, downloaded the files on her account and then deleted the account.

188.   On February 28, 2018, Plaintiff contacted Kristen Terry and told her that she was concerned. Knighton told Terry that Jones was deceitful and that he lied about who he was. Plaintiff expressed to Terry that she was scared.

189.    Plaintiff further asked Terry if the field office did their due diligence before affiliating agencies. Kristen Terry told Plaintiff that they did not have the time nor the resources.

190.    Terry told Knighton that she had told her the day before that her and Dr. Smith were going to contact her. Terry told Knighton that as soon as Smith came in, they would contact her. Knighton did not hear from Terry or Smith.

191.    On February 28, 2018, Plaintiff received a call from Natalie Eve in the field office giving her the contact information on a new agency to interview with in order to continue her internship. Knighton immediately contacted the agency and scheduled an interview.

192.    On or around February 28, 2018, Plaintiff contacted Haydee Hall and told her that Jones hacked into her email account.

193.    Plaintiff also told Hall that she knew that they did not believe her in the field office because they never called her, and they didn't reach out to the other students. Instead, they went directly to Jones and told him that plaintiff reported him.

194.    Hall told Plaintiff that it didn't matter if they believed her or not because she knew what happened and how it made her feel.

195.    Knighton told Hall that she was concerned because she had to go interview at a new place and she didn't know what to say because everything that happened at Wellspring was so fresh.

196.    On February 28, 2018, Jane Doe 2 received a voicemail from Kristen Terry stating the following:

    a.  This is Kristen Terry calling from UTA in The School of Social Work field office. I was just calling to check in with you and see how things were going.

b. We understand that there's been some situations at Wellspring. I just wanted to check in with you and see what your thoughts were and your perception of everything and to see if we could make this work or if we need to work on helping you find another placement.

c. If you could please give me a call back as soon as you can. Im going to email you as well that way you can respond that way but if you could please give me a call as soon as you can, 817-272-1583. Thank you, have a good day."

197.    On February 28, 2018, Jane Doe 2 told Knighton that she received a "weird" email from Kristen Terry. The email was forwarded to Knighton and it stated the following:

a. I hope you are doing well. I just left you a voicemail because I want to check-in with you about your placement. We understand that Wellspring is charging for weekly supervision. I am wondering if you were informed of this during your interview and if you are okay with this.

b. If so, you can remain in your placement. If you are not comfortable with this, we can help you find another placement. Lastly, I just wanted to confirm that you are still completing a BLOCK placement (completing all of your 480 hours in one semester)."

198.    On February 28, 2018 Doe 1 sent the following text messages to Knighton:

a. You have a wonderful day too. Yes God will protect us!! I'm very disgusted."

b. The school still has not call. The man text me this masking for me to call him when I am free.

c. Omg! Girl why the school saying that foundation students were never approved to be at a behavioral placement and I can't be transferred to another field placement.

d. Girl he have been playing with these people lives and their children lives. He is a demon.

e. I'm definitely filing a complaint on his ass. You are ruining people lives with you bs. Somebody is going to hear us

f. I reached out to the Dean for academic affair. Now the advisor saying that I'm advanced student and I should have not been approved for a foundation placement. But God is so good, I emailed you a couple of months ago regarding another placement, and she told me no because I was a foundation student. So you gave me the wrong information and you all approved this in etern.

g. Yes! Girl he just texted me saying the he spoke withe Dr Smith and they have worked something out regarding my fees. Girl this is crazy I hate this school.

h. They all trying to cover themselves. I will never step foot back there.  God got us out of there for a reason.

i. Yes it's very scary.

j. Yes they believe him. Why would u agree to pay this man.

k. I'm disgusted, and that man would get hurt playing with me. But y'all just told me thats should not have been an approved placement for me but y'all changed qualifications that fast.

199.   On February 28, 2018, Knighton sent the following text messages to Doe 1 after finding out that Jones hacked into her email account:

200.   "Please tell me am I crazy? This is really freaking me out."

201.   On March 1, 2018, Doe 1 sent Knighton a text telling her that she was told by

Amy Davis that the University wasn't allowing students to go back to the field placement, and if Jones contacted her again that she needed to call the police.

202.    On March 1, 2018, Jane Doe 1 told Knighton that she was contacted by Jones again and that he told her that he had talked to the University and her fees were going to be covered by them. Doe 1 told Knighton that she felt like Jones was lying and trying to lure her there.

203.    On March 1, 2018, Jane Doe 2 sent Knighton a screenshot of an email that was sent to her from Hall, telling her to go ahead and go back to Wellspring.

204.    Doe 2 called the Plaintiff when she arrived at Wellspring and told her that Jones never showed up and that she wasn't going back to Wellspring.

205.    On March 2, 2018 Doe 2 sent an email to Kristen Terry expressing her concerns about Wellspring and the unethical, unprofessional, and inappropriate behaviors of Jones. Doe 2 told Knighton that she was upset because Terry asked her if she could "tough it out."

206.    On March 2, 2018 Doe 2 told Knighton that her email to Terry got things moving because Smith had contacted her. As of March 2, 2018 Smith, still had not contacted Knighton.

207.    On March 2, 2018 Knighton sent an email to Kristen Terry stating:

   a.  I greatly apologize as I am very emotional and in deep disbelief of the events that have transpired.  I am writing you in regards to our conversation on Tuesday afternoon.

   b.  You told me that you and Dr. Smith would be contacting me the following day and I have yet to hear from anyone. I called you yesterday and this morning and I have received no response at all. I feel as though my concerns were not addressed.

c.  I can't express the disappointment that I have in the school for the way that things have been handled. The behaviors of David Jones at Wellspring was unethical, abusive, and extremely inappropriate.

d.  This incident that occurred with 2 of your students at an agency (that was approved through the University of Texas @ Arlington) on Tuesday was verbally abusive, traumatic, degrading, and physically uncomfortable. I gave you the name of the other student that was with mew and the other 2 students that have also endured inappropriate behaviors from this individual. Instead of reaching out to the other students first, you all reached out to David Jones, putting other students at risk for the same traumatic events to occur.

e.  Also, I am not ok with the form that will stand on my file for the interruption of internship from Wellspring because I did absolutely nothing wrong. I was a victim of abuse, possible extortion, and it should be documented as so. I do not know what the next steps will be in all of this but I expect to hear from someone soon as this is not ok. Thank you.

208.  On March 2, 2018, Kristen Terry responded to Plaintiff and CC'd Smith with the following:

a.  Please ensure that all future communication via email comes from your mavs email. We will not respond to further emails from a personal email address. Natalie Mangham, our out-of-DFW field advisor has contacted an agency who was willing to interview you. Were you able to meet with them? If so, what were the results?

b.  I am going to let Smith respond to the other parts of your email.

209.   On March 6, 2018, Knighton sent an email and a non-academic grievance to the Office of Community Standards, Dean of Student Affairs, Terry, Hall, Smith, Woody, and Teresa Doughty stating the following:

a.   My name is Jenifer Knighton and I am currently enrolled in the MSW online cohort program. I have some concerns that I feel need to be addressed. On Tuesday February 27th, 2018, I contacted my field liaison Haydee Hall to inform her of several events that transpired at my field placement Wellspring Family and Community Institute (affiliated agency) on Monday February 26th, 2018. I would like to say that Ms. Hall showed compassion, empathy, and dedication to her student(s) and the concerns.

b.   On Monday February 26th, 2018 I reported to my field placement as normal. My typical afternoon consisted of being there from 4-8 p.m. I was working on researching brochures as I was told to do. David Jones (practice administrator) assisted myself and Jane Doe 1 (another UT student) in going through the brochures and highlighting information so that Defendant Agency 1 could make their own brochures for psychoeducational groups.

c.   A few minutes before 8 p.m. David Jones went out of the room and returned with envelopes for Jane Doe 1 and me. As I opened the envelope I thought it was a stipend for our services as students. However, it was an invoice for $100. I was confused and shocked as I have never heard of practicum students paying for hours nor had I previously been informed that there would be a cost. When Jane Doe 1 and I questioned David Jones he became irate, telling us that he knew we

had money because we both worked and that if we did not pay for the past 5 weeks than we would not get credit for any previous hours.

d. David Jones continued to tell us that we had no values, and that we had 2 choices, we could stay and pay for the hours to be signed off on or we could leave and not come back. He proceeded to tell us that he had told everyone in the interview that there was going to be a charge. I never had an interview so I knew that information was incorrect.

e. For over an hour this man belittled us, intimidated us and pretty much told us if we did not pay we were not going to finish school or get credit for what we had already done. The way that he talked to us was mentally abusive, inappropriate, and very scary.

f. Around 9 p.m. David Jones told us we could wrap it up and go home (an hour later than our scheduled time). When we were about to leave he made an attempt to hug both Jane Doe 1 and me and told us not to let this stop us from coming back. We maintained calmness and told him we would see him the following day. After leaving I checked in with Jane Doe 1. We were both scared, in disbelief, and decided that we could not go back to this place anymore.

g. I contacted Ms. Hall on 2/27/2018 crying and scared and I explained the whole situation in detail to her. She told me that it was good that I spoke up and that what this man did was not ok. Later that afternoon I was contacted by Kristen Terri from the field office. I explained the same thing to her about what happened. I gave her the name of the other student that was with me and the other students of UTA. She informed me that Dr. Smith had already contacted David Jones and

that he had concerns about my behaviors. I was in complete shock and confused as to how things were turned around. Ms. Terri also told me that the agency would be submitting an interruption of internship.

h.  I questioned this an felt as though my concerns were disregarded especially since I was not the only student that had complaints. However, the other student's liaison did not contact the school directly or advocate like Ms. Hall did.

i.  On 2/28/2018 I contacted Ms. Terri again to inform her of background information I found out about David Jones and she asked me what it was that I wanted her to do and told me that they do not have the time nor the resources to do the due diligence on the people from the agencies that UT is sending their students to.

j.  She told me that her and Dr. Smith were going to contact me and I have yet to hear from anyone other than Ms. Hall. Natalie from field office contacted me to refer me to another agency but nobody understood or took the time to understand how traumatic things were and that I was still trying to process all that transpired. I followed up with the new agency and scheduled an interview the next day.

k.  I also sent an email on 3/2/18 in regard to my concerns and I received a brief email back from Ms. Terri that she would let Dr. Smith address my concerns. Today is 3/6/2018 and I still have not been contacted.

l.  I feel as though my concerns were not addressed. I can't express the disappointment that I have in the school for the way that things have been handled. The behaviors of David Jones at Wellspring were unethical, abusive, and extremely inappropriate. This incident that occurred with 2 of your students at an

agency (that was approved through the University of Texas @ Arlington) on 02/26/2018 were verbally abusive, traumatic, degrading, and physically uncomfortable.

m. This was one of the many events that occurred at this place. I gave the field office the name of the other student that was with me and the other 2 students that have also endured inappropriate behaviors from this individual.

n. Instead of reaching out to the other students first, the field office reached out to David Jones at Wellspring, and told students they'd have to return to this place. They put other students at risk for the same traumatic events to occur.

o. Also, I am not ok with a form that will stay on my file for the interruption of internship from Wellspring because I did absolutely nothing wrong. I was a victim of abuse, possible extortion, and it should be documented as so. I do not know what the next steps will be in all of this but I hope to hear from someone soon as this is not ok. I can be reached at 832-910-2931.

210.   On March 9, 2018, Debra Woody responded to Knighton's grievance with the following:

a. Thank you for your email. I'm sorry that you had such a difficult beginning to your field experience.

b. I talked with our field staff. I'm sorry that you did not feel supported. Although It may not feel like support to you, several staff members have been working on getting you and other interns out of the field placement at Wellspring and getting you all assigned to a better fit. My understanding is that this has now been accomplished.

    c.  We thank you for the information you provided. This was a new placement for the school and we were not aware, even after several pre-assignment conversations with David Jones, that interns would be charged for supervision or that all the social work practitioners are contract workers.

    d.  Dr. Smith plans to call you next week.  Please let us know if we can help any further.

**B.    Phone call Between Knighton and Dawnetta Smith on March 12, 2018.**

211.    Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

212.    On March 12, 2018, almost two weeks after Jenifer called Hall and complained, Dawnetta Smith finally called Jenifer.

213.    Smith told Jenifer that she was informed by Kristen Terry that she wanted to speak with her. Smith told Knighton that she had been in meetings and was not able to contact her. Smith also told Knighton that since they were not in Houston, they did not have the strong relationships with agencies like they did in their area.

214.    During the phone call Between Plaintiff and Smith; Smith stated the following:

    a.  "My objective is, I need to get you somewhere, so you don't lose your money.

    b.  So while I recognize and I understand it's not all about money but I also recognize and understand that you're paying a lot of money to be in your field placement and I also know you just have until May 11th to get 240 hours done and I had no clue how many hours any of you all had or where you were if that makes sense with even your supervision."

215.    Knighton stated:

a. "That makes sense and I understand that but you know I'm not saying that the money doesn't matter, I'm saying the money doesn't matter like if I had to pay something you know that I would have been willing to pay.

b. "That wasn't the point, the whole problem that was missed was the incident about Defendant A hugging me and the other student.

c. When I called my field liaison the next day I disclosed everything to her and when I talked to Kristen Terry the next day I also disclosed everything to her but nobody else reached out to me.

d. and on February 27th I was told by Kristen Terry that Dr. Smith was going to contact me the next day, that her and Dr. Smith were going to contact me the next day.

e. I know instead of reaching out to the other students that Defendant A was called and that the other students were sent back out there.

f. That was my concern because I felt as though I was being discredited or as if you know like I wasn't believed.

g. The last time that I talked to Kristen Terry was almost 2 weeks ago when she said that you and her were going to call me back so that we could talk about this. That's the last time I spoke to her on the phone.

h. When I sent her an e-mail a little over a week ago she told me that she was going to let you address the email.

i. The only person that reached out to me was my field liaison out of concern and Natalie sent me an email asking me about my field placement.

j. I just felt as though everybody is missing the point.

    k.  It wasn't easy for me to just snap out of it and two days later go and interview at another placement because I have had to explain to them why I was trying to leave the other placement.

    l.  Another thing, being told that I'm going to have the interruption of internship on my file because I filed the complaint and it was turned around that I was doing inappropriate things whatever they were when before they even found out that I complained the field instructor was contacted and nothing but wonderful things were said about me.

    m.  I understand that I'm on a deadline you know I have to make sacrifices, I've had to make sacrifices you know I have a family, I have a full-time job, I understand that but when you when you're traumatized, or you know a traumatic event and then you're pretty much discredited.

216.   Smith stated to Knighton:

    a.  So let me back you up here just a second, first of all I told Jones to complete the form. The reason that I told him to complete the form was because of what he said to me.

    b.  the only reason that I had him complete the form is because that's what you have to do when you say I no longer want a student here so he had to complete the form in order for that to take place.

    c.  I did not call you for a level 2 or level 3 based on his concerns because like you said I already had concerns on the other side.

    d.  Who do I say there was a problem with? Do I say there's a problem with the student because now I've been told different things about the student or do I say

well there's a problem with the agency because I've been told these things about the agency?

e. Well, in my mind there may be a problem with both but I don't know because I am not at the placement and so for me I said, there's no reason for us to do a level 2 or level 3 with you we just need to get you moved.

f. Initially, I wanted to move all students because I had a concern about the agency once I heard your complaint and I understand. However, there is still due process.

g. I can't come in because I as the Assistant Dean did not place you all there, you all chose your placement there, you all found your placement and you interviewed.

h. I know you didn't get to but the other students did and they said yes, they wanted to go there.

i. Legally, I can't come in and say I'm moving all of you because I didn't put you there and if I do say that and if there is a student that says well no I want to stay and finish it out, well now the school is liable because we're saying no, you can't stay there and finish it out.

j. Now more things have transpired in that time and I believe all but one of the students has left. So now we're at a point where we do have to move all of the students because other things have transpired and so we have to move all of you and the agency will no longer be used with our students but again there is still a process to that.

k. We have an entire legal team just here that services UT Arlington, so we have to follow what they say to a certain degree, but then we also have to use our judgment to say OK what needs to take place.

ORIGINAL COMPLAINT

l.   For you my concern was I needed to get you moved. The interruption of field form that he completed I'm not going to do anything with because so much has happened. I can't say well this needs to go in Jenifer's file because he completed it.

m.   No, because we're now trying to deactivate the agency altogether so is that fair to you as a student for me to say well I'm going to put it in her file even though I know that there's a problem with the agency.

n.   I guess what I want you to hear is I want to be fair in all instances but I also have to follow rules that are set and so in me doing that it may seem as if well they're not doing anything or they're not concerned and it's not that at all we just have to follow the process.

o.   First of all, I'm new to this role I've only been in this role since January so I'm still learning and secondly, we have not had an instance where an agency was charging.

p.   I recognize that's not the issue but at that time that was kind of the big thing for me. Do we allow this? How does this work? We hadn't had that in some time and so I had to know what are the rules when it comes to this.

q.   As far as safety goes, I had two different stories going on at this point. I had what you had stated but then I've got what dr. Jones is stating. So, it's like okay I wasn't there I don't know.

r.   Once the other students said okay well this is what happened; not that we didn't credit you but again I'm like we just need to get you moved because you were not comfortable there, something happened, so I know I need to get you moved.

s.   and the other students said okay well this happened now it's like okay what's going on with all of the students. Then I talked to two of the others and I knew that Kristen had already talked to you. Now I've got three students who all are saying the exact same thing. Okay what do we need to do to make sure that this situation is rectified in the student's best interest because at the end of the day the agency is null and void.

t.   The agency has discredited itself. Now we just need to figure out how we can make the motion to get them not on our registrar that students can go to period.

u.   Now I've got four students who are Midway through and I don't want them to lose their money so what's my next course of action?

v.   and remember I've got that along with other stuff happening. Other students that are having issues, midterm evaluations so we've got so much stuff we don't even know how to do your midterm eval. at this point because we can't go back to the agency to ask them for that but it's something that's supposed to be completed.

w.   I'm telling you all of this because I want you to understand that there are so many moving parts to what was happening. We were just trying to work through and navigate through all of this it wasn't that we weren't concerned it was literally that we needed to figure out what the best course of action so that you all, like I said don't lose your hours and don't lose your funds. What do we need to do while still making sure that you are all safe?

x.   Again, we're not in Houston so how do we ensure that we can get you into an agency that's going to still give you a good solid placement and give you the skills

that you need when you walk away from there without us necessarily knowing everything that happens in the agency does that make sense?

217.    Jenifer stated:

    a.   I get all that and I appreciate it. I mean we could go on and on.

    b.   The last time that I talked to Kristen Terry that was the last that I had heard, was that I'm going to have a level 2 meeting and there's going to be an interruption in my internship. I told her, I don't want that because I didn't do anything wrong.

    c.   Like I reached out to my field liaison early in the morning and told her, this happened and then you know whatever she did to do something.

    d.   Then it made sense that yes if he was trying to cover his self, and you know again if the other students would have been contacted before he was contacted then that would have been known.

    e.   You know it is what it is. I hope that as a school with all due respect to you guys, something can be learned from this. Regardless, yes, I chose to change my field placement to Defendant Agency A, but it was an agency that was approved by the school.

    f.   So as a student you know we would think that the school would do a little bit of due diligence and a little bit of background checking on the agencies before they approved an agency for their students to go to. I mean obviously, and from what I was told that's not the case. You know I guess next time for my own safety I know.

    g.   I need to move forward and I hope to move forward. I just want to move forward from all of this and everything that's going to happen. I have a lot of faith and

when I spoke up I had a lot of faith. It's just trying to process everything that's transpired and move forward.

h.  I guess I don't know anything else to say but as much as it was the student's choice, well what part did the school play in it? It was an approved agency by the school. Nobody took any accountability. Nobody you know said, I'm sorry that this happened to the students, nothing at all.

i.  This is the School of Social Work, you're teaching us something that's not being implemented.

218.  Smith Stated:

a.  Okay, so let me be the one to apologize. In my general Assumption of professionalism, I would assume that Kristen, that was probably one of the first things that she did. I don't know if she did or didn't because I wasn't on the phone with you guys.

b.  I will apologize to you and I will also let you know that there is a vetting process to every agency. do we do a background check on those that are at the agencies? No, we can't. there are certain things that we are bound that we can't do we can't do background checks on a student so naturally we can't do one in every agency or with every agency but there still a vetting process with each agency before they are approved.

c.  now again, the agency was approved before I came into the picture so I don't know what that process looked like necessarily for that particular assistant Dean. I couldn't give you the answer to that I can just tell you my process.

d.   If I have any questions a lot of times I'll send it back and or I'll just call or one of us will call and make sure that we understand what's going on there. so I guess I just want you to hear that there is a process. We don't just accept any agency that comes through.

e.   I do apologize that I did not call you back right away but again my assumption was that things we're moving as they should be so do I did I need to talk to you right then? I'm like well she's moving, they're moving her, they've got her an interview.

f.   That was my concern, I needed to get you moved because I understood that there was something that happened. Again, I didn't want you to lose your money.

g.   I do apologize that I didn't call and say okay let me make sure that I at least talk to you to know exactly what happened.

h.   I've gained more and more understanding and so again that's why we're here where we are today. Okay we need to deactivate this agency.

i.   Remember our office is composed of 4 people. We have 1200 of you all, 862 agencies you know. The Manpower is not always there but with new leadership which is myself my hope is that it will get better.

j.   I dont know where in the process, and I'm not blaming anyone, I take full responsibility for not calling you back, I don't blame anyone.

219.   Jenifer Stated the following:

a.   so everything that happened that night I mean there had been previous incidents, but we were all so concerned about getting our hours.

b. He had a key and he was twirling the key on his finger and he just started laughing. He went to tell us that we had no values and that he knew that we both had money because we both worked and that we were going to pay and if we did not pay we were not going to get any credit for what we have already worked.

c. Then he sat and told the other student that what was she going to tell her when they grew up that their mother chose a 4$ hamburger over her master's degree?

220. Smith asked:

a. Are you kidding? I'm sorry, I know you're not.

221. Knighton replied:

a. No, I'm not and he just went on and on and on. If you looked in this person's face, I don't know if you have had experience with child molesters or sex offenders but it was that face and it was so scary that I think the other student and I both we were just paralyzed. Maybe 5 minutes before 9, he said ok let's wrap it up, but it was just on and on and on.

b. This girl is telling him, Defendant A, I just took a $30,000 pay cut so I could go to school. How can you sit there and tell me that I don't have any values? And if you would have told me anything about money, I would have known.

c. When we go to leave, he tried to hug the both of us. So it was like wait a minute, for the past hour you just beat the crap out of us and then now you try to hug us. Then he said dont let this stop you from coming back tomorrow. It was just, it was so, it was really crazy, it was just horrible.

d. The feelings, it was sick, it was like you just got molested or beat up and then you know come here, I love you, I still love you.

e.  It was just feeling powerless and then you know it just, it was really crazy

f.  He was arrested in 2010 for failure to report child abuse when he was principal of the school and you know the the schools that he said that he was supposedly superintendent of, they didn't even exist.

g.  I knew, I knew that when I told Ms. Terry what I was telling her, I knew she didn't believe me. I say that because I had this feeling that it was being minimized.

h.  I mean this is for real and then you know he went into my email. He went into my personal email account and he changed the password and then he changed the recovery email to his. Then he deleted the account after he downloaded my stuff.

i.  I know that because I was able to recover the account.

j.  It was Ms. Hall that told me it doesn't matter if they believe you, you know how you feel and nobody can take that from you.

k.  Okay well this man has been lying about all of these things. He knows where I live, he has my background check, you know all my information He knows everything about me and I have absolutely no idea who this man is because everything that he said has pretty much been a lie

l.  So I mean would you not be scared? Would you not be concerned?

m.  Then again reaching out to the school and now being told that you're going to have a level 2 conference and an interruption in your internship and it was like wait a minute I was, we were the victims.

222.  Dr. Smith stated:

a. I havent heard everything, I just heard bits and pieces. Like I said I had just been told kind of bits and pieces, enough for me to know ok I need to do something.

223. Knighton Stated:

a. I did file a police report so it is documented. I dont know what they documented, I told them everything as well.

b. I was like I'm a single mom with three kids and he knows that. This is getting creepy. What creeped me out more was the whole email thing.

c. It was like wait a minute and you know he has political power. It was scary, it was. I think I legitimately had reason to be concerned.

224. Smith stated the following:

a. Right, yes... I agree, I agree. This is just quite a bit. So, here's the thing, Dr. Jones was just a primary contact for us. He wasn't listed as a field instructor. so we have a little bit more information if you will on our field instructors.. But for him we don't necessarily have any information on him because he's just a primary contact which means all he does is just request the students.

225. Knighton stated:

a. Then we were told that we were not allowed to contact the school, that we needed to leave it up to the agency because it was institute to institute... and its like, wait a minute this is our education.

b. One of the other students had reached out to the field liaison and he just chewed her out. And he told us you do not contact the school you go through us and we will contact the school.

226.   Smith's response to Knighton was:

    a.   Yeah thats not how thats supposed to go at all. Our first communication should be with you, the student, especially with your field liaison. Really, the agency has no reason to contact the liaison unless there is an issue.

227.   Otherwise, all communication should come from the student.

228.   Knighton stated the following to Smith:

    a.   It was a power thing. Another student was having issues already but again going back to everybody is so scared that were going to lose our …

    b.   it was clearly made to us that if you dont do your hours that you arent graduating.. Jajajaja I have the power. It was so.. It was really crazy.

    c.   The other student that was having issues, it was to the point where they were telling her.

    d.   Oh well then we dont know if were going to keep you here. So he kept telling her well dont come in today… It was a power thing.. And this poor lady was so scared that she was not going to be able to complete.. Ya know she wasnt going to be able to put her hours in. They finally let her go back.

    e.   I called her and told her, God like he went crazy on us. I said I will never ever I'm not going back there and she said oh well your hours; my mental health is a lot more important and what he did was not okay.

    f.   Even the other student I think it's probably Jane Doe 3 that had stayed there, that Saturday before I mean he yelled at her in front of me and just really belittled her.

g. It was just all so crazy and you know I was told by the other student well you do know if you speak up what thats going to do for other students? I was like you know what?... Like we cant go back there.. I told professor, im like ill quit school.

h. There was no Staff there; you know it was nothing it was like how can nobody say anything; everybody was so scared.

229.   Smith responded to Knighton with the following:

a. Im just going to say the whole intimidation factor, that really concerns me because again these are things that we talked about with our agencies kind of upfront and so just the whole way.

b. Again, I wasn't here, I don't know everything as far as him being vetted. I don't know all of that process because I wasn't in the role at that time.

c.  What concerns me is just some of the things that he said that are just vastly inappropriate. First of all saying that the students shouldn't contact the school, that's not correct, secondly, making it seem as or manipulating you all to believe that if you don't do your hours there then you won't get your hours done that's not correct.

d. I have several concerns what you said in the things that he said that are just not right at all as according to our agreement that we even have with the agency because we actually have a written agreement that every agency has to sign and our legal department signs; yeah that's a little concerning to me.

230.   Knighton responded to Smith with the following:

231.   That was the concerning part, again it was like well who's going to be held accountable?

a.  No, it was horrible, it was horrible, I promise to God that it was so horrible. I know that when I went last week I did the interview at ████████, I knew I shouldn't even have been at that interview because of the mental state that I was in.

b.  I came to work the next day and I told my supervisor and she was like you need to speak up and I said no I was like I need to go home.

   I was like I have a lot of self-awareness you know, I really looked at things and I was like wait a minute I wasn't alone, and I wasn't the only one feeling that way. It was just all of the things that this man did, you know just put the fear in us and made us feel like again like you just got molested but come here I love you I love you it was so crazy and it was so sick and it was it was just really sick.

c.  I went and interviewed at ████████ and I was like I shouldn't even be here the guy at ████████ asked me you know "tell me about yourself," I couldn't even think straight.

232.  Smith responded to Knighton with the following:

a.  Yes, I completely understand. Again, what I want you to know is that that's never the process that you went through at Wellspring, that shouldn't have been at all.

233.  just the whole you're not supposed to contact or communicate with the school just all of that.

234.  Jenifer stated:

a.  Jones called me and said well you know we do Monday through Friday from 4 to 8 and then Saturday from 9 to 2 and I was like man.

    b.  he said come in for orientation, I don't want you to miss it so I was like you know we'll all come in you know I don't mind giving up 2 hours even if I decide not to intern there.

    c.  but when you go in there it was so professional you had two doctors, you had an LPC supervisor, an LCSW and refreshments; this big old conference room and it was like wow this is really neat and just so organized; he gave us folders and packets, information, everything.

    d.  I was like maybe this was God which I'm sure it was God but in some other way because you know.

235.   Dr. Smith stated:

    a.  He was like ahh wait a minute, wait a minute

236.   Jenifer responded to Smith:

    a.  It wasn't the plan that I thought but hey you know advocating.

    b.  I went a few times and then the first time I went I was like something's off with this guy because he just talked and talked and talked and talked and it was all about himself and he kept saying June something 19 or 2014.

    c.  you have all this about you there's no way that there's no paper trail.

    d.  I was like things are not adding up and I think that he kind of caught on. I think I was intimidating for him which is why he kind of started to  treat me at a not very good manner.

    e.  but there were several things even in my journal like in two of my journals. You know I put and I put please do not say anything to this guy because it was scary

he would just go on and on and on and your hours and I'm doing you guys a favor and it was just so many things it's just it was crazy and then you know.

237.   Smith stated the following:

    a.   No no I'm glad that we are talking because again a lot of a lot of the things that you're well first of all most students they're not going to do some of the background check if you will does that make sense they're not going to go and look and see so I'm glad that you did kind of follow your gut and say let's check this guy out and see what's going on because like you said things just didn't add up.

    b.   As you're talking to me I'm just like where did he come from I'm thinking like where did he come from how did he wind up on this side and I know you can't answer that question for me but that's what's going through my head.

238.   Jenifer stated:

    a.   He had an agreement with the University of Houston and if he did to the students there what he did to us then they would make sense why he no longer has that agreement.

    b.   the other student that was with me that night, he kept calling her even after she didn't show up. And whats freaky about it is that two Tuesdays in a row that me and her were supposed to be there together, he sent me a message and said  don't come in.

    c.   He called her and texted her after she didn't show up and I told her I'm like dont message him back, you need to call the school. Her field liaison told her you need

to contact Ms. Terry or you need to contact somebody from the school and you have to go back there.

239.   Dr. Smith stated:

   a.   Yeah, no she didnt need to go back. I dont know. I think that we didnt talk to her until after. Anyways, I think we got that situated but yeah that was not the right message that she was supposed to get but we did get that.

240.   Jenifer stated:

   a.   It was, I mean it was so freaky. I think the second night and maybe my nerves were just getting to me because again like I dont know who this person is but you know my daughter was downstairs, It was late and my four-year-old was doing something and I was like oh my God somebody's in the house.

   b.   It was really scary,  I can't express that enough.

   c.   I knew another 6 months staying, you know staying 6 months there that just wasn't going to happen you know I knew for my own mental health like I've done a lot of work on myself  and I'm at a good place and I knew after that night I can't go back there.

   d.    God does things for whatever reason that he does things and if it meant me having to go through this to be the one to speak up and really push like this isn't okay then so be it I guess you know that that was my purpose there or something, I don't know.

**C.   Events after Knighton's March 12th phone call with Smith.**

241.   Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

242.   On April 4, 2018 Kristen Terry sent out a group email to Plaintiff, Jane Doe 1,2,

and 3, Smith, and Natalie Eve stating the following:

    a.  I hope this email finds you well. This is an email to check-in with you all and make a couple of things clear.

    b.  -May 11th is the absolute last day to accrue hours for field. We cannot make any exceptions- you MUST accrue 240 hours by this date. If you do not, it will result in an automatic failure of the course (5681). This is the policy for all students.

    c.  -If you do not think this is possible, we would advise you to talk with your academic advisor about dropping the course. The drop date has passed but you may be able to get approval from your academic advisor.

    d.  -Please send us which agency you have secured by THIS FRIDAY. We need the name of the agency along with your proposed schedule to make up your hours. Please include your field liaisons in this email as well.

    e.  Jenifer and Jane Doe 3- We have sent you multiple agencies that said they could work with you and this was weeks ago.

    f.  Jane Doe 2- If you have a verbal agreement with the new agency that they will sign our affiliation agreement, then you may go ahead and start your hours.

    g.  We want to make clear the urgency of this matter. If you have any questions about this, please feel free to contact Dr. Dawnetta Smith.

243.   Jane Doe 2 responded to Kristen Terry's April 4 email stating the following:

    a.  I am appalled to receive a message in a group email indicating that the university's failure to adequately screen an internship site will result in my failing or repeating a class.

b. I personally invested 20-25 hours per week at Wellspring until it was reported the agency's leadership was committing ethical and legal violations that could potentially cost me a license I've yet to earn.

c. Prior to selecting Wellspring, I reached out to every agency on the houston list. Many were more than 50 miles away or did not accept first year students. While the others contact information was incorrect and no one responded.

d. The fact the social work school is informing me of my private academic information in a group email is reprehensible. I, like my student colleagues, are pursuing this career because we have a passion to serve those who need it the most yet we are being marginalized because of questionable practices.

e. The documents have been submitted to ███████████ and their legal department is currently reviewing them. I reached out to numerous agencies that serve Houston, who oddly were pursued by the university.

f. Ultimately, I discovered ███████████ would be beneficial to not only me but any Houston based intern in the future. I have invested time and money and do not believe this harsh stand should have been taken. If this is the position the department is taking to either fail or have "us" please let me know no lister than close of business tomorrow so I know how I will need to proceed.

244. Knighton also responded to Kristen Terry April 4 email stating the following:

a. I find your email to be extremely disturbing, intimidating, and insensitive towards myself and the other students that are included in this email considering the events that have taken place.

b.  My information or what is going on should not be included in another students email.

c.  The apparent lack of compassion that you and others from the field office have shown is more concerning since it is a "school of social work." As I stated in previous emails and phone calls, not only was I a victim of abuse from Jones at Wellspring but so were other students.

d.  There was also unethical and unprofessional acts going on at this agency.

e.  What I am reading from your email is that we will all be penalized for advocating as we were taught to do.

f.  Please do tell me how this is fair or even ethical to myself or any of the other students that experienced the mistreatment, abuse, and attempted extortion of David Jones, an agency that was approved by UTA?

g.  I invested 95 hours of my time, I sacrificed my family time, gas, and my mental health plus the expenses I have for school and you are telling me that we will be punished for doing the right thing?

h.  In response to your other emails and this email about the information on the other agencies: I reached out to the contact from ███████ to schedule the 9 am Friday interview that you said would be available and I didn't hear back from her until that Friday morning after 10am.

i.  She informed me that they are only open Monday thru Friday 8-5. I have a full-time job that is flexible but there would be no possibilities of flexibility there.

j.   The other agency in Galveston is almost 2 hours away from where I live. I contacted ██████ from ██████ 3 times and have yet to hear back from her. I also contacted ██████ from ██████ and she told me that she wasn't sure if she could even accommodate the amount of hours that I had left to complete.

k.   I reached out to ██████ which was not able to accommodate me and to two social workers at ██████ that have not called me back. Despite everything that all of this has done to me emotionally, I have been proactive in trying to find a new placement.

l.   If there is nothing else that will be done other than "failing" or "dropping" for something that none of us were at fault for please make me aware by Friday April 6th so that I can decide on the actions that I need to take towards my educational needs.

245.   Jane Doe 3 Responded to Terry's April 4 email stating the following:

a.   I have called repetitive number of times and no one has answered me. I would love to speak with someone since the deadline is tomorrow.

b.   I really feel this is very unprofessional and last minute. I also believe we all were very urgent with finding another placement but the process before getting settled takes time.

c.   However, I did leave a voicemail with my advisor and could not schedule an appointment via online because the next available date won't be until the end of next week. Could you please give me some other numbers I could call about this matter ??

246.   On April 5, 2018 Smith responded to Knightons April 4th email to Terry stating the following:

a.   Let me start by stating, that in no way is the Field Office trying to be insensitive to what happened with you at Wellspring. As I stated to you over the phone, we want to support students in the best way that we can.

b.   That being said, to my knowledge the information that you provided we are just receiving today. Why have you not reached out to the Field Office to ask for further assistance after over 2 weeks of receiving the information for the other agencies that were sent to you?

c.   Ms. Terry's email was to inform you that May 11th is the absolute last day to complete your field hours. If the hours are not completed, the only option is to receive an "F" for the course as UT Arlington policy does not allow for "Incompletes" in Field courses.

d.   You may also, Withdraw from the course now and roll the 95 hours that you accrued over to your next placement. If you decide to Withdraw you will need to contact your Academic Advisor for assistance in completing this process.

e.   Again, I state to you that the Field Office is here to support you. At this time, how can we assist you to ensure you are successful?

247.   On or around April 5, 2018 Haydee Hall asked Knighton if they could speak because she wanted to see how Knighton felt about everything that was going on. During the call Hall asked Knighton what she felt in her heart that she needed to do.

248.   Knighton told Hall that she was going to continue advocating for herself but she

wasn't strong enough. Knighton also told Hall that she was not going to drop the course because that was not fair to her as she did nothing wrong. Knighton told Hall that she was going to continue looking for a new placement.

249.    On or around April 7, 2018 Knighton asked Hall why she was not allowed to complete as many hours as possible in the Spring 2018 semester and rollover the remainder of hours so that she did not lose the 6 credits. Hall told Knighton that she was not sure, but it was something to bring up and request for Smith to let her do.

250.    On April 6, 2018 following Smith's email, Knighton received an email from Academic Advisor Natalie Eve stating the following:

    a.  I hope this email finds you well and I am sorry for what you have experienced with Wellspring.  You are correct that UTA has a process for agencies to apply and affiliate with our University.

    b.  Included in our agreement with the agency is that they will uphold social work ethics and practice.  Unfortunately, Wellspring did not do so and UTA had to cease our relationship with them immediately.

    c.  When this happens, we strive to work with our students to find a new agency where you may complete your placement.  This is why we reached out to 20 additional agencies and 7 informed us they would work to support your continued placement.

    d.  I am sorry that these agencies will not work for you as you explained in your email below.  You are more than welcome to find an agency that can affiliate with UTA.  We encourage students from the beginning to have availability

during normal business hours as very few agencies can support after hours and weekends.

    e.  At this point I would encourage you to consider the hours you have remaining and divide them by 5. We have 5 weeks remaining in this semester and you must complete those hours each week in order to reach your 240 hours. If you feel you can meet this requirement, continue to reach out to the agencies where you were unable to arrange an interview. Please be proactive in this as your internship is part of your degree plan. You must complete the full 240 hours of your placement by May 11th.

    f.  Otherwise, we have no other option except to speak with Academic Advising about you completing your internship at a later date. Please keep us posted on this and let us know if there are any agencies you would like us to follow up with to assist you in this process. Have a wonderful weekend.

251.   On April 8, 2018 Knighton sent an email to Smith stating the following:

    a.  I hope this email finds you well. I would like to provide you with further information regarding your recent response to my previous email. I reached out to Ms. Terry in March when she began sending the emails of agency contacts. I also responded to Natalie and updated her on one of my interviews.

    b.  Since we are reaching out to agencies, it can take time for them to get back to us. I have been proactive in searching for a new placement.

    c.  I would also like to ask the same question, why hasn't anybody from the field office reached out to the students to check on our well-being? In our phone

conversation you told me that you were going to take care of contacting the organization that I work for but I have yet to hear of an update.

d. For over 5 weeks now I have experienced severe depression and an eating disorder relapse triggered by all of the events that have occurred with the field placement and the response from the school.

e. Although I am aware of school policy on field courses for "all students", as social work students that went through a traumatic experience with a UTA approved agency, I expected that there would have been other options that were in our favor.

f. From what I am seeing there are no other options that are being offered other than receiving an F or withdrawing and losing the time and money that has been invested. I would like to know why completing the class and rolling over the hours is not an option for extenuating circumstances if you are telling me that I am able to withdraw from the class and roll over the hours.

252.    On April 6, 2018 plaintiff enrolled in eating disorder treatment in an outpatient setting as it was the treatment team's recommended level of care for her.

253.    On or around April 6, 2018 Knighton sent an email to Natalie Eve that stated the following:

a. I hope this email finds you well. As I stated in my previous email only one of the agencies informed me that they only work traditional hours while the other agencies stated that a lot of hours were needed and they werent sure they would be able to accommodate the number of hours.

b.   Several agencies did not call back as Jane Doe 3 also mentioned having the same troubles. I decided to enroll in a split internship because of my schedule and the amount of hours that are needed now are almost equivalent to the amount weekly done for block.

c.   I will repeat that this is an injustice to myself and the other students that were pulled from Wellspring.

d.   . In regards to me finding my own placement to become an affiliate, isn't that what my tuition is paying for at the university?

e.   It is not my lack of availability but what you all are expecting is unrealistic and unfair and you are not taking into consideration the well-being of the students.

254.   On April 9, 2018 Knighton sent a group email to Kristen Terry, Haydee Hall, Natalie Eve, and Defendant Smith stating the following:

a.   I hope this email finds you well. I interviewed today with ███████████ at ███████. I still have not heard back from any of the other agencies that were "willing to interview us." Although Ms. ███████ is interested in helping me and another student, the expectations for the amount of weekly hours is unrealistic.

b.   I did not sign up for block field due to the high demand of weekly hours and in order to complete the remainder of time by May 11th, I will have to complete more than 30 hours a week.

c.  The interruption in my field placement was not my fault. ███ explained that they have a process that begins with human resources and there is no negotiation. She stated that it will take at least a week to get me started.

d.  I will ask again why I am not able to complete as many hours as possible and continue my coursework and rollover the remainder of the hours. I have been proactive in searching for a new placement but the expectations that have been put on me and other students are not appropriate.

e.  I would like to speak to someone in regards to this matter. It is of high urgency that this matter is resolved as I will need to contact Ms. ███ no later than tomorrow.

255.  On April 10, 2018 Defendant Smith responded to Plaintiff with the following:

a.  Please provide some possible dates and times that you are able to speak with Dr. Mitschke, the Director of the MSW program, and myself.

b.  I spoke with Professor Hall and I am sorry to hear about everything going on with you. I have also heard your concerns and the Field Office has followed through with each item promised to you. You were not pulled from Wellspring, the agency disrupted your placement.

c.  Typically when this happens, a student goes before the Professional Standards Committee to determine if they can continue in the program or not. Due to the situation, this action was not taken and instead the Field Office worked immediately to locate you another placement.

d.  As the School of Social Work's Field Office, our job is to ensure that each student is supported during their field placement and that students complete a

field placement with the number of hours required and within the timeframe specified.

e. With that being said, you need to make a decision about your education and how you would like to proceed. Could you tell me what your expectation of the Field Office is at this point?

f. It is not an option for you to receive an "Incomplete" in the Field course this Spring in order to complete the hours during a later semester; you have to have all 240 hours completed by May 11th. Again, I ask please provide some good days and times for us to speak with Dr. Mitschke.

256. On April 11, 2018 Knighton responded to Smith stating the following:

a. I am free Monday thru Friday after 3PM or during lunch hours from 12-12:45PM.

b. I would also like to request a copy of the form that was filled out for a disruption in my internship and a copy of my student records. Please tell me the steps I need to take to obtain these documents. Thank you!

257. On or around April 12, 2018, Knighton informed the Defendant Smith, Kristen Terry, Natalie Eve, and Haydee Hall that she was going to be interviewing at an agency.

258. Knighton was offered an evening position as a Social Work practicum student. Knighton was told by the interviewer that the expectations of the UTA School of Social Work were unrealistic. She told Knighton that it would take at least a week to get the paperwork going in human resources. She asked why Knighton was not able to receive an extension on her hours; and told Knighton that most Universities allow that for their students.

259. As of the early morning of April 16, 2018, Plaintiff had not received a response

from her April 11th email to Smith.

260.   On or before April 16, 2018, Knighton sent Hall an email telling her that she was going to withdraw from the course. It was impossible for Knighton to complete the 145 hours that she had left in four weeks and the University refused to assist Knighton or make an exception due to the circumstances.

261.   On April 16, 2018 almost a week after Plaintiff emailed Smith; Defendant Smith responded to Knighton stating the following:

     a.   I received the email that you are planning to withdraw from Field this semester. Would you still like to speak with Dr. Mitschke and I? If so, we are available today at 12:30pm for a call.

     b.   When you speak with your academic advisor, you should ask Ms. Davis how you can obtain a copy of your student record as the Field Office does not have this information.

     c.   I have attached a copy of the disruption form. Please let me know if you have any further questions or concerns.

262.   Knighton looked at the interruption form that Smith told Jones to complete; and at the learning contract that was previously signed by Kimberly in front of Knighton in the beginning of the semester and the signatures were completely different.

263.   Smith sent the April 16th email to Knightons school account giving Knighton an insufficient amount of just 2 hours to plan for time to speak with her and Diane Mitchke. Knighton did not respond to Smith.

264.   On or around April 16, 2018 Plaintiff filed a formal complaint with the

University's Equal Opportunity Services for sexual misconduct, sexual harassment, discrimination, and for negligence on behalf of the UTA School of Social Work. Plaintiff sent the complaint to the Title IX Coordinator Michelle Willbanks and Defendant Freeman.

265.   On April 24, 2018, Knighton emailed Mitschke stating the following:

    a.   I would like to consult with you as to what I should do in regards to withdrawing from field. I have an appointment with Patrice Green but it isnt until Friday of this week. I have reached out to her and have yet to recieve a response.

    b.   I would also like to schedule an individual phone conference with you. Dr. Smith informed me last week that you two would be available but it was 2 hours notice which I dont feel is sufficient since it was sent via email and I dont check my email while I am at work. Thank you.

266.   On the afternoon of April 24, 2018 Mitschke responded to Knighton's April 24th email stating the following:

    a.   I spoke with Dr. Smith about your situation and it sounds like you will be able to withdraw from field when you meet with Ms. Green at your appointment on Friday.  I am willing to approve a late withdrawal given the circumstances.

    b.   I'm sorry it has been a difficult semester for you.  Let me know if there is anything else you need.

267.   On April 27, 2018, again left with no other options, Knighton spoke with Advisor Patrice Green and withdrew from the Field Course. The UTA School of Social Work provided no assistance for Jenifer while withdrawing.

268.   Knighton, on many occasions requested assistance from UTA that she was

denied.

269.    The School of Social Work never informed the advisor of the circumstances either. Knighton was left to figure out and fix things on her own.

270.    Ms. Green informed Knighton that withdrawing from field education was going cause her to drop from her cohort; and postpone her graduation for at least a year unless she completed the remainder of the 480 hours of field education during the 2018 Summer Semester.

271.    Ms. Green also informed Knighton that she would be responsible for paying the tuition again; which amounted to almost $2,500. Knighton was not offered a refund or credit to her financial account at UTA. She would also have two withdraws (W) on her academic transcripts.

272.    Knighton broke down in tears while on the phone with Green. Green said that she was going to talk to Smith about what was going on and call her back but Green never called Knighton back.

273.    After being forced to withdraw from field education, Jenifer's mental health began to decline even more. Jenifer blamed herself and even told Hall that she should have never spoke up. Jenifer felt embarrassed, shamed and did not want to be around anyone. She became distant with her family, friends and kids;

274.    She was avoiding her coworkers at work; missing lunch; hiding in her office, to the point that it was brought to her attention by her coworkers.

275.    Jenifer was having frequent flashbacks, intrusive thoughts, panic attacks, crying spells, isolating herself from others, shock, and disbelief. Jenifer had ever increasing fears, anxiety, sleeplessness, feelings of worthlessness and hopelessness, loss of motivation, and decline of cognitive and overall functioning.

276.    On or around April 23, 2018 Jenifer had to take emergency Non-Paid FMLA and was admitted into a partial hospitalization program (PHP) for approximately 38 days.

277.    Knighton had to stay in (PHP) for 11 hours a day, 7 days a week. Knighton had never received nor been recommended to this level of care.

278.    Jenifer received treatment for bulimia, depression, anxiety, and post-traumatic stress disorder (PTSD).  Jenifer believed that her injuries were permanent and that she could never recover, even with treatment. Jenifer felt like her world was falling apart. Everything that she had worked so hard for was ripped away from her because she courageously spoke up.

279.    In April of 2018 Jenifer completed a psychosocial assessment for psychiatric treatment purposes and indicated that she was having "Suicidal Thoughts" and problems with "PTSD, depression, [and] anxiety stemming from what happened at Wellspring with David Jones and the University."

280.    Knighton reported that there had been major losses, changes, and recent traumatic events in her life inflicted by Jones and the University.
On April 29, 2018 Jenifer courageously sent an email to UTA President Karbhari, stating the following:

    a.  I hope this email finds you well. First and foremost I would like to thank you
        for taking the time to read this email. My name is Jenifer Knighton and I am
        currently enrolled in the MSW online cohort program at UTA. I am searching
        for justice and for an explanation that I have yet to receive. I would like to
        start by sharing my story with you.

    b.  It seemed as though my whole life all odds were against me. After enduring a
        substantial history of physical/sexual abuse, substance use, and battling a 13

year battle of Bulimia, I found my way to treatment in 2014. Medically, I should not have been alive but my HOPE for life would not let me die.

c.   Throughout my journey I have learned so much about myself I rediscovered my dreams that I had once dreamed as a child of some day being a counselor. I realized that I had a true passion for helping others. I also had life's experiences to show that recovery was possible and so was living a healthy life. I learned that despite the triumphs and tribulations that we face in life, it does not determine our destiny.

d.   In 2015, I was interviewed and featured on the website of Eating Recovery Center. I enrolled in school at The Institute of Chemical Dependency Studies in Houston, Texas where I studied to become a Licensed Chemical Dependency Counselor. In 2015, I enrolled in college at Springfield College Houston. The Assistant Dean Dr. Eric Castillo was strong on teaching the students about social justice and advocating for change. I was pushed to further my education and accomplish my goals. During my time at Springfield I worked at a substance abuse treatment center to support my 3 beautiful daughters.

e.   In 2017, I received my bachelor's degree and graduated in Magna Cum Laude with a GPA of 3.7. I knew that I was going to apply to grad school and in July 2017 I applied to The University of Texas at Arlington School of Social Work. They had an online cohort that would be perfect for me and since I had a high GPA it was easy for me to get in. I felt so much pride when I was accepted, like seriously me of all people going to grad school?

f. I began in the fall of 2017, the same week that Harvey hit Houston. I kept looking forward and completed my first semester while preparing to complete my first internship of 240 hours in the spring. I began field this semester and it started off well. I had found a placement at a home health care agency that provided hospice services.

g. At the end of January I received a call from David Jones at Wellspring Family and Community Institute in Houston. Wellspring was an agency that was on UTA's approved affiliate list for field placements so I made the decision to switch placements. I thought it would be a better fit in order for me to get more clinical skills while having the flexibility of working evenings and weekends. I thought, wow this must be God working.

h. Not long after switching placements did I realize that it was a mistake. The social worker that was supposed to supervise the students was contracted only to sign off on the students hours while we were being supervised by David Jones, an unlicensed individual that was providing counseling services to children and families. Mr. Jones is the owner and practice manager of the organization and also contact person for UTA.

i. Mr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. The students were told that since he was the owner nobody could fire him and if we didn't like it we could leave and not come back. We were also told that we needed to leave all concerns that we had with the school up to him.

j.  There was a deadbolt lock that was locked on a few different occasions while interns were in the office with him in the evenings. On February 26, 2018 I was verbally abused by David Jones, told that if I did not pay money I was not going to get credit for the previous 5 weeks I had put in. He told me and another student that he knew we had money because we both had jobs. He twirled a key on his finger, laughed in a scary manner, and kept us an hour over scheduled . Before we left he attempted to inappropriately hug us and said "don't let this stop you from coming back." I felt violated, I felt like I had just been raped or molested.

k.  The next day I followed procedure and reported it to my field liaison who reported it to UTA School of Social Work office. Dawnetta Smith (assistant dean) put my safety and the safety of other students at risk by contacting Mr. Jones and disclosing to him that I reported him.

l.  She failed to contact any of the students including myself until after she contacted him. That afternoon I was contacted by Kristen Terry from the field office telling me that I was going to be contacted by Ms. Smith the following day to discuss my behaviors. Things were then turned around and the blame was put on me, that I was being disruptive at the agency.

m.  Ms. Smith told Mr. Jones to file the form for an interruption of my internship. The incident was never reported to the EOS or title 9 coordinator and they failed to follow policy and procedure. I filed a grievance in March but again expressing my concern resulted in an ineffective outcome.

n.  I cried every day for five weeks which led me into a deep depression and bulimia relapse. I was forced to withdraw from my field without any accommodations/exceptions due to the extenuating circumstances and traumatic experience that I endured at an affiliated agency of UTA.

o.  I was given no credit towards tuition on the 6 credit course that I was forced to withdraw from. Due to the emotional distress that this has caused me I had to be admitted into a partial hospitalization program which will now hinder me from continuing the field placement in the summer.

p.  When I spoke with my advisor Patricia Green who was unaware of anything that transpired, I was informed that my graduation will be prolonged an extra year.

q.  Also, despite being told by Ms. Smith that this was not going to go against me because other students confirmed that what I was saying was true, when I requested some sort of modification due to the extenuating circumstances, it was denied and I was told that I was not pulled from Wellspring, the agency disrupted my internship.

r.  I requested a copy of the form and after reviewing it I saw that it was signed the same day that I reported the agency. The response or lack of that I have received from the school goes against every value that we have been taught by the school.

s.  The way that I have been treated by the faculty from the school of social work is unjust and a violation of the NASW Code Of Ethics. As mandated reporters they also failed to report the sexual misconduct that occurred at the field

placement. Instead they retaliated against me and had David Jones file an interruption of internship.

t.   I ask that this matter be addressed as I have followed procedure of filing complaints and grievances and have yet to receive a fair solution. Thank you again, I look forward to your prompt response.

u.   Regards, Jenifer Knighton 832-910-2931

281.   On Sunday April 29, 2018 Vistasp Karbhari responded to Jenifer's April 29th email stating the following:

a.   Thank you for reaching out to let me know about the difficulties you have been facing.  My apologies that you have not received adequate responses.  At UTA it is our desire that each and every student be able to succeed and that we provide a welcoming, safe and nurturing environment to make that possible.

b.   Since I am not aware of the details you mentioned and of steps that may have been taken to investigate the complaints I am cc'ing the Dean of the College, Dr. Scott Ryan, the VP for HR, Ms. Jean Hood, and the VP for Student Affairs, Ms. Lisa Nagy, and am requesting that they expeditiously review this and get back to you and me.

282.   On April 29, 2018 Lisa Nagy, Vice President for Student Affairs sent Jenifer an email stating the following:

a.   I apologize that you have had such a traumatic experience In your field placement and subsequently faced challenges is getting assistance from UTA. I'm sure it is difficult to retell your story over and over.

b.  I will be following up with Student Conduct and Dean of Students tomorrow to review our response and how we can assist you moving forward.

283.  Following Karbhari's email on April 29, 2018 to Jenifer, Jean Hood responded to him on April 29, 2018 and CC'd Jenifer stating the following:

a.  Dear Vistasp,

b.  We will take the necessary next steps so the student will know the resources available to support her and the steps involved in the investigative review.

284.  Knighton responded to Hood's email and addressed both Karbhari and Hood stating the following:

a.  Dear Ms. Hood and Mr. Karbhari,

b.  Thank you for your prompt responses! On February 27, I reported to my field liaison who reported the last incident to the social work field office. I filed a grievance on March 2nd with The Office Of Community Standards and Dean of Student Affairs and received no support.

c.  I filed a formal complaint with the EOS on April 16 and have yet to get a response. I will be more than happy to forward all of the documentation and a timeline if that would help. Thank you.

285.  On April 29, 2018 Karbhari responded to Knighton's April 29th email asking her for a copy of the documents and a timeline.

286.  On April 29, 2018 Jenifer responded to Karbhari's email stating the following:

a.  Mr. Karbhari,

b.  Attached is a timeline of events. the emails, voice mails, text messages, and recorded phone call can be accessed through the link below.

  c. For questions regarding any of the information I can be reached at 832-910-2931. Thank you.

  d. https://mavsutamy.sharepoint.com/:f:/g/personal/jenifer_knighton_mavs_uta_edu/Ehff3ib8nyBHpwhbhuNOMZYBYHmXaU3ZoE1Rm_lZEXQU_g?e=db ww4q

287. On April 30, 2018 Jean Hood responded to Knighton's April 29th email to Karbhari stating the following:

  a. Dear Ms. Knighton,

  b. Thank you for sending all of the documents and the timeline.  We will review them and get back to you.  I have had an initial conversation with Dean Ryan and Lisa Nagy.

  c. I have asked Eddie Freeman to contact you about the process for reviewing the complaint you sent to him and Michelle Willbanks.  I apologize that you had not  heard from either of them.

  d. I do want you to know that Ms. Vicki Goins is a counselor in our Counseling Center if you want to utilize their services you can reach her at Vgoins@uta.edu or by phone at 817 272 3417.

  e. Please feel free to call or email me with any questions.  I will contact you again on Wednesday with an update.

  f. With best regards, Jean

288. About two months after Knighton's original complaint, she was offered the information of UTA Counseling Center.

289. Jenifer responded to Hood's April 30th email and told her that she had been

admitted into PHP.

290.    On April 30, 2018 Freeman sent Knighton an email stating the following:

    a.  I have attached our procedure for investigating EOS complaints See Exhibit .
We are already in the process of reviewing your information and interviewing
witnesses. You should hear the disposition of your complaint within the next
week if not sooner. Below is a link to our policy for your review as well.

    b.  https://www.uta.edu/policy/hop/5-503

    c.  I apologize for the delay in getting back to you.

    d.  Eddie B.Freeman, MBA,Sr.CAAP

291.    Freeman sent Knighton a copy of UTA Policy 5-503; Knighton was never
informed or educated by Freeman or any other UTA officials about Title IX or the rights that she
had as a reporter and a victim.

292.    On May 2, 2018 Hood sent an email to Knighton stating the following:

    a.  Good afternoon, I know Mr. Freeman has concluded the majority of the
interviews.  As he indicated in his email, he will get back to upon the
completion of the review next week.

    b.  In speaking with Dean Ryan in Social Work, the School will rollover the
hours from the internship.

    c.  I would like to call you.  I do have your number and thank you for providing it
for us.   Is there a best time during the day or evening for me to call you?

293.    On May 3, 2018 Freeman emailed Knighton asking if she had time to speak with
him.

294.    On or around May 3, 2018 Knighton called Freeman. Freeman asked Knighton

who else it was that she wanted an apology from if she had already received an apology.

295.    Freeman went on to ask Knighton if she had anything else to add to her complaint.

296.    Knighton told Freeman that she was upset because her complaint was never sent to the Title IX coordinator.

297.    Freeman asked Knighton why it was Title IX.

298.    Knighton told Freeman that there was inappropriate hugging, verbal abuse, intimidation and other things that David Jones did to her and other female students.

299.    Freeman asked Knighton if Jones physically held her down or restrained her from leaving. Knighton told Freeman that the doors had previously been locked at Wellspring and that it was so scary, and she was scared to move.

300.    Freeman asked Knighton again if Jones had physically restrained her.

301.    Knighton reiterated that he didn't have to because the way that he was behaving and talking paralyzed her and the other students.
On May 9, 2018 Knighton sent an email to Freeman following up on the investigation. Freeman told Knighton that he was finishing up the report that week and would get back to her when it was finished.

302.    On May 10, 2018 Knighton had a conference call with Jean hood. Knighton expressed her disappointment in the University and the way that they mistreated her and mishandled her complaint. Knighton told Hood that it caused her severe emotional distress, depression, PTSD, Bulimia relapse, and that she almost committed suicide behind the misconduct of Jones and UTA; and what was done to her went against the NASW Code of Ethics and the schools mission and policies. Knighton also told Hood again that she was in a

Partial Hospitalization Program caused by what happened at Wellspring with David Jones and the University.

303.    Knighton told Hood that all she asked for was extra time to complete her field hours because of what happened, yet she was denied any requests and told that there were no exceptions.

304.    Knighton told Hood that this was the School of Social Work, they are teaching their students about social justice and how to advocate but they are not doing the same; and what UTA School of Social work did to her was unethical and wrong.

305.    Hood told Knighton that she understood because her daughter was a social worker.

306.    Hood proceeded to tell Knighton that she could get a refund for the 6 credits if she filled out medical leave paperwork for Spring of 2018. Knighton told her that she absolutely would not because that was not the reason why she was not able to complete her hours; she wasn't able to complete because the UTA School of Social Work failed to assist her in any way.

307.    Knighton told Hood that all of this needed to get off of her record including the withdraws because she did nothing wrong and she was being punished for being courageous and speaking up.

308.    Hood told Knighton that she would call her the following week. Hood never called Knighton back.

309.    On or around May 23, 2018 Knighton received an email that she received a refund for her tuition.

310.    Even after suffering irreparable psychological harm, Jenifer decided to return to UTA for online Summer classes in an attempt to regain normalcy.

311.    Knighton submitted a request to take two classes since she was still in PHP. Diane Mitschke told Knighton that she was going to approve it but that she recommended that Knighton took a break and continued in the Fall 2018.

312.    On May 23, 2018 Freeman sent Knighton an email stating the following:

    a.   Hi Ms. Knighton,

    b.   I have completed the investigation of the complaint filed by you against Dr. David Jones, Owner and agency contact for Wellspring Community Institute; Dr. Dawnetta Smith, Assistant Dean School of Social work; and Ms. Kristen Terry, Academic Advisor III in the School of Social Work on allegations of discrimination based on race and disability, retaliation and sexual harassment and sexual misconduct.

    c.   I have attached a copy of the report and determination letter for your review should you have any questions or additional information regarding your complaint *See Exhibit* A .

    d.   A copy of the report has also been sent to the Provost Dr. Teik Lim, Dr. Scott Ryan, Dean School of Social Work and Ms. Jean Hood, Vice President of HR. You have 10 days to provide any additional information which could change the outcome of this investigation. Otherwise the investigation will be considered closed.

313.    Knighton reviewed the investigation report and noticed that Freeman copied and pasted the information that Knighton originally sent in an email to Karbhari.

314.    The determination letter and investigation stated that Jones was not subject to the policies of UTA because he was not an employee *See Exhibit* A ;

ORIGINAL COMPLAINT

315.    It also stated that Smith did not violate any of UTA's policy relating to "Non-discrimination.

316.    On May 29, 2018 Jenifer sent an appeal of the investigation to Freeman, Provost Teik Lim, Diane Mitschke, Dean for the School of Social Work, Scott Ryan, and President Karbhari, that included her civil rights being violated, being sexually harassed, and Smith lying and fabricating her words *See Exhibit* β .

317.    Knighton requested that the University pay her for loss of wages and damages that the University caused her.

318.    Knighton continued having panic attacks, anxiety and depression. She felt worthless and felt like she no longer wanted to pursue her career in social work. Knighton felt like she was a failure, and nothing mattered anymore. Every time that her school email went off she had a mental break down.

319.    While working through therapy, Knighton realized that it was not school that she wanted to quit, it was that school (UTA). For Knighton, getting a degree from UTA and having it hang on her wall would be nothing more than a daily reminder of the injustice that was done to her by David Jones and UTA faculty and officials. It would be a reminder of unethical and inappropriate practices. It would be against every value that Knighton had.

320.    Soon after Knighton began Summer courses at UTA, she withdrew from them.

321.    On June 21, 2018 Knighton sent an email to President Karbhari and Provost Lim stating the following:

    a.    I would like to get an update on the appeal that I submitted to you on May 29, 2018. I would also like to know what measures will be put in place to assure the safety of the online cohort students and making sure that UTA faculty are

following policy and procedure in regards to student complaints. I look forward to hearing from you. Thank you.

322.   On June 22, 2018 Freeman sent an email to Knighton stating the following:

a.   The Office of Equal Opportunity Services (EOS) has completed its investigation of the complaint filed by you against Dr. David Jones, Owner and agency contact for Wellspring Community Institute; Dr. Dawnetta Smith, Assistant Dean School of Social work; and Ms. Kristen Terry, formerly Academic Advisor III in the School of Social Work on allegations of discrimination based on race and disability, retaliation and sexual harassment and sexual misconduct.

b.   Your comments and concerns to the Preliminary report have reviewed and addressed in the final report that is attached *See Exhibit*    . The information provided did not materially change the findings in the previous report.

c.   The University considers this matter closed and no further action will be taken.  Any future correspondence with the University should be directed to the University Attorney Shelby Boseman.

d.   Since Dr. Jones is not an employee of UT Arlington and is the owner of the facility. The University has limited ability to subject or enforce discipline on him. The only options for the University in this instance were to remove students and terminate our agreement with Wellspring as an agency.

e.   Because of Dr. Smith's investigation of your complaint this was done.

f.   Ms. Kristen Terry is no longer an employee of UT Arlington. She resigned April 18, 2018 to take a position with another organization. She did not

violate any of the policies or procedures prior to leaving university. She was responsible for reporting complaint to Dr. Smith which she did.

g.  Dr. Smith did not violate UT Arlington's policy related to Non-discrimination in her actions to help you with your complaint against Dr. Jones and his agency. Our investigative process requires that we contact the accused of any complaint and allow them to respond just as Dr. Smith did when she contacted Dr. Jones.

h.  We are sorry for the experience you had during your field assignment. It is our intent that students in field assignments have a safe and enriching learning environment. The School of Social Work has reviewed their process for ensuring the safety and environments of future field placement agencies along with recommendations from EOS.

323.  On or around June 22, 2018 Knighton received a message from Jane Doe 1 telling her that The University didn't do an investigation, they were just trying to cover themselves.

324.  On June 22, 2018 Knighton sent an email to Karbhari stating the following:

a.  Dear Mr. Karbhari,

b.  I hope this email finds you well. I submitted my appeal to you on May 29, 2018 from the EOS complaint. In the complaint process it states that the final decision is made by the president. Today I received a response from Mr. Freeman stating that the investigation has been closed. I would like to hear from you on this matter and my concerns as they have not been addressed.

325.  Knighton never received a response from Karbhari. In lieu of Karbhari

responding, Knighton received an email from UTA Attorney Shelby Boseman June 25, 2018 stating that Karbhari asked him to respond to her; and he was not familiar with the complaint process that Knighton was talking about.

326.    On June 25, 2018 Knighton responded to Boseman's June 25 email with a copy of the appeal process for UTA Policy 5-513.

327.    On June 25, 2018 Knighton sent another email to Boseman stating the following:

  a.  Attached is a copy of my appeal. I was sexually harassed, discriminated against, retaliated against, and my civil rights were violated.

  b.  The Assistant Dean Dawnetta Smith fabricated my own words, I have the 78 minute phone call recorded and transcribed and the faculty of The School of Social Work failed to follow UTA policy and procedures.

328.    On July 5, 2018 Boseman sent an email to Knighton stating the following:

  a.  Thank you for clarifying. Initally your complaint was looked at under Policy 5-513 and Policy 5-503 based on the specific allegations you made. However, 5-513 quickly became inapplicable as your allegations of sexual harassment were that Dr. Jones attempted to hug you and another student one time on February 26, 2018.

  b.  This behavior does not meet the level to be considered sexual harassment. Consequently, your complaint was investigated under Policy 5-503 for discrimination and harassment, in addition to whether SSW procedures were followed.

  c.  Policy 5-503 does not have an appeal process. However, after you submitted your comments to Mr. Freeman's draft report, it was re-reviewed by Mr.

Freeman and I also reviewed it to ensure the investigation was thorough,

impartial, and the conclusion fit the facts.

d.   The hours you completed at Wellspring can be carried over to your new

placement. I understand your tuition for the course was also refunded. I

apologize you had to go through this and that you feel the SSW did not

communicate well with you. We hope to see you back on campus this fall.

329.   After receiving the July 5, 2018 email from Boseman, Knighton had another

mental breakdown. Jenifer no longer replied to the UTA emails.

330.   Jenifer felt like she was in a nightmare that she couldn't wake up from. Knighton

had to resign from her job that she loved in July 2018 because of the intense symptoms of PTSD,

anxiety, depression, panic attacks, feelings of unworthiness and intrusive thoughts and

flashbacks caused by Jones and UTA. She was no longer enrolled in school classes. Jenifer felt

like she was being punished all because she advocated for herself and other students. She felt

like everything that she worked so hard for was being taken away from, including her right to life

and liberty.

331.   Knighton made an attempt to enroll into another MSW program to try and find

joy again in her life but again another barrier stood in the way; UTA refused to release her

transcripts, stating that Knighton now owed them a balance of around $750.

332.   Ironically on August 10, 2018 Knighton received an email on her personal email

from UTA stating that she had been awarded a Maverick Enrollment Award to assist her with her

Fall enrollment.

333.   Following the August 10th award email, On August 11, 2018 Knighton received

an email on her personal and UTA email from Diane Mitchke stating the following:

a. On behalf of the UTA School of Social Work, I hope that you have had a great summer.  I'm reaching out to you personally because I've noticed that you are not yet enrolled in courses for the Fall semester.

b. Please note that I pulled the enrollment list on August 6th, so if you enrolled in courses after the 6th, please disregard this message.  I want you to know that we value you as a student in our MSW program, and if there is anything we can do to facilitate your registration for the Fall semester, I hope you'll reach out to let us know.  We are getting close to the first day of classes, August 22nd, and I want to make sure that you're enrolled and set up for a successful Fall semester.  Please contact your Academic Advisor or me personally for assistance in getting enrolled.

334.   Knighton practically begged and pleaded with the University to assist her in some way. She only wanted the same fair chance to complete her hours that was given to other students.

335.   The University maliciously and deliberately acted indifferent towards her. They turned things around on Knighton in an effort to protect and cover themselves without any regards to human life.

## CAUSES OF ACTION

## COUNT I: DISCRIMINATION ON THE BASIS OF GENDER IN VIOLATION OF 20 U.S.C. § 1681 (TITLE IX) (AGAINST ALL DEFENDANTS)

336.   Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

337.   The acts and failures to act perpetrated against Plaintiff amounted to unlawful

sexual harassment and discrimination on the basis of gender.  The harassment and discrimination were sufficiently severe and pervasive to create a hostile educational environment for Plaintiff.

338.    One or more administrators or officials of UTA and UTA School of Social Work, with authority to take corrective and remedial action on Plaintiff's behalf, had actual notice of said harassment and discrimination and failed to adequately respond, in violation of their own policies.

339.    Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur. As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

340.    Additionally, and/or in the alternative, Defendants failed to enact and/or disseminate and/or implement proper or adequate procedures to discover, prohibit or remedy the kind of discrimination that Plaintiff suffered.  This failure included, without limitation, non-existent or inadequate customs, policies or procedures for the recognition, reporting, investigation and correction of unlawful discrimination.

341.    Those failures amounted to deliberate indifference toward the unlawful sexual conduct and retaliatory conduct that had occurred, was occurring, or was likely to occur.  As a result, Plaintiff was subject to continuing harassment and a loss of educational opportunity.

342.    Defendants acted with deliberate indifference in deviating significantly from the standard of care outlined by the Department of Education in the Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, Dear Colleague Letter of 2011, Questions and Answers from 2014, and Defendants' own policies.

343.    Defendants subjected Jenifer to discrimination by denying her full access to equal

education and other services, including the enjoyment of benefits of a service, program or activity conducted by the university.

344.    As a result of Defendants' deliberate indifference, As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, suicidal thoughts, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

345.    The aforementioned acts and/or omissions of Defendants were willful, wanton, malicious, reckless, and oppressive. Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT II: VIOLATION OF 42 U.S.C. § 12101

### (Against All Defendants)

346.    Plaintiff incorporates all paragraphs of this Complaint is if fully set forth herein.

347.    Title II of The Americans with Disabilities Act (ADA) provides that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of a public entity or be subjected to discrimination by such entity.

348.    Title II of the ADA requires that a public entity take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

349.    Title II of the ADA also requires a public entity to furnish appropriate auxiliary aids and services where necessary to afford an individual with disability an equal opportunity to participate in, and enjoy the benefits of a service, program, or activity conducted by a public entity.

350.    To be protected by the ADA one must have a disability, defined by the ADA as "(a) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual;

(b) a record of such an impairment; or

(c) being regarded as having such an impairment." 42 U.S.C. § 12102(2) (1994); 29 C.F.R. § 1630.2(g) (1996).

351.    The ADA rule defines "mental impairment" to include "any mental or psychological disorder, such as . . . emotional or mental illness." 29 C.F.R. § 1630.2(h)(2) (1996).

352.    Defendants were aware of Jenifer's disabilities. Defendants knew that Jenifer was suffering from Depression, PTSD, and Anxiety. Jenifer merely begged UTA for assistance;

353.    UTA not only denied Knighton of any assistance but Defendants continuously refused to take responsibility for their actions; and made it look like Knighton was the one that did something wrong; UTA almost drove Knighton to the point of taking her own life.

354.    Defendant Freeman claimed that Knighton knew how to request accommodations

because she received them for ADHD. However, Knighton never used those accommodations; and there was a big difference in the accommodations and services that Knighton needed for the symptoms that were associated with Depression, PTSD, and Anxiety.

355.    Defendants discriminated against Plaintiff based on disability when the School of Social Work denied her request for an accommodation for her disability (e.g., request to extend the deadline for her to complete the necessary hours for her practicum);

356.    Smith stated that there were no exceptions to the UTA School of Social Work Policies.

357.    However, Jane Doe 3 requested an exception to the program and Smith approved it; and Smith deliberately withheld information from Jenifer about the petition for an exception to graduate programs that Smith as Assistant Dean for The School of Social Work knew about or should have known about.

358.    Smith reported to Freeman that her faculty said that Knighton should withdraw from the semester and "take care of her mental health."

359.    When Knighton reported having thoughts of suicide, and suffering from PTSD, and Depression, UTA failed to provide Knighton with any type of assistance or referrals to Mental Health organizations. Smith went to the extent of lying to Freeman in the investigation saying that Knighton told her she was getting help.

360.    Depression, Anxiety, and PTSD are recognized by the ADA as mental disabilities.

361.    As a governmental and public entity charged with ensuring compliance with federal law, Defendants knew or should have known their duties and obligations under Title II of the ADA.

362.    Despite this knowledge and based on the facts alleged herein, Defendants

intentionally refused adequate compliance with Title II of the ADA and failed to afford Jenifer with disability accommodations in a setting appropriate to her needs, in violation of 42 U.S.C. § 12182.

363.    Defendants subjected Jenifer to discrimination by denying her full access to equal education and health services, including the enjoyment of benefits of a service, program or activity conducted by the university.

364.    Because she had a disability, Knighton was encouraged by UTA to withdraw from the Spring 2018 semester; UTA also attempted to dissuade Knighton from enrolling in the Summer, 2018 courses because of her disability.

365.    Hood knew that Knighton had a mental disability when she contacted Knighton.  Hood also knew that Knighton was receiving treatment in PHP. In an attempt to relieve the University from any liability for their wrongdoing; acting in malice and a discriminatory way, Hood attempted to coerce Knighton into submitting medical leave paperwork for the Spring 2018 courses that Knighton was forced to withdraw from and in return she would be able to get a refund for the Spring 2018 courses.

366.    Hood had knowledge that Knighton did not withdraw from the Spring 2018 courses because of disability/medical reasons.

367.    Defendants subjected Jenifer to discrimination by denying her full access to equal education and other services, including the enjoyment of benefits of a service, program or activity conducted by the university.

368.    As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, suicidal thoughts, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

369.    These damages proximately result from UTA's deliberate indifference to plaintiff's rights under ADA.

370.    The aforementioned acts and/or omissions of Defendants were willful, wanton, malicious, reckless, and oppressive. Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT III: VIOLATION OF THE CIVIL RIGHTS ACT OF 1964

### 42 U.S. Code § 2000

368.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

371.    The University discriminated against Plaintiff based on race when it failed to respond appropriately to her reports that Jones tried to extort money from her and other student interns at Wellspring.

372.    After Knighton reported to UTA that Jones attempted to extort money from her and another student, UTA called the other students and asked if they were ok with being charged; and if they could stay at the agency.

373.    Smith told Knighton that it was her word against Jones and asked who she was to

believe; until the other students (African Americans) confirmed that what Knighton was saying was the truth.

374.    Jones (African American) was immediately contacted by Smith (African American) before she contacted Knighton (White) who made the complaint; and after Smith contacted Jones she contacted the other students that were at Wellspring who happened to be African American. When Smith called Knighton she told her that she "knew" that Terry (white) had already contacted her and she didn't feel like she needed to.


375.    In the investigation report conducted by Freeman, Smith stated that charging students was not against University policy; However, On or around the month of March 2018 Advisor Amy Lopez from the School of Social Work sent an email to one of the agencies stating that charging students was against policies; and none of the students were told that they were going to be charged until February 26, 2018 when Jones attempted to extort money from Plaintiff.

376.    The University discriminated against Knighton based on race when it failed to respond to her complaint of sexual harassment by Jones.

377.    After Hall contacted Smith, Smith quickly contacted Jones and told him that Knighton had reported him. Jones was not the field instructor and should have never been contacted.

378.    Knighton was the only student that false allegations of misconduct were made against; Knighton was the only student that Smith told Jones to file an Interruption of Internship on; Knighton was the only white student.

379.    UTA was deliberately indifferent to its obligations and its procedures applied.

Such deliberate indifference included failing to adequately investigate Knighton's allegations in accordance with Title IX when the same were mandatory, denying Knighton the right to a thorough and impartial investigation and ultimately ignoring UTA's misconduct.

380.    UTA also wrongfully retaliated against Jenifer by intimidating and discriminating against her for disputing the mistreatment, for disputing the investigation, and for complaining that UTA engaged in misconduct against her.

381.    UTA's actions in violating its own policies on non-discrimination were intentional and deliberate, and causally resulted in Jenifer suffering an adverse outcome, severe injury and harm.

382.    Defendants subjected Jenifer to discrimination by denying her full access to equal education and other services, including the enjoyment of benefits of a service, program or activity conducted by the university.

383.    As a result of the above-described conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, suicidal thoughts, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

384.    The aforementioned acts and/or omissions of Defendants were willful, wanton,

malicious, reckless, and oppressive. Plaintiff demands judgment against the Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

### COUNT IV: NEGLIGENCE (AGAINST ALL DEFENDANTS)

385.   Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

386.   At all times relevant, Defendants offered services associated with higher education to Plaintiff.  Defendants had a duty to protect Plaintiff as a student at Defendants' institution, UTA.  Defendants had a duty to take reasonable protective measures to protect Plaintiff and other similarly situated students from the risk of sexual harassment and/or sexual misconduct, such as the duty to properly warn, train or educate Plaintiff and other students about how to avoid such a risk.  This created a special relationship between Defendants and Plaintiff who was entrusted to Defendants' care.  Defendants voluntarily accepted the entrusted care of Plaintiff.  As such, Defendants owed Plaintiff a duty of care.

387.   Defendants breached their duty to take reasonable protective measures to protect Plaintiffs and other similarly situated students from the risk of sexual harassment and/or sexual misconduct, such as the failure to properly warn, train, or educate Plaintiffs and other students about how to avoid such a risk.

388.   At all material times, Defendants were further required to comply with federal laws.

389.   Defendants' intentional and negligent acts and omissions therefore amount to negligence, negligent failure to warn, train and/or educate, and negligence per se.

404.   Defendants subjected Jenifer to discrimination and harassment by denying her full access to equal education and other services, including the enjoyment of benefits of a service, program or activity conducted by the university.

390.    As a result of Defendants conduct, Plaintiff has suffered, and continues to

suffer, great pain of mind and body, physical injury, shock, emotional distress, suicidal thoughts,

physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace,

humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was

prevented and will continue to be prevented from performing Plaintiff's daily activities and

obtaining the full enjoyment of life; was prevented and will continue to be prevented from

obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss

of educational opportunities and/or benefits; has sustained and will continue to sustain loss of

earnings and earning capacity; and/or has incurred and will continue to incur expenses for

medical and psychological treatment, therapy, and counseling.

391.    The aforementioned acts and/or omissions of Defendants were willful, wanton,

malicious, reckless, and oppressive. Plaintiff demands judgment against the Defendants, jointly

and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT V: DEPRIVATION OF PLAINTIFF'S RIGHT

## TO EQUAL PROTECTION OF THE LAWS

## 42 U.S.C. § 1983

392.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

393.    As a student of a public university, plaintiff was entitled to personal security,

bodily integrity and the Equal Protection of the Laws, pursuant to the Fourteenth Amendment to

the United States Constitution. Failing to properly investigate David Jones sexual harassment of

the Plaintiff;

    a.  UTA failed to adequately train and/or supervise Defendants;

    b.  And demonstrating complete and deliberate indifference to the sexual

harassment of the Plaintiff, and to the ongoing trauma suffered by the Plaintiff caused by the continuous actions and omissions of Defendants.

394.    UTA had, at all times material hereto, unconstitutional customs, policies or procedures of:

  a.  Failing to investigate evidence of criminal and tortious misconduct against students in the nature of violations of their right to personal security and bodily integrity.;

  b.  Failing to adequately train and supervise UTA employees with regard to maintaining, preserving and protecting students – including the Plaintiff – from violations of their right to personal security, bodily integrity, and the Equal Protection of the Laws.

395.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

396.    The aforementioned acts and/or omissions of Defendants were willful, wanton,

malicious, reckless, and oppressive, thereby justifying Defendants, jointly and severally, for compensatory and punitive damages, plus interest and costs.

## COUNT VI: 18 U.S.C. § 241 CONSPIRACY AGAINST RIGHTS

### (Against All Defendants)

397.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

398.    Knighton followed all of the UTA School of Social Work policies. Knighton followed all of UTA policies.

399.    Knighton was not aware or informed of her rights as a student or as a victim of discrimination and harassment. Despite Knighton making several complaints to UTA, a complaint was never filed until Knighton learned of the complaint process herself.

400.    As a "Responsible Employee" Defendant Smith was required to report Knighton's allegations to the Title IX Coordinator so that Knighton could be afforded the same treatment as others, due process. It would have allowed Knighton to decide if she wanted to file a formal or informal complaint against Jones. Smith failed to report any and all Knighton's allegations against Jones harassment and misconduct to the Title IX Coordinator or the EOS.

401.    Instead of Smith contacting Plaintiff or reporting Knighton's complaint as the complainant on February 27, 2018. Defendant Smith used her authority as Assistant Dean by completely disregarding UTA Policy and taking things in her own hands by contacting Jones and informing him that Knighton had reported him; and telling him to submit an interruption of internship on Knighton in an attempt to cover up his discriminatory and illegal actions; and in an attempt to relieve UTA of any liability for its deliberately indifferent and discriminatory actions.

402.    Despite the fact that Smith knew that something happened to Knighton at

Wellspring (as she stated in their March 12 conversation) Smith continued to use the interruption form against Plaintiff when Plaintiff requested assistance and an extension for her field hours.

403.    Despite the School of Social Work knowing about the sexual harassment, abuse, Harassment and attempted extortion that Plaintiff endured by Jones; The School of Social Work forced Knighton to withdraw from their field education.

404.    Defendant Woody knew or should have known that something was wrong after she received Knighton's grievance in March 2018. Instead of addressing any of Knighton's concerns on the grievance, or forwarding her complaint to a higher authority, Woody acted out of malice, and intention to conspire with Smith; completely disregarded any of Knighton's complaints against Jones' behaviors including sexual harassment, abuse, harassment and attempt to extort money from the female students that were at Wellspring; and the unethical conduct of UTA School of Social work (including Smith).

405.    Defendant Freeman, Defendant Hood, Michelle Willbanks, and Defendant Karbhari were given access to the link provided by Knighton that had all of the documents that Knighton had related to the events that occurred with Jones and UTA.

406.    The evidence proved that misconduct of Jones and UTA was oppressive and discriminatory against Plaintiff. However, Defendant Freeman as the investigator of Knighton's formal complaint, only chose to look at a few of the documents.

407.    Freeman conducted a biased investigation; completed a bogus report that minimized Jones' behaviors and denied Smith's unethical and discriminatory behaviors including Smith fabricating Knighton's words and defaming Knighton's character *See Exhibit*

408.    Knighton made a request for Karbhari to review Freemans report and Knighton's appeal. Knighton also asked Karbhari what UTA was going to do to make sure that their students did not go through what Knighton went through. Karbhari refused to further respond to Knighton.

409.    Defendants subjected Jenifer to discrimination and harassment by denying her full access to equal education and other services, including the enjoyment of benefits of a service, program or activity conducted by the university.

410.    Each Defendant acted in malice and deliberately indifference to Plaintiff for reporting Jones and UTA faculty; and they made a deliberate attempt to cover up the unethical and inappropriate misconduct of Jones and UTA.

411.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, suicide thoughts, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

412.    The aforementioned acts and/or omissions of Defendants were willful, wanton, malicious, reckless, and oppressive, thereby justifying that Defendants be fined.

## COUNT VII: VIOLATION OF 42 U.S.C. § 1983 SUBSTANTIVE DUE PROCESS – THE

## RIGHT TO INTIMATE ASSOCIATION FOURTEENTH AMENDMENTS TO THE U.S.

## CONSTITUTION

### (Against All Defendants)

413.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

414.    Defendants, and each of them, subjected plaintiff to violations of her Right to Intimate Association. Such conduct by Defendant's "shocks the conscience."

415.    Knighton requested nothing more than "extra time" to complete her field education hours because of the severe emotional distress that Knighton was caused by Jones and UTA. Knighton was stripped of any and every right that she had as a student.

416.    Defendants conduct hindered Knighton's relationship with her children.

417.    Such conduct of Defendants caused Knighton to be admitted into PHP after nearly committing suicide; and miss important events and moments with her children such as sports, traveling, family time, and any other extracurricular activities.

418.    Such conduct by Defendants caused Plaintiff to miss a road trip to Florida with

her daughters because she was in PHP.

419.    Such conduct of Defendants caused an interference with Knighton's right as a Parent; almost resulting in 3 children being without a mother.

420.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress, suicidal thoughts, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer

spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily

activities and obtaining the full enjoyment of life; was prevented and will continue to be

prevented from obtaining the full enjoyment of being a mother; and/or has incurred and will

continue to incur expenses for medical and psychological treatment, therapy, and counseling.

421.    The aforementioned acts and/or omissions of the Defendants were willful,

wanton, malicious, reckless, and oppressive, thereby justifying an award of exemplary and

punitive damages to punish the wrongful conduct alleged herein and to deter such conduct in the

future.

## COUNT VIII: DEFAMATION AND

## DEFAMATION PER SE (AGAINST SMITH)

422.    Defendant Smith published statements of fact to UTA, via Freeman, referring

specifically, to Jenifer.

423.    Jenifer suffered pecuniary injury (although no such showing is required due to the

per se nature of the defamation).

424.    Smith's published statements about Jenifer were false and defamatory and with

regard to the truth of the same, Smith was acting with actual malice, she was negligent, or she is

strictly liable on a per se basis, for accusing Knighton of unethical conduct such as being

inappropriate with clients and students at Wellspring; and/or because her publications are

presumptively injurious.

425.    As a direct and proximate result of Defendant's conduct, Plaintiff has suffered,

and continues to suffer, great pain of mind and body, physical injury, shock, emotional distress,

suicidal thoughts, physical manifestations of emotional distress, embarrassment, loss of self-

esteem, disgrace, humiliation, and loss of enjoyment of life; has suffered and continues to suffer

spiritually; was prevented and will continue to be prevented from performing Plaintiff's daily activities and obtaining the full enjoyment of life; was prevented and will continue to be prevented from obtaining the full enjoyment of being a mother; has suffered and will continue to suffer the loss of educational opportunities and/or benefits; has sustained and will continue to sustain loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

426.    The aforementioned acts and/or omissions of the Defendant were willful, wanton, reckless, and oppressive. Plaintiff seeks to recover actual damages, and an award of exemplary or punitive damages of and from Smith.

## **PRAYER FOR RELIEF**

427.    Plaintiff incorporates all paragraphs of this Complaint as if fully set forth herein.

426.    The University has committed numerous violations of its contractual obligations as set forth above.

427.    WHEREFORE, Plaintiff Jenifer Knighton respectfully requests that this Honorable Court grant the following relief:

a.)    A declaratory judgment that Defendants actions, policies, and practices complained of herein violated Jenifer Knighton's rights as secured by the Fourth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

b.)    Declare that the University breached its contract with Jenifer;

c.)    Grant injunctive relief ordering the University to reverse its findings of the EOS Investigation report;

d.)    Grant preliminary injunctive relief ordering the University to release Jenifer's academic transcripts;

e.)  Grant injunctive relief ordering the University to provide a President's Statement and Apology Letter to Plaintiff certifying that The University has accepted responsibility for wrongdoing;

f.)  A joint and several judgment against all Defendants for compensatory damages in an amount to be determined at trial, including without limitation, damages to physical well-being, loss of integrity, loss of self-esteem, emotional and psychological damages, damages to reputation, past and future economic losses, loss of education and professional opportunities, loss of future career prospects, and other direct and consequential damages;

g.)  A joint and several judgment against all Defendants for punitive damages in an amount of $100,000,000 necessary and sufficient to punish Defendants and deter Defendants and others from similar conduct;

h.)  Award prejudgment interest;

i.) The cost of litigating this case;

j.)  All other relief to which Plaintiff is entitled or that the Court deems just and proper.

## JURY DEMAND

428.    Plaintiffs demands a trial by jury on all counts.


DATED: September 24, 2018                    Respectfully submitted,

Jenifer L. Knighton, *Pro Se Litigant*
Jeniferknighton08@yahoo.com
19543 Cabra Ct. Katy, TX 77449
832-910-2931

Dated September 24, 2018

Respectfully Submitted,

Jenifer Knighton Pro se
Jenifer Knighton08@yahoo.com
19543 Cabra Ct.
Katy, TX 77449
832 910.2931

# Exhibit A

## SUMMARY OF COMPLAINT INVESTIGATION

I.   **APPLICABLE POLICY(IES)**

### University Policy – 5-503 Non-Discrimination Policy

It is the policy of The University of Texas at Arlington ("the University") that no person shall, on the basis of race, color, national origin, religion, age, sex, sexual orientation, disabilities, genetic information, and/or veteran status, be denied employment with or admission to the University; or be excluded from participation in, denied the benefits of, or subject to discrimination under, any program or activity that the University sponsors or conducts. Retaliation against persons who oppose a discriminatory practice, file a charge of discrimination, or testify for, assist in, or participate in an investigative proceeding relating to discrimination is prohibited. Constitutionally-protected expression will not be considered discrimination or harassment under this policy.

The University of Texas at Arlington complies with the Equal Pay Act of 1963, Titles VI and VII of the Civil Rights Act of 1964, Executive Order 11246, the Age Discrimination in Employment Act of 1967, Title IX of the Education Amendments of 1972, Sections 503 and 504 of the Rehabilitation Act of 1973, the Americans with Disabilities Act of 1990, the Uniformed Services Employment and Reemployment Rights Act of 1994, Title II of the Genetic Information Nondiscrimination Act of 2008, the Vietnam Era Veterans' Readjustment Act of 1974, the Texas Commission on Human Rights Act and their subsequent amendments, as well as other applicable federal and state laws and regulations, the Rules and Regulations of the Board of Regents of The University of Texas System, and policies and standards issued by The University of Texas System Administration.

This Non-Discrimination Policy shall be implemented throughout the University. It is the responsibility of all departments and personnel to ensure the University's compliance. The University will take prompt disciplinary action against any individuals or organizations within its control who violate this policy.

### 5-513 Sexual Harassment and Sexual Misconduct Policy

The University of Texas at Arlington ("University") is committed to maintaining a learning and working environment that is free from discrimination based on sex in accordance with Title IX of the Higher Education Amendments of 1972 (Title IX), which prohibits discrimination on the basis of sex in educational programs or activities; Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits sex discrimination in employment; and the Campus Sexual Violence Elimination Act (SaVE Act). Sexual misconduct is a form of sex discrimination and will not be tolerated. As stated in the definition, sexual misconduct includes sexual harassment, sexual violence, sexual assault, stalking, domestic violence and/or dating violence. Individuals who engage in sexual misconduct and other inappropriate sexual conduct will be subject to disciplinary action.

The University will take prompt disciplinary action against any individuals or organizations within its control who violate this policy. The University encourages any student, faculty, staff or visitor to promptly report violations of this policy to an individual identified in Section C.1. of this Policy.

II.  **SCOPE**

This policy applies to all university administrators, faculty, staff, students, and third parties within the University's control, including visitors and applicants for employment. It applies to conduct regardless of where it occurs, including off university property, if it potentially affects the complainant's education or employment with the University. It also applies regardless of the gender, gender identity or sexual orientation of the complainant or the respondent. In addition, it applies whether the complaint was made by or against a third party, and whether the complaint was made verbally or in writing.

III. **SUMMARY**

On April 17, 2018 the Office of Equal Opportunity Services received a formal complaint from Ms. Jenifer Knighton concerning allegations of discrimination based on race and disability, retaliation and sexual harassment and sexual misconduct by Dr. David Jones, Owner and agency contact for Wellspring Community Institute; Ms. Kristen Terry, Academic Advisor III in the School of Social Work; and Dr. Dawnetta Smith, Assistant Dean School of Social work. Ms. Knighton provided additional details on April 29, 2018.

It was reported that Dr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. He also requested that students were to pay $20 a week to pay for licensed supervision.

Ms. Knighton alleges that Ms. Terry and Dr. Smith did not report the complaint to the EOS or Title IX Coordinator and they failed to follow UTA policy and procedure. Ms. Knighton also filed a grievance with Social Work that did not result in an effective outcome.

IV. **COMPLAINT**

Ms. Knighton states "The social worker (Kimberly Gallien LCSW) that was supposed to supervise the students was contracted only to sign off on the student's hours while we were being supervised by David Jones, an unlicensed individual that was providing counseling services to children and families. Mr. Jones is the owner and practice manager of the organization and also contact person for UTA. Mr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. The students were told that since he was the owner nobody could fire him and if we didn't like it we could leave and not come back. We were also told that we needed to leave all concerns that we had with the school up to him. There was a deadbolt lock that was locked on a few different occasions while interns were in the office with him in the evenings.

On February 26, 2018 I was verbally abused by David Jones, told that if I did not pay money I was not going to get credit for the previous 5 weeks I had put in. He told me and another student that he knew we had money because we both had jobs. He twirled a key on his finger, laughed in a scary manner, and kept us an hour over scheduled. Before we left he attempted to inappropriately hug us and said 'don't let this stop you from coming back.' I felt violated, I felt like I had just been raped or molested.

The next day I followed procedure and reported it to my field liaison who reported it to UTA School of Social Work office. Dr. Dawnetta Smith (assistant dean) put my safety and the safety of other students at risk by contacting Mr. Jones and disclosing to him that I reported him. She failed to contact any of the students including myself until after she contacted him. That

afternoon I was contacted by Kristen Terry from the field office telling me that I was going to be contacted by Ms. Smith the following day to discuss my behaviors.

Things were then turned around and the blame was put on me, that I was being disruptive at the agency. Ms. Smith told Mr. Jones to file the form for an interruption of my internship. The incident was never reported to the EOS or title 9 coordinator and they failed to follow policy and procedure. I filed a grievance in March but again expressing my concern resulted in an ineffective outcome.

I cried every day for five weeks which led me into a deep depression and bulimia relapse. I was forced to withdraw from my field without any accommodations/exceptions due to the extenuating circumstances and traumatic experience that I endured at an affiliated agency of UTA. I was given no credit towards tuition on the 6 credit course that I was forced to withdraw from. Due to the emotional distress that this has caused me I had to be admitted into a partial hospitalization program which will now hinder me from continuing the field placement in the summer. When I spoke with my advisor Patricia Green who was unaware of anything that transpired, I was informed that my graduation will be prolonged an extra year.

Also, despite being told by Ms. Smith that this was not going to go against me because other students confirmed that what I was saying was true, when I requested some sort of modification due to the extenuating circumstances, it was denied and I was told that I was not pulled from Wellspring, the agency disrupted my internship. I requested a copy of the form and after reviewing it I saw that it was signed the same day that I reported the agency.

The response or lack of that I have received from the school goes against every value that we have been taught by the school. The way that I have been treated by the faculty from the school of social work is unjust and a violation of the NASW Code of Ethics. As mandated reporters they also failed to report the sexual misconduct that occurred at the field placement. Instead they retaliated against me and had David Jones file an interruption of internship."

## V.   Dr. Dawnetta Smith's Response to Complaint (Full statement Attached)

"On February 27, 2018, I was informed by Kristen Terry, the then Field Advisor for BSW/Foundation MSW students, that the students at Wellspring Counseling were being charged for their weekly supervision. She also informed me that an inappropriate conversation took place with two of the students at Wellspring, where the CEO, Dr. David Jones, belittled the students. Kristen further explained that one of the students felt violated because the CEO attempted to hug her, and she wanted a new placement. I immediately contacted the agency, Dr. Jones specifically, as I wanted to get a better understanding of what was happening as we had three other students placed at the agency.

On February 27, 2018, I called and spoke with Dr. Jones, CEO of Wellspring Counseling. Before we began our conversation, Dr. Jones stated, I am so glad you called me I have some concerns with one of your students. He stated for me to continue with the reason for my call and he would address his concerns after. I proceeded to ask Dr. Jones, if the agency charged students for weekly supervision. To which he replied; yes, we have always charged students for weekly supervision and after-hours services. He stated that he had two contracted therapists, one being

a LMSW, and the therapist charges students for supervision since they keep their doors open to accommodate working students. I asked him, if he informed the previous Assistant Dean about this and he stated "no"; it was an agreement between his agency and the students. Mr. Jones stated that the students are informed of this before beginning their hours. I asked him if the students signed an agreement with this information and he stated "no". He informed me that he has students from various universities, such as UH and any student needing to complete hours after the traditional work hours and have weekly supervision are charged $20/week for supervision. He went on to state that one of the students, Ms. Knighton, was not informed of this because she did not attend the orientation. He stated Ms. Knighton contacted him just before the semester was to start and he told her she could start the following week. He stated I also have some concerns with this student. I stated to Dr. Jones, that I understood and while I did not agree with this policy, he needed to have sent the Field Office this information upfront and he needed to put something in writing so students understood this and were not blindsided with an invoice. I further informed Dr. Jones, that I would check into the charge with CSWE, one of our accreditation bodies, and UT Arlington. I wanted to ensure that there was not a rule against this for our students.

I then proceeded to ask Dr. Jones about a conversation he had with 2 UT Arlington students on February 26, 2018. Dr. Jones, informed me that he met with the students to provide them with their invoices for supervision. He stated that both students were upset about the charges but by the end of the conversation, he felt they had reached an agreement. I then asked Dr. Jones, did he attempt to hug the students. He stated that he was standing in between both students as they were leaving the meeting and he put his arm around the students and told them they were going to be "okay". I informed Dr. Jones, that was inappropriate and he should not touch a student unless he first asks. Dr. Jones stated that he was not trying to be inappropriate but wanted the students to know that he supported them. He further stated, that he would not let that happen again.

As Dr. Jones and I were wrapping up, I informed Dr. Jones, that Ms. Knighton would not be returning as she was upset about the charges for weekly supervision and the conversation he had with her and another student. Dr. Jones then stated that he had some concerns in regards to Ms. Knighton and was not sure she was a good fit for the agency. Dr. Jones stated that Ms. Knighton asked the therapist if she would be able to sign off on some extra hours. Dr. Jones also stated that Ms. Knighton was having inappropriate conversations while working, such as talking about being intoxicated. He stated that he felt, Ms. Knighton was upset about having to pay the money and reiterated that she has displayed inappropriate behaviors on more than one occasion, even with clients, and he did not feel she would a good fit for the agency. With Dr. Jones voicing such concerns, I asked him to complete an "Interruption of Field" form for the student as she was going to be placed with a new agency immediately per her request. He complied and sent over the form that afternoon.

On February 27, 2018, I immediately, asked all of the Field Advisors to work to find Ms. Knighton a new placement. The Field Advisors found Ms. Knighton a new placement within February 28, 2018, and Ms. Knighton interviewed at the new placement on March 2, 2018. I had not talked with Ms. Knighton as, Kristen Terry had been in communication with the student. However, Ms. Terry informed me that Ms. Knighton wanted to speak with me.

4

On February 27, 2018, I contacted UT Arlington's Legal department to inquire about students being charged for weekly supervision at their Field placements. The Field Office also contacted CSWE to inquire if there was a policy against this. Both stated this was allowable.

On March 6, 2018, I received an email that included a grievance from Ms. Knighton. I spoke with Dr. Woody about the grievance and informed her that we immediately moved the student and she interviewed with another agency. However, the student was still waiting on a response from the new agency as to if she would be accepted. I informed Dr. Woody that I had not had an opportunity to speak with the student, but that Kristen, Natalie and Haydee had each been in communication with the student consistently since she informed us of her concerns.

I gave Ms. Knighton a call following my meeting with Dr. Woody. During my call with Ms. Knighton, she proceeded to explain to me what happened during the evening of February 26, 2018 at the placement. She stated that Dr. Jones belittled and intimated her and another student. She informed me that Dr. Jones stated to them that they would be responsible for paying for their weekly supervision and it would be $20/week. She stated that Dr. Jones handed her an envelope with an invoice in it. She stated that she told Dr. Jones that she was not informed that she would have to pay for weekly supervision and she did not agree with the charges. Dr. Jones stated to her that she was correct, since she did not have an interview, and that is when the fee would have been discussed. Ms. Knighton stated that Dr. Jones then began to give them a lecture on their values and how paying the $20/week was an investment in their education. She stated he used examples of not buying coffee or McDonalds to afford the fee. Ms. Knighton stated that she was very upset by his comments and after he tried to hug her.

I immediately, apologized to Ms. Knighton and explained to her that we are here to support students and want to ensure that students feel safe. I further asked Ms. Knighton if she felt safe and she stated she did, but that Dr. Jones may have her address due to running a criminal background check. I informed Ms. Knighton, we could not request the paperwork since it did not belong to the school. Ms. Knighton, went on to explain that she investigated Dr. Jones and found that he was fired from Houston ISD due to not reporting child abuse within the school where he was principal. I informed Ms. Knighton that we were still investigating and trying to contact her peers that were at the placement. I informed Ms. Knighton that Dr. Jones completed an "Interruption of Field" form, due to some concerns he had in regards to her behavior. I told Ms. Knighton, I asked Dr. Jones to complete the form so that we could move her to another placement, but that she would not have to go before the professional standards committee and we were simply going to place her at a new agency. Ms. Knighton stated that she understood. I proceeded to ask Ms. Knighton how her interview was at the new prospective placement, Ms. Knighton stated she felt it went well, but she was still very upset by the disruption and she felt that showed during her interview. I told Ms. Knighton I understood and that we would support her to find another placement quickly. Ms. Knighton stated the new placement would get back with her in a week as they have a background process and paperwork that must be completed. I informed Ms. Knighton to follow up with Ms. Terry, her Field Advisor as soon as she knew if she could start the placement. Ms. Knighton and I got off the phone with the understanding that we would assist her in getting a new placement as quickly as possible so that she would not have to drop the course. I also, requested that Ms. Knighton look at the agencies we suggested when she first completed her application with the Field Office. Ms. Knighton expressed that she was having a difficult time coping, but explained she was feeling better and was going to get some help. I informed Ms. Knighton to contact us if she needed anything."

VI.   **WITNESSES AND SIGNIFICANT DOCUMENTS**

Each of the three other students in Ms. Knighton's Field placement were contacted concerning the allegations in her complaint. None of the students reported feeling physically threatened by or fearful of Dr. Jones. They all stated Dr. Jones had belittled them and was verbally abusive at times but did not fear for their safety.

They were never informed prior to February 26th of the charge for supervision. They felt his actions were unethical in asking for money but not informing them prior to them starting or they would have chosen another agency.

███████████ confirmed that Dr. Jones attempted to hug her and Ms. Knighton after the meeting on February 26th but she deflected his attempt. She mentioned how he was belittling them and insisting since they had jobs they could afford to pay.

All students felt the communication from Social Work was not very good and the school could have done a better job of reviewing agency prior to placement.

The students mentioned that the doors were locked but this was an after-hours facility. So they assumed it was to keep people from coming in who didn't have an appointment.

Two of the students were able to be placed at another facility and are able to get the hours necessary to complete program. █████████ was in the wrong placement to begin with due to a mix up in registration. Attempts to place Ms. Knighton in another facility were unsuccessful.

VII.   **ANALYSIS and FINDING: VIOLATION OF UNIVERSITY POLICIES/PROCEDURES**

A.   Dr. Jones is not subject to UT policies and is only held responsible for the contractual obligations specified in contract with School of Social Work to provide premises, personnel, services, and all other items necessary for educational experience of students placed there.

The School of Social Work field education program specifies the credentials and practice experience of its field instructors necessary to design field learning opportunities for students to demonstrate program social work competencies. Field instructors for master's students hold a master's degree in social work from a CSWE-accredited program and have 2 years post-master's social work practice experience. For cases in which a field instructor does not hold a CSWE-accredited social work degree or does not have the required experience, the program assumes responsibility for reinforcing a social work perspective and describes how this is accomplished.

In order to uphold the standard, Social Work requires all Field Instructors to submit their resume and complete an application in our student/agency tracking system, E-Intern. When an agency has a Task Supervisor (in this case Dr. Jones), Social Work informs the Field Instructor (Ms. Kimberly Gillen) that they are responsible for the students' supervision and documentation. However, the Task Supervisor may oversee some of the day to day duties of the students and even assign duties that are approved by the Field Instructor.

The School of Social Work has terminated its relationship with Wellspring as a field placement agency on March 12th due to the following reasons which were violations of Educational Experience Affiliation Agreement and standards stated above:

- Multiple students (3 of the 4) stating they were not told about the weekly supervision fee during the initial interview/orientation.
- Dr. Jones, did not inform the School of Social Work about the fee and told the students not to contact the School for anything that only the agency should contact Social Work.
- After discussion with Dr. Jones, Dr. Smith felt he was trying to intimidate the students and insist that they pay the fee or they would not be able to find another placement.
- The School of Social Work received further information that the students were not receiving weekly supervision from the Field Instructor, the students were only being supervised by Dr. Jones. This is a violation of the CSWE accreditation standards as Dr. Jones does not have the proper credentials to be a Field Instructor for Social Work students.

B. Dr. Smith followed the proper procedures for Social Work to remove Ms. Knighton from the facility. Dr. Smith's contact with Mr. Jones was to confirm that he was charging students for providing outside supervision which had not been disclosed prior to the signing the agreement with Social Work. Once the other students confirmed Ms. Knighton's complaint she discontinued UT Arlington's association with facility and removed remaining students. Dr. Jones brought up his concerns about Ms. Knighton before Dr. Smith mentioned concerns about charging students and inappropriate behavior.

C. Ms. Knighton alleges that Dr. Smith's contacting Dr. Jones put her and the other students at risk. However none of the other students felt that they were in any danger from Dr. Jones. Ms. Knighton continues to fear for her safety and fears Dr. Jones will try to harm her. However it should be noted that Dr. Jones has not had any further contact with Ms. Knighton since February 26th and has not talked to any of the other students since March 1st.

D. Dr. Smith has taken no action on the Interruption of Field Placement Form that was sent by Dr. Jones. Ms. Haydee Hall (Field Liaison) had concerns about this form being filed by Dr. Jones. She stated in an email dated April 16, 2018 that there was a difference between her conversation with the Field Instructor Ms. Gallien and what was written on the form. A copy was sent to Ms. Knighton per her request on April 16, 2018. The form was not submitted to the professional standards committee as was told Ms. Knighton by Ms. Terry. Dr. Smith held on to the form because of her and Ms. Hall's concerns with agency and the form was not placed in Ms. Knighton's student record.

E. Ms. Kristen Terry reported Ms. Knighton's complaint to her supervisor Dr. Smith which was the appropriate action to take concerning this matter. However Ms. Terry handling of placing students at another agency did show a lack of insensitivity to the situation the students were facing. Instead of sending the students an individual email to check on their status she sent a group email describing each student's situation.

7

VIII.   **CONCLUSION AND RECOMMENDATIONS**

Dr. Jones is not subject to the policies of the University of Texas at Arlington but Dr. Smith acted promptly when she received the complaint from Ms. Knighton to remove her from the placement at Wellspring.

Ms. Kristen Terry is no longer an employee of UT Arlington. She resigned April 18, 2018 to take a position with another organization. She did not violate any of the policies or procedures prior to leaving university. She was responsible for reporting complaint to Dr. Smith which she did. Her handling of placing students after Wellspring could have better.

It is EOS determination that Dr. Smith did not violate either of UT Arlington's policies in her actions to help Ms. Knighton with her complaint against Dr. Jones and his agency. She acted according to School of Social Work policy and procedure to take prompt action regarding Ms, Knighton's complaint. Even though she didn't report to Equal Opportunity Services or Title IX she did consult with the University's legal department.

The Interruption of Field Placement Form that was sent by Dr. Jones to Dr. Smith should not have been sent to Ms. Knighton or be a part of her file. The form was not submitted to the professional standards committee which would have been the procedure had Ms. Knighton's complaint not been confirmed. Also, Ms. Hall sent a follow up email pointing out the discrepancy in the Field Instructor's verbal evaluation verses what was written on the form which was a factor in no action being taken against Ms. Knighton.

It is recommended that Ms. Knighton be refunded her tuition costs related to this placement. The two students that were able to be place at another agency were able to complete the required hours. Ms. Knighton should also be given access to additional counseling services should they be needed.

There are other recommendations that will be discussed with the Dean of Social Work concerning process of selecting and monitoring field placements and agencies.

**Attachment I:**

**Response to Complaint filed by Jenifer Knighton by Dawnetta Smith, Assistant Dean on April 30, 2018.**

On February 27, 2018, I was informed by Kristen Terry, the then Field Advisor for BSW/Foundation MSW students, that the students at Wellspring Counseling were being charged for their weekly supervision. She also informed me that an inappropriate conversation took place with two of the students at Wellspring, where the CEO, Dr. David Jones, belittled the students. Kristen further explained that one of the students felt violated because the CEO attempted to hug her, and she wanted a new placement. I immediately contacted the agency, Dr. Jones specifically, as I wanted to get a better understanding of what was happening as we had three other students placed at the agency.

On February 27, 2018, I called and spoke with Dr. Jones, CEO of Wellspring Counseling. Before we began our conversation, Dr. Jones stated, I am so glad you called me I have some concerns with one of your students. He stated for me to continue with the reason for my call and he would address his concerns after. I proceeded to ask Dr. Jones, if the agency charged students for weekly supervision. To which he replied; yes, we have always charged students for weekly supervision and after-hours services. He stated that he had two contracted therapists, one being a LMSW, and the therapist charges students for supervision since they keep their doors open to accommodate working students. I asked him, if he informed the previous Assistant Dean about this and he stated "no"; it was an agreement between his agency and the students. Mr. Jones stated that the students are informed of this before beginning their hours. I asked him if the students signed an agreement with this information and he stated "no". He informed me that he has students from various universities, such as UH and any student needing to complete hours after the traditional work hours and have weekly supervision are charged $20/week for supervision. He went on to state that one of the students, Ms. Knighton, was not informed of this because she did not attend the orientation. He stated Ms. Knighton contacted him just before the semester was to start and he told her she could start the following week. He stated I also have some concerns with this student. I stated to Dr. Jones, that I understood and while I did not agree with this policy, he needed to have sent the Field Office this information upfront and he needed to put something in writing so students understood this and were not blindsided with an invoice. I further informed Dr. Jones, that I would check into the charge with CSWE, one of our accreditation bodies, and UT Arlington. I wanted to ensure that there was not a rule against this for our students.

I then proceeded to ask Dr. Jones about a conversation he had with 2 UT Arlington students on February 26, 2018. Dr. Jones, informed me that he met with the students to provide them with their invoices for supervision. He stated that both students were upset about the charges but by the end of the conversation, he felt they had reached an agreement. I then asked Dr. Jones, did he attempt to hug the students. He stated that he was standing in between both students as they were leaving the meeting and he put his arm around the students and told them they were going to be "okay". I informed Dr. Jones, that was inappropriate and he should not touch a student unless he first asks. Dr. Jones stated that he was not trying to be inappropriate but wanted the students to know that he supported them. He further stated, that he would not let that happen again.

As Dr. Jones and I were wrapping up, I informed Dr. Jones, that Ms. Knighton would not be returning as she was upset about the charges for weekly supervision and the conversation he had with her and another student. Dr. Jones then stated that he had some concerns in regards to Ms. Knighton and was

9

not sure she was a good fit for the agency. Dr. Jones stated that Ms. Knighton asked the therapist if she would be able to sign off on some extra hours. Dr. Jones also stated that Ms. Knighton was having inappropriate conversations while working, such as talking about being intoxicated. He stated that he felt, Ms. Knighton was upset about having to pay the money and reiterated that she has displayed inappropriate behaviors on more than one occasion, even with clients, and he did not feel she would a good fit for the agency. With Dr. Jones voicing such concerns, I asked him to complete an "Interruption of Field" form for the student as she was going to be placed with a new agency immediately per her request. He complied and sent over the form that afternoon.

On February 27, 2018, I immediately, asked all of the Field Advisors to work to find Ms. Knighton a new placement. The Field Advisors found Ms. Knighton a new placement within February 28, 2018, and Ms. Knighton interviewed at the new placement on March 2, 2018. I had not talked with Ms. Knighton as, Kristen Terry had been in communication with the student. However, Ms. Terry informed me that Ms. Knighton wanted to speak with me.

On February 27, 2018, I contacted UT Arlington's Legal department to inquire about students being charged for weekly supervision at their Field placements. The Field Office also contacted CSWE to inquire if there was a policy against this. Both stated this was allowable.

On March 6, 2018, I received an email that included a grievance from Ms. Knighton (please see attached). I spoke with Dr. Woody about the grievance and informed her that we immediately moved the student and she interviewed with another agency. However, the student was still waiting on a response from the new agency as to if she would be accepted. I informed Dr. Woody that I had not had an opportunity to speak with the student, but that Kristen, Natalie and Haydee had each been in communication with the student consistently since she informed us of her concerns.

I gave Ms. Knighton a call following my meeting with Dr. Woody. During my call with Ms. Knighton, she proceeded to explain to me what happened during the evening of February 26, 2018 at the placement. She stated that Dr. Jones belittled and intimated her and another student. She informed me that Dr. Jones stated to them that they would be responsible for paying for their weekly supervision and it would be $20/week. She stated that Dr. Jones handed her an envelope with an invoice in it. She stated that she told Dr. Jones that she was not informed that she would have to pay for weekly supervision and she did not agree with the charges. Dr. Jones stated to her that she was correct, since she did not have an interview, and that is when the fee would have been discussed. Ms. Knighton stated that Dr. Jones then began to give them a lecture on their values and how paying the $20/week was an investment in their education. She stated he used examples of not buying coffee or McDonalds to afford the fee. Ms. Knighton stated that she was very upset by his comments and after he tried to hug her.

I immediately, apologized to Ms. Knighton and explained to her that we are here to support students and want to ensure that students feel safe. I further asked Ms. Knighton if she felt safe and she stated she did, but that Dr. Jones may have her address due to running a criminal background check. I informed Ms. Knighton, we could not request the paperwork since it did not belong to the school. Ms. Knighton, went on to explain that she investigated Dr. Jones and found that he was fired from Houston ISD due to not reporting child abuse within the school where he was principal. I informed Ms. Knighton that we were still investigating and trying to contact her peers that were at the placement. I informed Ms. Knighton that Dr. Jones completed an "Interruption of Field" form, due to some concerns he had in regards to her behavior. I told Ms. Knighton, I asked Dr. Jones to complete the form so that we could move her to another placement, but that she would not have to go before the professional standards

committee and we were simply going to place her at a new agency. Ms. Knighton stated that she understood. I proceeded to ask Ms. Knighton how her interview was at the new prospective placement, Ms. Knighton stated she felt it went well, but she was still very upset by the disruption and she felt that showed during her interview. I told Ms. Knighton I understood and that we would support her to find another placement quickly. Ms. Knighton stated the new placement would get back with her in a week as they have a background process and paperwork that must be completed. I informed Ms. Knighton to follow up with Ms. Terry, her Field Advisor as soon as she knew if she could start the placement. Ms. Knighton and I got off the phone with the understanding that we would assist her in getting a new placement as quickly as possible so that she would not have to drop the course. I also, requested that Ms. Knighton look at the agencies we suggested when she first completed her application with the Field Office. Ms. Knighton expressed that she was having a difficult time coping, but explained she was feeling better and was going to get some help. I informed Ms. Knighton to contact us if she needed anything.

March 6-16, 2018, after the conversation with Ms. Knighton, I checked back with the Field Advisor to see if she had started her new placement. The Field Advisor informed me that she called and emailed the contact at the new placement and he would be out until Monday, March 19, 2018; but that she was working to find other alternatives for all of the students.

March 19, 2018, The Field Liaison for Ms. Knighton reached out to her Field Advisor to inquire about the status of Ms. Knighton's placement. The Field Liaison was concerned that Ms. Knighton may not be able to complete her hours by the end of the semester. The Field Advisor provided the Liaison with an update on Ms. Knighton. At that time, the Field Advisor still had not heard back from the contact at the new placement.

On March 21, 2018, I asked the Field Advisors to look for other placements for the students as none of them had moved to a new location. However, 2 of 3 students had interviewed and were waiting to hear back from the agencies they interviewed with. Ms. Knighton emailed her Field Advisor stating that she had contacted the agencies we recommended to no avail (see email attached).

On April 4, 2018, after about 2 weeks of no communication from any of the students including Ms. Knighton, The Field Office informed Ms. Knighton and the other students they needed to complete the 240 hours for the course requirement by May 11th, if they did not feel this was feasible to contact their Academic Advisor about dropping the course.

On April 5, 2018, Ms. Knighton emailed the Field Advisor back very upset by the email sent over (see attached). I responded to Ms. Knighton by informing her of the options she had to try and find a placement to complete her hours by May 11th or to drop and roll over the hours she accrued previously once she is ready to continue her practicum hours (see attached).

April 8-13, 2018 I received an email from Ms. Knighton requesting a meeting, as I was working to schedule the meeting. I received another communication from Ms. Knighton stating she was meeting with her Academic Advisor to drop Field. I emailed Ms. Knighton providing her with a time to meet, but also asked if she needed to meet since she was planning to drop Field. Ms. Knighton emailed me back stating she was not available at the time. This was my last communication with Ms. Knighton.

On April 16, 2018, I emailed Ms. Knighton to follow up in regards to meeting with the MSW Director and myself. On this same day, Ms. Haydee Hall, called and spoke with me, she stated Ms. Knighton was having a hard time adjusting after the disruption in her placement and Ms. Hall stated that she felt Ms.

Knighton needed to take a break in order to improve her mental health. Ms. Hall stated that the student had relapsed with her bulimia due to the incident at Wellspring. Ms. Hall also informed me that Ms. Knighton was receiving assistance for this. Ms. Hall stated she would email me once she spoke with Ms. Knighton.

On April 24, 2018, Ms. Knighton emailed the Director of the MSW program to inquire about next steps. The Director emailed me and we spoke and agreed that the student should be allowed to keep her hours and should drop this semester as this was Ms. Knighton's plan according to the email.

EQUAL OPPORTUNITY SERVICES

UNIVERSITY OF
**TEXAS**
ARLINGTON

May 23, 2018

Ms. Jenifer Knighton
19543 Cabra Court
Kathy, Texas 77449

Hi Ms. Knighton,

The Office of Equal Opportunity Services (EOS) has completed its investigation of the complaint filed by you against Dr. David Jones, Owner and agency contact for Wellspring Community Institute; Dr. Dawnetta Smith, Assistant Dean School of Social work; and Ms. Kristen Terry, Academic Advisor III in the School of Social Work on allegations of discrimination based on race and disability, retaliation and sexual harassment and sexual misconduct.

You reported that Dr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. He also requested that students were to pay $20 a week to pay for licensed supervision. You also alleged that Ms. Terry and Dr. Smith did not report the complaint to the EOS or Title IX Coordinator and they failed to follow UTA policy and procedure.

Since Dr. Jones is not an employee of UT Arlington he is not subject to the policies of the University. However the University's use of Wellspring as a placement agency has been terminated. Ms. Kristen Terry is no longer an employee of UT Arlington. She resigned April 18, 2018 to take a position with another organization. She did not violate any of the policies or procedures prior to leaving university. She was responsible for reporting complaint to Dr. Smith which she did.

Dr. Smith did not violate UT Arlington's policy related to Non-discrimination in her actions to help you with your complaint against Dr. Jones and his agency. She was required to discuss the incident with Dr. Jones per the School of Social work procedures. Even though she didn't report to Equal Opportunity Services or Title IX she did consult with the University's legal department.

The final report is available for your review should you have any questions or additional information regarding your complaint. You have 10 days to provide any additional information which could change the outcome of this investigation. Otherwise the investigation will be considered closed.

As you know, retaliation against individuals who have filed a charge, or participated in an investigation or opposed any unlawful practice is prohibited and will subject the person who retaliates to disciplinary action.

13

Sincerely,

Eddie Freeman
Executive Director, Employment & Equal Opportunity Services

14

# Exhibit B

**APPEAL OF COMPLAINT INVESTIGATION AND DETERMINATION May 24, 2018**

**A.  Jenifer Knighton's Appeal May 29, 2018;**

I am a white, female student enrolled in The University of Texas at Arlington, Masters of Social Work Program Online Cohort. I had/have no prior history or reports of misconduct of any kind, at UTA or otherwise. I had a solid academic record and I was planning on furthering my education following my graduation in the Spring of 2019. I needed to successfully complete my Field Placement and Internship during the four-term time frame to graduate.

Although David Jones was not a UT Arlington employee, he is the owner of Wellspring Family and Community Institute, a previously affiliated agency of UT Arlington. He would be considered a third party. Per UTA Policy 5-513, as a responsible employee, Dr. Smith was required to contact the Title 9 coordinator, instead she contacted David Jones whom was not the field instructor for the affiliated agency. The signature of the field instructor on the learning contract are inconsistent with the signature on the Interruption of field placement that was filed against me, signed and dated on February 27, 2018, the same day that I reported abuse, sexual harassment, and extortion.

Dr. Smith contacted the UTA legal department to ask about the students being charged which she states was permitted, however in an email sent by Amy Lopez to one of the affiliated agencies on March 21, 2018, she states that charging students was against policy.

My civil rights were violated; I was sexually harassed by owner of Wellspring Family and Community Institute, a UTA Affiliated Agency; The University of Texas at Arlington has failed to address all of my concerns. Dr. Dawnetta Smith (Assistant Dean for School of Social Work) engaged in an intentional tort and fabricated my own words in her response to a complaint that I previously filed.

As a result of the above-described conduct, I have suffered and continue to suffer, great pain of mind and body, physical injury, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, nightmares, suicide ideation, humiliation, and loss of enjoyment of life; I have suffered and continue to suffer spiritually; I was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life; I had to cancel my planned vacation that I had already purchased airfare for; I have incurred extra childcare expenses; I was left with no other option other than to withdraw from my field course. I had to take an unpaid leave of absence from work. I have sustained and will continue to sustain loss of earnings and earning capacity; and/or I have incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling. I am requesting for damages; punitive damages; loss of income; I am also requesting a formal apology letter from the School of Social Work and UTA. I am requesting that the allegations against me are dissolved of and I would like that in writing. If the University of Texas At Arlington does not take my concerns seriously, I will be forced to take further action.

**B.**

I.        The University discriminated against me based on sex when it failed to respond to my February 2018 complaint of sexual harassment by the owner of the UTA approved affiliated agency where I was assigned to complete my practicum;

Jenifer Knighton's Appeal                                                                                        05/29/2018

II.     The University discriminated against me based on race when it failed to respond to my February 2018 complaint of sexual harassment by the owner of the UTA approved affiliated agency where I was assigned to complete my practicum:

III.    The University discriminated against me based on race when it failed to respond appropriately to my reports that the agency owner tried to extort money from me and another student;

IV.     The University discriminated against me based on disability when the School of Social Work denied my request for any accommodations for my disability (e.g., my request to extend the deadline for me to complete the necessary hours for my practicum); and

V.      The University retaliated against me by denying my request to extend the deadline for me to complete the necessary hours for my practicum because I reported sexual harassment to the School of Social Work in February 2018.

**C.  Relevant Information**

On January 16, 2018, I started the Spring field placement at Harbor Hospice with field instructor Brenda Galindo MSW.

On January 26, 2018, I (Jenifer Knighton) received a call from David Jones Owner of Wellspring Family and Community Institute LLC. (an affiliated agency of UTA, The University of Texas at Arlington, School of Social Work). David Jones offered me an internship with the working hours of Monday- Friday from 4:00PM to 8:00PM and Saturdays from 9:00AM to 2:00PM. David Jones asked me to come in for orientation and I explained to him that I had found a placement but I would be open to check it out.

On January 27, 2018, I attended an orientation at Wellspring Family and Community Institute LLC. (440 Benmar Dr.) in Houston, TX with David Jones, Carolyn Smith LPC-S, Kimberly Gallien LCSW, Board Member, 3 students from (UTA) and 1 student from Sam Houston State University.During orientation we (the students) were told that we would be meeting with David Jones and Carolyn Smith weekly and bi-weekly with Kimberly Gallien. Ms. Gallien was the assigned Field Instructor for UTA.

On January 29, 2018, I met with David Jones to talk about beginning my internship and sending paperwork to school. I emailed Kristen Terry to inquire about transferring to Wellspring. I Contacted Brenda and consulted with her about moving to the new placement. She was supportive of my transfer because of the idea that I would be getting more clinical skills.

On January 30, 2018, I submitted form to transfer field placement from Harbor Hospice to Wellspring.

In February of 2018, there were occasions that we (interns) were locked in the office with David Jones in the evening. There was a deadbolt lock on the door that could only be opened with a key from the inside and outside. When I questioned David Jones, he told me that the cleaning people were the ones that locked the door. I contacted the property management company and they said that the door is not locked when people are in the office due to safety reasons. David Jones made it clear that he knew if we did not complete our internship hours we would not graduate and we would fail. David Jones told us that nobody wanted us because we were non-traditional students and he was doing us a favor so he

should be the one getting paid. David Jones hugged me in the beginning of my internship. I felt uncomfortable but I was scared to tell anyone. I needed to complete the hours for my internship and I feared that my academic career would be in jeopardy if I reported David Jones. My classmate told me that she had a creepy feeling about David Jones and that she was also afraid to tell.

On February 1, 2018, I met with David Jones to discuss my available hours and new programs/projects that we would be working on. David Jones made it clear that we were not to contact the school for anything, that we needed to go through him and let him take care of things.

February 6, 2018 was my first official day at Wellspring. David Jones made me complete a psychosocial assessment on a 7-year-old child while                  ·        ··as in the room and without supervision while he counseled another family.

On February 9, 2018 I went to Valentine's Day party representing Wellspring at The Villas. (diverse senior citizen community).

On February 10, 2018, I met with Kimberly Gallien for the first time at a local library for group supervision and to sign our learning contract. I asked Kimberly if they could partner with an organization that I volunteer at so that we could complete projects for hours. Kimberly told me that she would have to double check with David Jones. I asked Kimberly if she was supposed to sign off on my hours from the previous internship. We talked about expectations and goals. I found out that Ms. Gallien did not work at Wellspring, she was contracted to provide supervision to the interns and sign off on the required hours.

On February 12, 2018, I sent an email to Haydee Hall asking her about transferring my hours from the previous internship. "Originally, I started my internship with another organization. How would I submit those hours and supervision logs? Thank you."
A client's mother called for a phone conference that I was ordered to take over. I paraphrased some things with her to make sure that I was understanding her correctly. When the phone call ended David Jones verbally insulted and belittled me in front of another intern. David Jones told me that I should not have asked her questions and that I was going to do things his way. He told me that I had institutionalized thinking and he began to criticize my place of employment. David Jones said something in similarity to me not knowing my purpose in life. He then said that he terminated an intern for following state procedure as a mandated reporter. He said that things were going to be done his way because he was the owner and nobody could fire him. David Jones said that if we didn't like it, we had the key to the door and we could unlock it and leave.

On February 13, 2018, I received a text message from David Jones stating "Ms. Knighton, last minute schedule change; No internship tonight, report on Thursday. I sent a message to Audrey Coleman and asked if her internship had been canceled as well and she confirmed that it had not.

On February 16, 2018, I submitted my weekly journal # 3 expressing some of my concerns.

On February 19, 2018, A Client from previous week came in for services with mother. They liked me and were excited for me to be working with them. Prior to meeting with them Dr. Jones met with me and
       He set it up as if it were a role play, he told us where we were going to sit, how I was going to sit and him and Audrey were going to watch me while I was providing services. David Jones stated that he

was glad that they came since we almost lost them because of me. I began to feel uncomfortable and I asked him politely if I could shadow him so that I could do things the right way or how he wanted me to do them. David Jones yelled "Oh no, no, no Ms. Knighton, you are not going to take over the show here. No, Ma'am." That evening _____ _____ was in the room.

On February 20, 2018, I received a text message from David Jones confirming an assignment he sent me via email and telling me not to come in that he would give me the 4 hours credit. He requested the information of my Licensed Chemical Dependency Counselor Intern License and contact information for one of the shelters that I do outreach at so that Wellspring could possibly partner up with the organization. I completed my background check with Identigo, the information was sent to David Jones at Wellspring.

On February 23, 2018, David Jones requested for me to call client before he went into treatment to wish him well. I did as he asked. I had a phone supervision with Kimberly Gallien. We talked for an hour about my goals and aspirations. I told her that I wanted more clinical skills and learning to complete notes. She said that she was excited for me and she saw my passion I had for people. She said that I was doing well.

On February 24, 2018, I submitted my journal entry # 4.

On February 26, 2018, I went to my internship at Wellspring as usual. I was assigned to email Mr. Jones copies of brochures that I found as he was going to use them to copy information to build his own brochure. The people present on this day were David _____ and myself. I was scrolling through the brochures and David Jones made the comment that maybe I needed a coffee fix because I was moving at a fast pace caused by ADHD. I did not respond to him. David Jones assigned me and _____ _____ to go through the brochures again and highlight certain information. We were scheduled to leave at 8:00PM. Approximately ten minutes before 8:00PM, David Jones came into the office and handed me and _____ _____ an envelope. As I opened the envelope and looked I thought "oh, wow it's a stipend." I pulled out the paper and it was a bill for $100. I asked David Jones and he said it was a stipend for supervision. I was confused and told him that we weren't supposed to be charged. He said that he told everyone that they would have to pay for Kimberly to sign off on hours. David Jones said, "well Ms. Knighton, maybe you were at a disadvantage because you didn't have an interview but everyone else did and they all knew." _____ _____ looked at him and said that he did not inform her either. He insisted that he did and if he didn't then we were told during orientation. David Jones told me that if I didn't pay I would not get credit for my intern hours that I had already completed. _____ _____ kept telling him "Dr. Jones if you would have said anything about money I would have remembered." He looked her in the face and said I told you, I know I did when I interviewed you. David Jones was twirling a key on his finger, the key dropped and he picked it up and started laughing. I sat down next t____ and I tried to reach for my cell phone but I felt paralyzed, I was scared. David Jones became irate and told us that he knew we both had money and that we were either going to pay him or we could leave and not come back. He told us that we had no values and ' _____. again told him that he did not tell her and she asked him "how can you tell me I don't have values Dr. Jones, I took a $30,000 pay cut to finish school."David Jones said that he was keeping it real because he was nothing but real and that he should be the one getting paid for having to be with us late at night. He told us that nobody wanted us because we were nontraditional students. David Jones said, "It's only $4 a day and you spend more than that on lunch." He said to _____ "what are you going to do when your kids grow up, tell them their mom chose a $4 hamburger over her master's degree?" David Jones said it was ok if we didn't pay, we just wouldn't get credit for any of the weeks that we didn't pay for including the previous weeks. I was scared by the look

on David Jones' face and in his eyes, I felt numb and I felt violated. The look on his face compared to that of a rapist or a child molester. David Jones kept us an hour over our usual scheduled time. Shortly before 9:00PM David Jones looked up at the clock and said, "Ok let's wrap it up.' ........., and David Jones walked to the front while I gathered my things and turned off the electronics. I walked to the front and David Jones was hugging .           He then walked up to me and attempted to hug me and said, "don't let this stop you from coming back." When I got in my car I burst in tears and as soon as I left the parking lot of Wellspring, I contacted                    We both agreed that we had to be courageous and report what happened.


On February 27, 2018, I cried my whole way to work. I talked to my supervisor and told her that I needed to go home because I wasn't feeling well. I contacted Haydee Hall (UTA Field Liaison) via telephone that morning. I burst out in tears and told her everything that happened on February 26, 2018. I told her I was not alone and that I was so scared.

Haydee Hall told me that she was going to contact the field office and see what needed to be done. She told me that it was good that I called and reported it and that what happened at Wellspring was not ok. Haydee Hall sent text message me to inform me that she had spoken to Kristen Terry and that Ms. Terry would be talking to Dr. Dawnetta Smith and that there would be an answer on how to proceed later that day. Haydee Hall contacted Kimberly Gallien and told her that she wanted to check on how things were going with me. Ms. Gallien reported that I was doing very well.

I returned a missed call from Kristen Terry and explained everything that happened at Wellspring with David Jones to her as well. Kristen Terry told me that Dawnetta Smith (Assistant Dean for School of Social Work) had already contacted David Jones and that there was going to be an interruption in my internship. I told her no, that I did not want that on my file because I did not do anything wrong but she said that it was procedure.

However, this is not correct. When a student no longer wants to continue at a field placement there is a specific form for the student to fill out. The form can be found on the UTA SSW website as well as in the SSW handbook.

Kristen Terry told me that her and Dr. Smith would be contacting me to have a level two meeting to discuss my behaviors at Wellspring. Kristen Terry sent me an email confirming that I would be contacted by Dr. Smith to schedule a Level II meeting. Dr. Smith was cc'd on the email.

On February 28, 2018, I was contacted by                      ' another UTA student completing her internship at Wellspring. CC informed me that she received a call from Kristen Terry telling her that she heard there was a problem at Wellspring and if she could work it out. According to CC, Kristen Terry also sent her a "weird" email asking her if she was ok with paying. The other 3 UTA students were told to go back to Wellspring to continue field placement. I also received a text message
stating that Dr. Jones told her he had spoken to Dr. Smith and they had worked something out regarding her fee               sent me a message stating that it was very scary.

On February 28, 2018, I contacted Kristen Terry and gave her information that I had found out about David Jones' background. I told her that he was deceitful because he lied about who he was and I was scared. I asked if the field office did their due diligence before affiliating agencies.


Jenifer Knighton's Appeal

05/29/2018

Kristen Terry told me that they did not have the time nor the resources and that she had told me the day before that her and Dr. Smith were going to contact me. I never heard back from them. I received a call from Natalie Eve in the field office giving me a phone number to call an agency to interview with. David Jones went into my personal Gmail email account and changed the password, recovery address, downloaded the files and deleted the account. I recovered the account. I contacted Haydee Hall and I told her that they never called me and they didn't reach out to any other students. Dr. Smith went directly to David Jones and told him that I reported him.

On March 1, 2018, I made contact with Haydee Hall informing her that I never received a call from Kristen Terry and Dr. Smith. I also let her know that I went to the interview at Memorial Hermann and I was still trying to process everything that transpired at Wellspring. She replied that she also had not heard back from them. I also received a text message fro                    stating that David Jones sent her a message telling her that her fees were covered. She also stated that he was lying and it was like he was just trying to lure her there.

On March 2, 2018, I Sent an email to Kristen Terry expressing my concerns. (Mistakenly sent from personal email.) Kristen Terry responded by telling me to make sure to go through and send email through the UTA school email and that Natalie found an agency willing to interview me. She said that she would let Dr. Smith address the rest. Kristen Terry also CC'd Dr. Smith on the email. I received an email from Haydee Hall that she was still waiting on final word from field office.

On March 6, 2018, I filed a grievance with the Office of Community Standards, Dean of Student Affairs. Dr. Dawnetta Smith and Kristen Terry were both included in the email.

On March 7, 2018, I contacted Haydee Hall and let her know that I sent an email to the person I interviewed with at Memorial Hermann. I also let her know that I never received a call from Dr. Smith and Kristen Terry never called me back.

On March 9, 2018, I received an email response to my grievance from Debra Woody telling me that she had contacted faculty at the School of Social Work and everything was taken care of and that they had found me a placement but I still had not been placed at another organization. Dean Ryan Scott and Dr. Dawnetta Smith were included on the email.

On March 12, 2018, I received the first call from Dr. Dawnetta Smith after two weeks of waiting (recording of call available upon request).

On March 21, 2018, I made contact with Haydee Hall and informed her that I still had not found a placement. I also informed her that I had filed a police report on David Jones and I was struggling with depression because of everything that happened. I received email from Kristen Terry:

"Hello,            nd Jenifer.

I hope you both are doing well. We have heard from the following agencies that are willing to interview you. We would like you two to interview by Friday so you can hopefully start Monday and not get any further behind your hours. We may have other options coming in.
Please choose which one you'd like to interview with and keep us posted of your progress:"

Jenifer Knighton's Appeal                                                                    05/29/2018

My Response to Kristen Terry: I called Adrianna at Fort Bend and left a voicemail. I also followed up with Chris at Memorial Hermann but have not got a response. I left a voicemail for him today. Galveston is almost 2 hours away from my home not including traffic. Fort Bend is an hour not including traffic. It would be feasible if I can work out schedule. I will talk to my supervisor about taking Friday off with such short notice. Also, can we complete CEUs to make up for some of the hours while we are looking? I have called a few shelters that I go to for outreach but they are all full. I tried to contact a lady from the agency I work at but I havent had much luck. I will continue to work on what I have as well in regards to resources.

On March 23, 2018, I contacted Haydee Hall and asked her if she had heard back from the school regarding my hours and supervision. I also expressed my concerns of the expectations being unrealistic.

On April 4, 2018, I received a group email from Kristen Terry disclosing personal information. She stated that she wanted to make clear the urgency of the matter and that if we did not complete 240 hours by May 11th then it would result in an automatic failure or we could drop the course. She further stated that this was a policy for all students. I still had not been placed at a new agency.                    and
                    responded to group email.

On April 5, 2018, I responded to Kristen Terry's email expressing my concerns for her lack of sensitivity due to the circumstances. I also reiterated that I was a victim of abuse and the only option the school was giving me was to be penalized for doing what was right. I received a response to the email from Dr. Smith reinforcing that if my hours were not completed "the only option is to receive an F for the course as UT Arlington Policy does not allow withdraws for field courses." Dr. Smith stated that I could withdraw from field and roll over the hours.

On April 6, 2018, I received an email from Natalie Eve stating that I had five weeks to complete the remainder 145 field hours. I still had not found a new placement.

On April 8, 2018, I responded to Dr. Smith's email and explained to her that I was proactive in searching for a new placement. I asked why I had not been contacted by anyone to check on my well-being. I also made her aware that I was having severe depression and an eating disorder relapse caused by the events that had occurred at the field placement and the response that I received from the school. Furthermore, I explained that I was aware of the policy on field courses, but due to the traumatic experience that I endured at a UTA approved agency, I expected that there would have been other options in favor of the students other than receiving an F and losing the time and money that had been invested. I also requested to know why I was not able to complete the course and roll over the hours if I was offered to withdraw from the course and roll over the hours.

On April 9, 2018, I responded to Natalie Eve's email and expressed to her that the number of hours that they were expecting me to complete was equivalent to that of a block placement and it was an injustice to me and the other students that were pulled from Wellspring. I told her that what they were expecting was unrealistic and unfair and they were not taking into consideration the wellbeing of the students. I sent a group email to Kristen Terry, Natalie Eve, and Dr. Smith about field placement interview that I had at an agency. I explained that while the agency was willing to assist me in completing my field placement, the number of hours that they were asking me to complete in the field office was unrealistic. I reiterated that the interruption in my field placement was not my fault. I also informed them that the

Jenifer Knighton's Appeal                                                      05/29/2018

process to begin with the new placement would take at least a week, leaving me with 145 hours to complete in 4 weeks, that is more hours that is required for individuals that are completing a block placement. Again, I asked why I was not able to continue the class and complete as many hours as possible and rollover the hours. I also explained that the expectations that were put on me were not appropriate. I requested to speak to someone in regard to the matter.

On April 10, 2018, I received an email from Dr. Smith asking me for dates and times to schedule a meeting with her and Dr. Mitschke, the Director of the MSW program. She stated that the field office followed through with each item promised to me. She further stated in her email that I was not pulled from Wellspring, the agency disrupted my placement and that they worked immediately to find me a new placement. However, I still had not been placed at a new placement. She also stated that I needed to make a decision about my education, how I would like to proceed and that it was not an option to receive an incomplete in the field course during the Spring and complete the rest of the hours in a later semester.

On April 11, 2018, I responded to Dr. Smith's email letting her know that I was available Monday through Friday after 3PM and during lunch hours from 12PM-12:45PM. I also requested a copy of the form that was filled out for the "disruption of my internship."

On April 16, 2018, left with no other options, I submitted form to withdraw from field course to Haydee Hall. Despite several requests for assistance, the field office and Dr. Dawnetta Smith refused to assist me in any way so that I could complete my field placement in the Spring of 2018. They failed to provide any accommodations after repeated requests and providing them with valid reasoning as to why I was requesting assistance.

I was left with no other option other than to withdraw from the field course. I received an email from Dr. Smith at almost 10:30AM stating "I received an email that you are planning to withdraw from Field this semester. Would you still like to speak with Dr. Mitschke and I? If so, we are available today at 12:30pm for a call. When you speak with your academic advisor, you should ask Ms. Davis how you can obtain a copy of your student record as the Field Office does not have this information. I have attached a copy of the disruption form. Please let me know if you have any further questions or concerns"

On April 17, 2018, I submitted a formal complaint via email to the Dean of Student Affairs, Eddie Freeman of the Equal Opportunity Services and Michelle Willbanks, the designated Title IV Coordinator for UTA. The type and basis of my complaint was for discrimination, retaliation, sexual harassment/misconduct, race, disability, and field office and faculty failed to follow policy and procedures regarding my complaint on sexual harassment/misconduct.

On April 29, 2018, after exhausting resources and complaints/grievances I emailed UTA President Mr. Vistasp Karbhari to express my concerns about the handling of my complaint following the event(s) that occurred at a UTA Affiliated Agency and lack of assistance from Field Office. I sent an email to Mr. Karbhari with a OneDrive link that provided access to all relevant information including the email correspondence, the transcribed phone call between Dr. Smith and I, and the voice recording of the phone call.

# Exhibit C

**SUMMARY OF COMPLAINT INVESTIGATION**

I.      **APPLICABLE POLICY(IES) University Policy – 5-503 Non-Discrimination Policy**

It is the policy of The University of Texas at Arlington ("the University") that no person shall, on the basis of race, color, national origin, religion, age, sex, sexual orientation, disabilities, genetic information, and/or veteran status, be denied employment with or admission to the University; or be excluded from participation in, denied the benefits of, or subject to discrimination under, any program or activity that the University sponsors or conducts. Retaliation against persons who oppose a discriminatory practice, file a charge of discrimination, or testify for, assist in, or participate in an investigative proceeding relating to discrimination is prohibited. Constitutionallyprotected expression will not be considered discrimination or harassment under this policy.

The University of Texas at Arlington complies with the Equal Pay Act of 1963, Titles VI and VII of the Civil Rights Act of 1964, Executive Order 11246, the Age Discrimination in Employment Act of 1967, Title IX of the Education Amendments of 1972, Sections 503 and 504 of the Rehabilitation
Act of 1973, the Americans with Disabilities Act of 1990, the Uniformed Services Employment and
Reemployment Rights Act of 1994, Title II of the Genetic Information Nondiscrimination Act of
2008, the Vietnam Era Veterans' Readjustment Act of 1974, the Texas Commission on Human Rights Act and their subsequent amendments, as well as other applicable federal and state laws and regulations, the Rules and Regulations of the Board of Regents of The University of Texas System, and policies and standards issued by The University of Texas System Administration.

This Non-Discrimination Policy shall be implemented throughout the University. It is the responsibility of all departments and personnel to ensure the University's compliance. The University will take prompt disciplinary action against any individuals or organizations within its control who violate this policy.

**5-513 Sexual Harassment and Sexual Misconduct Policy**

The University of Texas at Arlington ("University") is committed to maintaining a learning and working environment that is free from discrimination based on sex in accordance with Title IX of the Higher Education Amendments of 1972 (Title IX), which prohibits discrimination on the basis of sex in educational programs or activities; Title VII of the Civil Rights Act of 1964 (Title VII), which prohibits sex discrimination in employment; and the Campus Sexual Violence Elimination Act (SaVE Act). Sexual misconduct is a form of sex discrimination and will not be tolerated. As stated in the definition, sexual misconduct includes sexual harassment, sexual violence, sexual assault, stalking, domestic violence and/or dating violence. Individuals who engage in sexual misconduct and other inappropriate sexual conduct will be subject to disciplinary action.

The University will take prompt disciplinary action against any individuals or organizations within its control who violate this policy. The University encourages any student, faculty, staff or visitor to promptly report violations of this policy to an individual identified in <u>Section C.1.</u> of this Policy.

## II.   SCOPE

This policy applies to all university administrators, faculty, staff, students, and third parties within the University's control, including visitors and applicants for employment. It applies to conduct regardless of where it occurs, including off university property, if it potentially affects the complainant's education or employment with the University. It also applies regardless of the gender, gender identity or sexual orientation of the complainant or the respondent. In addition, it applies whether the complaint was made by or against a third party, and whether the complaint was made verbally or in writing.

## III.   SUMMARY

On April 17, 2018 the Office of Equal Opportunity Services received a formal complaint from Ms. Jenifer Knighton concerning allegations of discrimination based on race and disability, retaliation and sexual harassment and sexual misconduct by Dr. David Jones, Owner and agency contact for Wellspring Community Institute; Ms. Kristen Terry, Academic Advisor III in the School of Social Work; and Dr. Dawnetta Smith, Assistant Dean School of Social work. Ms. Knighton provided additional details on April 29, 2018.

It was reported that Dr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. He also requested that students were to pay $20 a week to pay for licensed supervision.

Ms. Knighton alleges that Ms. Terry and Dr. Smith did not report the complaint to the EOS or Title IX Coordinator and they failed to follow UTA policy and procedure. Ms. Knighton also filed a grievance with Social Work that did not result in an effective outcome.

## IV.   COMPLAINT

Ms. Knighton states "The social worker (Kimberly Gallien LCSW) that was supposed to supervise the students was contracted only to sign off on the student's hours while we were being supervised by David Jones, an unlicensed individual that was providing counseling services to children and families. Mr. Jones is the owner and practice manager of the organization and also contact person for UTA. Mr. Jones was unprofessional, unethical, verbally abusive, intimidating and extremely inappropriate by hugging student interns. The students were told that since he was the owner nobody could fire him and if we didn't like it we could leave and not come back. We were also told that we needed to leave all concerns that we had with the school up to him. There was a deadbolt lock that was locked on a few different occasions while interns were in the office with him in the evenings.

On February 26, 2018 I was verbally abused by David Jones, told that if I did not pay money I was not going to get credit for the previous 5 weeks I had put in. He told me and another

student that he knew we had money because we both had jobs. He twirled a key on his finger, laughed in a scary manner, and kept us an hour over scheduled. Before we left he attempted to inappropriately hug us and said 'don't let this stop you from coming back.' I felt violated, I felt like I had just been raped or molested.

The next day I followed procedure and reported it to my field liaison who reported it to UTA School of Social Work office. Dr. Dawnetta Smith (assistant dean) put my safety and the safety of other students at risk by contacting Mr. Jones and disclosing to him that I reported him. She failed to contact any of the students including myself until after she contacted him. That afternoon I was contacted by Kristen Terry from the field office telling me that I was going to be contacted by Ms.
Smith the following day to discuss my behaviors.
Things were then turned around and the blame was put on me, that I was being disruptive at the agency. Ms. Smith told Mr. Jones to file the form for an interruption of my internship. The incident was never reported to the EOS or title 9 coordinator and they failed to follow policy and procedure. I filed a grievance in March but again expressing my concern resulted in an ineffective outcome.

I cried every day for five weeks which led me into a deep depression and bulimia relapse. I was forced to withdraw from my field without any accommodations/exceptions due to the extenuating circumstances and traumatic experience that I endured at an affiliated agency of UTA. I was given no credit towards tuition on the 6 credit course that I was forced to withdraw from. Due to the emotional distress that this has caused me I had to be admitted into a partial hospitalization program which will now hinder me from continuing the field placement in the summer. When I spoke with my advisor Patricia Green who was unaware of anything that transpired, I was informed that my graduation will be prolonged an extra year.

Also, despite being told by Ms. Smith that this was not going to go against me because other students confirmed that what I was saying was true, when I requested some sort of modification due to the extenuating circumstances, it was denied and I was told that I was not pulled from Wellspring, the agency disrupted my internship. I requested a copy of the form and after reviewing it I saw that it was signed the same day that I reported the agency.

The response or lack of that I have received from the school goes against every value that we have been taught by the school. The way that I have been treated by the faculty from the school of social work is unjust and a violation of the NASW Code of Ethics. As mandated reporters they also failed to report the sexual misconduct that occurred at the field placement. Instead they retaliated against me and had David Jones file an interruption of internship."

V.    **Dr. Dawnetta Smith's Response to Complaint (Full statement Attached)**
"On February 27, 2018, I was informed by Kristen Terry, the then Field Advisor for BSW/Foundation MSW students, that the students at Wellspring Counseling were being

charged for their weekly supervision. She also informed me that an inappropriate conversation took place with two of the students at Wellspring, where the CEO, Dr. David Jones, belittled the students. Kristen further explained that one of the students felt violated because the CEO attempted to hug her, and she wanted a new placement. I immediately contacted the agency, Dr. Jones specifically, as I wanted to get a better understanding of what was happening as we had three other students placed at the agency.

On February 27, 2018, I called and spoke with Dr. Jones, CEO of Wellspring Counseling. Before we began our conversation, Dr. Jones stated, I am so glad you called me I have some concerns with one of your students. He stated for me to continue with the reason for my call and he would address his concerns after. I proceeded to ask Dr. Jones, if the agency charged students for weekly supervision. To which he replied; yes, we have always charged students for weekly supervision and after-hours services. He stated that he had two contracted therapists, one being a LMSW, and the therapist charges students for supervision since they keep their doors open to accommodate working students. I asked him, if he informed the previous Assistant Dean about this and he stated "no"; it was an agreement between his agency and the students. Mr. Jones stated that the students are informed of this before beginning their hours. I asked him if the students signed an agreement with this information and he stated "no". He informed me that he has students from various universities, such as UH and any student needing to complete hours after the traditional work hours and have weekly supervision are charged $20/week for supervision. He went on to state that one of the students, Ms. Knighton, was not informed of this because she did not attend the orientation. He stated Ms. Knighton contacted him just before the semester was to start and he told her she could start the following week. He stated I also have some concerns with this student. I stated to Dr. Jones, that I understood and while I did not agree with this policy, he needed to have sent the Field Office this information upfront and he needed to put something in writing so students understood this and were not blindsided with an invoice. I further informed Dr. Jones, that I would check into the charge with CSWE, one of our accreditation bodies, and UT Arlington. I wanted to ensure that there was not a rule against this for our students.

I then proceeded to ask Dr. Jones about a conversation he had with 2 UT Arlington students on February 26, 2018. Dr. Jones, informed me that he met with the students to provide them with their invoices for supervision. He stated that both students were upset about the charges but by the end of the conversation, he felt they had reached an agreement. I then asked Dr. Jones, did he attempt to hug the students. He stated that he was standing in between both students as they were leaving the meeting and he put his arm around the students and told them they were going to be "okay". I informed Dr. Jones, that was inappropriate and he should not touch a student unless he first asks. Dr. Jones stated that he was not trying to be inappropriate but wanted the students to know that he supported them. He further stated, that he would not let that happen again.

As Dr. Jones and I were wrapping up, I informed Dr. Jones, that Ms. Knighton would not be returning as she was upset about the charges for weekly supervision and the conversation he had with her and another student. Dr. Jones then stated that he had some concerns in regards

to Ms. Knighton and was not sure she was a good fit for the agency. Dr. Jones stated that Ms. Knighton asked the therapist if she would be able to sign off on some extra hours. Dr. Jones also stated that Ms. Knighton was having inappropriate conversations while working, such as talking about being intoxicated. He stated that he felt, Ms. Knighton was upset about having to pay the money and reiterated that she has displayed inappropriate behaviors on more than one occasion, even with clients, and he did not feel she would a good fit for the agency. With Dr. Jones voicing such concerns, I asked him to complete an "Interruption of Field" form for the student as she was going to be placed with a new agency immediately per her request. He complied and sent over the form that afternoon.

On February 27, 2018, I immediately, asked all of the Field Advisors to work to find Ms. Knighton a new placement. The Field Advisors found Ms. Knighton a new placement within February 28, 2018, and Ms. Knighton interviewed at the new placement on March 2, 2018. I had not talked with Ms. Knighton as, Kristen Terry had been in communication with the student. However, Ms.
Terry informed me that Ms. Knighton wanted to speak with me.
On February 27, 2018, I contacted UT Arlington's Legal department to inquire about students being charged for weekly supervision at their Field placements. The Field Office also contacted CSWE to inquire if there was a policy against this. Both stated this was allowable.

On March 6, 2018, I received an email that included a grievance from Ms. Knighton. I spoke with Dr. Woody about the grievance and informed her that we immediately moved the student and she interviewed with another agency. However, the student was still waiting on a response from the new agency as to if she would be accepted. I informed Dr. Woody that I had not had an opportunity to speak with the student, but that Kristen, Natalie and Haydee had each been in communication with the student consistently since she informed us of her concerns.

I gave Ms. Knighton a call following my meeting with Dr. Woody. During my call with Ms. Knighton, she proceeded to explain to me what happened during the evening of February 26, 2018 at the placement. She stated that Dr. Jones belittled and intimated her and another student. She informed me that Dr. Jones stated to them that they would be responsible for paying for their weekly supervision and it would be $20/week. She stated that Dr. Jones handed her an envelope with an invoice in it. She stated that she told Dr. Jones that she was not informed that she would have to pay for weekly supervision and she did not agree with the charges. Dr. Jones stated to her that she was correct, since she did not have an interview, and that is when the fee would have been discussed. Ms. Knighton stated that Dr. Jones then began to give them a lecture on their values and how paying the $20/week was an investment in their education. She stated he used examples of not buying coffee or McDonalds to afford the fee. Ms. Knighton stated that she was very upset by his comments and after he tried to hug her.

I immediately, apologized to Ms. Knighton and explained to her that we are here to support students and want to ensure that students feel safe. I further asked Ms. Knighton if she felt

safe and she stated she did, but that Dr. Jones may have her address due to running a criminal background check. I informed Ms. Knighton, we could not request the paperwork since it did not belong to the school. Ms. Knighton, went on to explain that she investigated Dr. Jones and found that he was fired from Houston ISD due to not reporting child abuse within the school where he was principal. I informed Ms. Knighton that we were still investigating and trying to contact her peers that were at the placement. I informed Ms. Knighton that Dr. Jones completed an "Interruption of Field" form, due to some concerns he had in regards to her behavior. I told Ms. Knighton, I asked Dr. Jones to complete the form so that we could move her to another placement, but that she would not have to go before the professional standards committee and we were simply going to place her at a new agency. Ms. Knighton stated that she understood. I proceeded to ask Ms. Knighton how her interview was at the new prospective placement, Ms. Knighton stated she felt it went well, but she was still very upset by the disruption and she felt that showed during her interview. I told Ms. Knighton I understood and that we would support her to find another placement quickly. Ms. Knighton stated the new placement would get back with her in a week as they have a background process and paperwork that must be completed. I informed Ms. Knighton to follow up with Ms. Terry, her Field Advisor as soon as she knew if she could start the placement. Ms. Knighton and I got off the phone with the understanding that we would assist her in getting a new placement as quickly as possible so that she would not have to drop the course. I also, requested that Ms. Knighton look at the agencies we suggested when she first completed her application with the Field Office. Ms. Knighton expressed that she was having a difficult time coping, but explained she was feeling better and was going to get some help. I informed Ms. Knighton to contact us if she needed anything."

VI.   **WITNESSES AND SIGNIFICANT DOCUMENTS**

Each of the three other students in Ms. Knighton's Field placement were contacted concerning the allegations in her complaint. None of the students reported feeling physically threatened by or fearful of Dr. Jones. They all stated Dr. Jones had belittled them and was verbally abusive at times but did not fear for their safety.

They were never informed prior to February 26th of the charge for supervision. They felt his actions were unethical in asking for money but not informing them prior to them starting or they would have chosen another agency.

confirmed that Dr. Jones attempted to hug her and Ms. Knighton after the meeting on February 26th but she deflected his attempt. She mentioned how he was belittling them and insisting since they had jobs they could afford to pay. She did not say that they were being sexually harassed.

All students felt the communication from Social Work was not very good and the school could have done a better job of reviewing agency prior to placement.

The students mentioned that the doors were locked but this was an after-hours facility. So they assumed it was to keep people from coming in who didn't have an appointment.

Two of the students were able to be placed at another facility and are able to get the hours necessary to complete program                    was in the wrong placement to begin with due to a mix up in registration. Attempts to place Ms. Knighton in another facility were unsuccessful.

**VII.   ANALYSIS and FINDING: VIOLATION OF UNIVERSITY POLICIES/PROCEDURES**

A. Dr. Jones is not subject to UTA policies and is only held responsible for the contractual obligations specified in contract with School of Social Work to provide premises, personnel, services, and all other items necessary for educational experience of students placed there.

The School of Social Work field education program specifies the credentials and practice experience of its field instructors necessary to design field learning opportunities for students to demonstrate program social work competencies. Field instructors for master's students hold a master's degree in social work from a CSWE-accredited program and have 2 years post-master's social work practice experience. For cases in which a field instructor does not hold a CSWE-accredited social work degree or does not have the required experience, the program assumes responsibility for reinforcing a social work perspective and describes how this is accomplished.

In order to uphold the standard, Social Work requires all Field Instructors to submit their resume and complete an application in our student/agency tracking system, E-Intern. When an agency has a Task Supervisor (in this case Dr. Jones), Social Work informs the Field Instructor (Ms. Kimberly Gillen) that they are responsible for the students' supervision and documentation. However, the Task Supervisor may oversee some of the day to day duties of the students and even assign duties that are approved by the Field Instructor.

The School of Social Work has terminated its relationship with Wellspring as a field placement agency on March 12th due to the following reasons which were violations of Educational Experience Affiliation Agreement and standards stated above:

- Multiple students (3 of the 4) stating they were not told about the weekly supervision fee during the initial interview/orientation.
- Dr. Jones, did not inform the School of Social Work about the fee and told the students not to contact the School for anything that only the agency should contact Social Work.
- After discussion with Dr. Jones, Dr. Smith felt he was trying to intimidate the students and insist that they pay the fee or they would not be able to find another placement.
- The School of Social Work received further information that the students were not receiving weekly supervision from the Field Instructor, the students were only

being supervised by Dr. Jones. This is a violation of the CSWE accreditation standards as Dr. Jones does not have the proper credentials to be a Field Instructor for Social Work students.

B. Ms. Knighton informed Dr. Smith that she would not be returning to the agency on February 27th when she called to complain about Dr. Jones charging a fee for supervision and what she perceived as inappropriate behavior.

Dr. Smith contacted Dr. Jones after Ms. Knighton's call to discuss what she had heard concerning charging students for providing outside supervision. Dr. Smith also informed Dr. Jones that hugging or touching students was inappropriate. During the call with Dr. Jones brought up concerns about Ms. Knighton before Dr. Smith mentioned concerns about charging students and inappropriate behavior

UT Arlington's association with facility was terminated due to Dr. Jones not disclosing charging a fee for supervision and not providing the appropriate and agreed upon services. The two students were able to find another placement and complete their hours.

C. Ms. Knighton alleges that Dr. Smith's contacting Dr. Jones put her and the other students at risk. However none of the other students felt that they were in any danger from Dr. Jones.
Ms. Knighton continues to fear for her safety and fears Dr. Jones will try to harm her. However it should be noted that Dr. Jones has not had any further contact with Ms. Knighton since February 26th and has not talked to any of the other students since March 1st.

D. Dr. Smith has taken no action on the Interruption of Field Placement Form that was sent by Dr. Jones. Ms. Haydee Hall (Field Liaison) had concerns about this form being filed by Dr. Jones. She stated in an email dated April 16, 2018 that there was a difference between her conversation with the Field Instructor Ms. Gallien and what was written on the form. A copy was sent to Ms. Knighton per her request on April 16, 2018. The form was not submitted to the professional standards committee as was told to Ms. Knighton by Ms. Terry. Dr. Smith held on to the form because of her and Ms. Hall's concerns with agency and the form was not placed in Ms. Knighton's student file or apart of her record.

E. Ms. Kristen Terry reported Ms. Knighton's complaint to her supervisor Dr. Smith which was the appropriate action to take concerning this matter. However Ms. Terry handling of placing students at another agency did show a lack of insensitivity to the situation the students were facing. Instead of sending the students an individual email to check on their status she sent a group email describing each student's situation.

SUMMARY OF COMPLAINT INVESTIGATION                                      06/22/2018

## VIII.   ADDITIONAL COMMENTS BY MS. KNIGHTON

Ms. Knighton was provided a preliminary copy of the report and submitted the following requests and comments:

1. "I am requesting for damages; punitive damages; Loss of Income; I am also requesting a formal apology letter from the School of Social Work and UTA. I am requesting that the allegations against me are dissolved of and I would like that in writing."

   I       have recommended that the University reimburse Ms. Knighton the tuition for her clinical course. I have not found that and UTA policies were violated which would justify any other payments, but rather the School of Social Work reacted timely to investigate Ms. Knighton's complaint and remove her from the placement. There are no allegations pending against Ms. Knighton.

2. "The University discriminated against me based on sex when it failed to respond to my February 2018 complaint of sexual harassment by the owner of the UTA approved affiliated agency where I was assigned to complete my practicum; "

   Ms. Knighton selected this agency from a list provided to her after her first selection did not work with her schedule. The University did act on Ms. Knighton's complaint in a timely fashion and it worked on finding her a new placement. The termination of UTA's agreement with Wellspring was a result of Ms. Knighton bringing Dr. Jones' behavior to Dr. Smith's attention.

3. "The University discriminated against me based on race when it failed to respond to my February 2018 complaint of sexual harassment by the owner of the UTA approved affiliated agency where I was assigned to complete my practicum:"

   I       have found no evidence that Ms. Knighton's race was a factor in how the complaint was handled. The School of Social Work responded timely to her complaint and investigated immediately. The School of Social Work's policy called for them to inform the agency of the complaint and allow them to respond as part of the investigation. The same procedure would have been followed by Equal Opportunity Services or Title IX investigators regardless of race.

4. "The University discriminated against me based on race when it failed to respond appropriately to my reports that the agency owner tried to extort money from me and another student;"

   The School of Social Work did respond to Dr. Jones requesting payment from students and communicated it needed to stop immediately and that was not a part of the contract. I found no evidence that any students paid money to Dr. Jones.

5. "The University discriminated against me based on disability when the School of Social Work denied my request for any accommodations for my disability (e.g., my request to extend the deadline for me to complete the necessary hours for my practicum); and"

> The University has a formal process for students requesting accommodation based on a disabilities. The Office for Students with Disabilities is where requests for accommodations are required to be submitted and not to the School of Social work. Ms. Knighton registered with the Office for Students with Disabilities in October 2017 and therefore knew the process. The School of Social Work maintains that they were not aware of any such possible disability until after the placement was disrupted.

6. "The University retaliated against me by denying my request to extend the deadline for me to complete the necessary hours for my practicum because I reported sexual harassment to the School of Social Work in February 2018."

> The School of Social Work attempted to find Ms. Knighton another placement and setup an appointment with three agencies. The Field Advisors found Ms. Knighton a potential placement on February 28, 2018 with Herman Memorial Hospital and she interviewed at the potential placement on March 2, 2018. She dropped field because she was unable to find/secure a new placement in sufficient time. Ms. Knighton alleges she was not able to find another placement due to the experience at Wellspring She tried, but was unsuccessful. The same offer was made to students and (         ) who were able to secure another placement and complete the necessary hours.

> The School also agreed to give her credit for the hours completed at the two prior agencies. The School of Social Work does not usually allow this, but did in this instance. The number of hours needed is a minimum, and many students do more because they have to complete the work with their clients. It is very possible that, even with any credited hours, any new placement will still require her to be at her internship for more than the minimum (or more than her remaining balance). Ultimately, it is about her learning, not the specific number of hours (like in any class).

## IX.   CONCLUSION AND RECOMMENDATIONS

Dr. Jones would not be subject to discipline under the policies of the University of Texas at Arlington because he is not an employee. However his actions were cause for the University to discontinue its use of Wellspring as a placement agency and UTA has terminated that contract.

Ms. Kristen Terry is no longer an employee of UT Arlington. She resigned April 18, 2018 to take a position with another organization. There is no evidence she violated any of the policies or procedures prior to leaving the university. She was responsible for reporting complaint to Dr. Smith which she did. Her handling of placing students after Wellspring could have better.

It is EOS determination that Dr. Smith did not violate either of UT Arlington's policies in her actions to help Ms. Knighton with her complaint against Dr. Jones and his agency. She acted according to School of Social Work policy and procedure to take prompt action regarding Ms. Knighton's complaint and to find her another placement.

The Interruption of Field Placement Form that was sent by Dr. Jones to Dr. Smith is not a part of Ms. Knighton's student record. The form was also not submitted to the professional standards committee which would have been the procedure had Dr. Smith not believed Ms. Knighton's complaint. Also, Ms. Hall sent a follow up email pointing out the discrepancy in the Field Instructor's verbal evaluation verses what was written on the form which was a factor in no action being taken against Ms. Knighton.

Ms. Knighton was refunded her 100% of tuition costs related to this placement.

There are other recommendations that will be discussed with the Dean of Social Work concerning process of selecting and monitoring field placements and agencies.

SUMMARY OF COMPLAINT INVESTIGATION                                      06/22/2018

**Attachment I:**

**Response to Complaint filed by Jenifer Knighton by Dawnetta Smith, Assistant Dean on April 30, 2018.**

On February 27, 2018, I was informed by Kristen Terry, the then Field Advisor for BSW/Foundation MSW students, that the students at Wellspring Counseling were being charged for their weekly supervision. She also informed me that an inappropriate conversation took place with two of the students at Wellspring, where the CEO, Dr. David Jones, belittled the students. Kristen further explained that one of the students felt violated because the CEO attempted to hug her, and she wanted a new placement. I immediately contacted the agency, Dr. Jones specifically, as I wanted to get a better understanding of what was happening as we had three other students placed at the agency.

On February 27, 2018, I called and spoke with Dr. Jones, CEO of Wellspring Counseling. Before we began our conversation, Dr. Jones stated, I am so glad you called me I have some concerns with one of your students. He stated for me to continue with the reason for my call and he would address his concerns after. I proceeded to ask Dr. Jones, if the agency charged students for weekly supervision. To which he replied; yes, we have always charged students for weekly supervision and after-hours services. He stated that he had two contracted therapists, one being a LMSW, and the therapist charges students for supervision since they keep their doors open to accommodate working students. I asked him, if he informed the previous Assistant Dean about this and he stated "no"; it was an agreement between his agency and the students. Mr. Jones stated that the students are informed of this before beginning their hours. I asked him if the students signed an agreement with this information and he stated "no". He informed me that he has students from various universities, such as UH and any student needing to complete hours after the traditional work hours and have weekly supervision are charged $20/week for supervision. He went on to state that one of the students, Ms. Knighton, was not informed of this because she did not attend the orientation. He stated Ms. Knighton contacted him just before the semester was to start and he told her she could start the following week. He stated I also have some concerns with this student. I stated to Dr. Jones, that I understood and while I did not agree with this policy, he needed to have sent the Field Office this information upfront and he needed to put something in writing so students understood this and were not blindsided with an invoice. I further informed Dr. Jones, that I would check into the charge with CSWE, one of our accreditation bodies, and UT Arlington. I wanted to ensure that there was not a rule against this for our students.

I then proceeded to ask Dr. Jones about a conversation he had with 2 UT Arlington students on February 26, 2018. Dr. Jones, informed me that he met with the students to provide them with their invoices for supervision. He stated that both students were upset about the charges but by the end of the conversation, he felt they had reached an agreement. I then asked Dr. Jones, did he attempt to hug the students. He stated that he was standing in between both students as they were leaving the meeting and he put his arm around the students and told them they were going to be "okay". I informed Dr. Jones, that was inappropriate and he should not touch a student unless he first asks.

SUMMARY OF COMPLAINT INVESTIGATION                    06/22/2018

Dr. Jones stated that he was not trying to be inappropriate but wanted the students to know that he supported them. He further stated, that he would not let that happen again.

As Dr. Jones and I were wrapping up, I informed Dr. Jones, that Ms. Knighton would not be returning as she was upset about the charges for weekly supervision and the conversation he had with her and another student. Dr. Jones then stated that he had some concerns in regards to Ms. Knighton and was not sure she was a good fit for the agency. Dr. Jones stated that Ms. Knighton asked the therapist if she would be able to sign off on some extra hours. Dr. Jones also stated that Ms. Knighton was having inappropriate conversations while working, such as talking about being intoxicated. He stated that he felt, Ms. Knighton was upset about having to pay the money and reiterated that she has displayed inappropriate behaviors on more than one occasion, even with clients, and he did not feel she would a good fit for the agency. With Dr. Jones voicing such concerns, I asked him to complete an "Interruption of Field" form for the student as she was going to be placed with a new agency immediately per her request. He complied and sent over the form that afternoon.

On February 27, 2018, I immediately, asked all of the Field Advisors to work to find Ms. Knighton a new placement. The Field Advisors found Ms. Knighton a new placement within February 28, 2018, and Ms. Knighton interviewed at the new placement on March 2, 2018. I had not talked with Ms. Knighton as, Kristen Terry had been in communication with the student. However, Ms. Terry informed me that Ms. Knighton wanted to speak with me.

On February 27, 2018, I contacted UT Arlington's Legal department to inquire about students being charged for weekly supervision at their Field placements. The Field Office also contacted CSWE to inquire if there was a policy against this. Both stated this was allowable.

On March 6, 2018, I received an email that included a grievance from Ms. Knighton (please see attached).  I spoke with Dr. Woody about the grievance and informed her that we immediately moved the student and she interviewed with another agency. However, the student was still waiting on a response from the new agency as to if she would be accepted. I informed Dr. Woody that I had not had an opportunity to speak with the student, but that Kristen, Natalie and Haydee had each been in communication with the student consistently since she informed us of her concerns.

I gave Ms. Knighton a call following my meeting with Dr. Woody. During my call with Ms. Knighton, she proceeded to explain to me what happened during the evening of February 26, 2018 at the placement.
She stated that Dr. Jones belittled and intimated her and another student. She informed me that Dr. Jones stated to them that they would be responsible for paying for their weekly supervision and it would be $20/week. She stated that Dr. Jones handed her an envelope with an invoice in it. She stated that she told Dr. Jones that she was not informed that she would have to pay for weekly supervision and she did not agree with the charges. Dr. Jones stated to her that she was correct, since she did not have an interview, and that is when the fee would have been discussed. Ms. Knighton stated that Dr. Jones then began to give them a lecture on their values and how paying the $20/week was an investment in their education. She stated he used examples of not buying coffee

or McDonalds to afford the fee. Ms. Knighton stated that she was very upset by his comments and after he tried to hug her.

I immediately, apologized to Ms. Knighton and explained to her that we are here to support students and want to ensure that students feel safe. I further asked Ms. Knighton if she felt safe and she stated she did, but that Dr. Jones may have her address due to running a criminal background check. I informed Ms. Knighton, we could not request the paperwork since it did not belong to the school. Ms. Knighton, went on to explain that she investigated Dr. Jones and found that he was fired from Houston ISD due to not reporting child abuse within the school where he was principal. I informed Ms. Knighton that we were still investigating and trying to contact her peers that were at the placement. I informed Ms. Knighton that Dr. Jones completed an "Interruption of Field" form, due to some concerns he had in regards to her behavior. I told Ms. Knighton, I asked Dr. Jones to complete the form so that we could move her to another placement, but that she would not have to go before the professional standards committee and we were simply going to place her at a new agency. Ms. Knighton stated that she understood. I proceeded to ask Ms. Knighton how her interview was at the new prospective placement, Ms. Knighton stated she felt it went well, but she was still very upset by the disruption and she felt that showed during her interview. I told Ms. Knighton I understood and that we would support her to find another placement quickly. Ms. Knighton stated the new placement would get back with her in a week as they have a background process and paperwork that must be completed. I informed Ms. Knighton to follow up with Ms. Terry, her Field Advisor as soon as she knew if she could start the placement. Ms. Knighton and I got off the phone with the understanding that we would assist her in getting a new placement as quickly as possible so that she would not have to drop the course. I also, requested that Ms. Knighton look at the agencies we suggested when she first completed her application with the Field Office. Ms. Knighton expressed that she was having a difficult time coping, but explained she was feeling better and was going to get some help. I informed Ms. Knighton to contact us if she needed anything.

March 6-16, 2018, after the conversation with Ms. Knighton, I checked back with the Field Advisor to see if she had started her new placement. The Field Advisor informed me that she called and emailed the contact at the new placement and he would be out until Monday, March 19, 2018; but that she was working to find other alternatives for all of the students.

March 19, 2018, The Field Liaison for Ms. Knighton reached out to her Field Advisor to inquire about the status of Ms. Knighton's placement. The Field Liaison was concerned that Ms. Knighton may not be able to complete her hours by the end of the semester. The Field Advisor provided the Liaison with an update on Ms. Knighton. At that time, the Field Advisor still had not heard back from the contact at the new placement.

On March 21, 2018, I asked the Field Advisors to look for other placements for the students as none of them had moved to a new location. However, 2 of 3 students had interviewed and were waiting to hear back from the agencies they interviewed with. Ms. Knighton emailed her Field Advisor stating that she had contacted the agencies we recommended to no avail (see email attached).

SUMMARY OF COMPLAINT INVESTIGATION                                    06/22/2018

On April 4, 2018, after about 2 weeks of no communication from any of the students including Ms. Knighton, The Field Office informed Ms. Knighton and the other students they needed to complete the 240 hours for the course requirement by May 11th, if they did not feel this was feasible to contact their Academic Advisor about dropping the course.

On April 5, 2018, Ms. Knighton emailed the Field Advisor back very upset by the email sent over (see attached). I responded to Ms. Knighton by informing her of the options she had to try and find a placement to complete her hours by May 11th or to drop and roll over the hours she accrued previously once she is ready to continue her practicum hours (see attached).

April 8-13, 2018 I received an email from Ms. Knighton requesting a meeting, as I was working to schedule the meeting. I received another communication from Ms. Knighton stating she was meeting with her Academic Advisor to drop Field. I emailed Ms. Knighton providing her with a time to meet, but also asked if she needed to meet since she was planning to drop Field. Ms. Knighton emailed me back stating she was not available at the time. This was my last communication with Ms. Knighton.

On April 16, 2018, I emailed Ms. Knighton to follow up in regards to meeting with the MSW Director and myself. On this same day, Ms. Haydee Hall, called and spoke with me, she stated Ms. Knighton was having a hard time adjusting after the disruption in her placement and Ms. Hall stated that she felt Ms. Knighton needed to take a break in order to improve her mental health. Ms. Hall stated that the student had relapsed with her bulimia due to the incident at Wellspring. Ms. Hall also informed me that Ms.
Knighton was receiving assistance for this. Ms. Hall stated she would email me once she spoke with Ms. Knighton.

On April 24, 2018, Ms. Knighton emailed the Director of the MSW program to inquire about next steps. The Director emailed me and we spoke and agreed that the student should be allowed to keep her hours and should drop this semester as this was Ms. Knighton's plan according to the email.

SUMMARY OF COMPLAINT INVESTIGATION                                    06/22/2018

JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS
Jenifer Lyne Knighton

**(b)** County of Residence of First Listed Plaintiff   Harris
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

## DEFENDANTS
The University Of Texas At Aelington

County of Residence of First Listed Defendant   Tarrant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1  U.S. Government Plaintiff

☒ 3  Federal Question *(U.S. Government Not a Party)*

☐ 2  U.S. Government Defendant

☐ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / Product Liability |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & / ☐ 367 Health Care/ |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' / Product Liability |  | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / ☐ 368 Asbestos Personal ☐ 340 Marine / Injury Product Liability |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / **PERSONAL PROPERTY** |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle / ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | Product Liability / ☐ 380 Other Personal | ☐ 720 Labor/Management Relations | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | ☐ 360 Other Personal / Property Damage Injury / ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
|  | ☐ 362 Personal Injury - / Product Liability Medical Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
|  |  | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 791 Employee Retirement |  | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights / **Habeas Corpus:** | Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting / ☐ 463 Alien Detainee |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment / ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 |  |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations / ☐ 530 General |  |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - / ☐ 535 Death Penalty | **IMMIGRATION** |  |  |
| ☐ 290 All Other Real Property | Employment / **Other:** | ☐ 462 Naturalization Application |  |  |
|  | ☐ 446 Amer. w/Disabilities - / ☐ 540 Mandamus & Other Other / ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions |  |  |
|  | ☒ 448 Education / ☐ 555 Prison Condition |  |  |  |
|  | ☐ 560 Civil Detainee - Conditions of Confinement |  |  |  |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from Another District *(specify)*   ☐ 6 Multidistrict Litigation - Transfer   ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983, Title IX

Brief description of cause:
discrimination retaliation, defamation

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER   Klocke vs. UTA

DATE  9/24/18

SIGNATURE OF ATTORNEY OF RECORD  Jenifer Knighton Pro Se.

**FOR OFFICE USE ONLY**

RECEIPT #        AMOUNT  400 00   APPLYING IFP        JUDGE        MAG. JUDGE

MW031380